UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| OCTAL INC.,<br>OCTAL SAOC-FSZ<br><br>    Plaintiffs,<br><br>  v.<br><br>United States,<br>    Defendant. | Court No. 20-03697 |

## COMPLAINT

Plaintiffs OCTAL Inc., and OCTAL SAOC-FSZ (collectively "OCTAL" or "Plaintiffs"), by and through their counsel, state the following claims against Defendant, the United States:

## JURISDICTIONAL STATEMENT

1. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) because the action is commenced under Section 516A of the Tariff Act of 1930, as amended, 19 U.S.C. 1516a(a)(2)(A)(i)(II) and (B)(i). This action contests the final determination issued by the U.S. Department of Commerce ("Commerce" or the "Department") in the final less-than-fair-value determination of polyethylene terephthalate sheet ("PET sheet") from Oman (Commerce Case No. A-523-813) for the period of July 1, 2018, through June 30, 2019. *See Polyethylene Terephthalate Sheet from the Sultanate of Oman: Final Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 44,278 (Jul. 22, 2020) ("Final Determination"); and *Polyethylene Terephthalate Sheet from the Sultanate of Oman: Anti-Dumping Duty Order*, 85 Fed. Reg. 55,824 (Sep. 10, 2020) ("AD Order").

2. Commerce's analysis of issues raised in the Final Determination is contained in the "Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Polyethylene Terephthalate Sheet from the Sultanate of Oman," issued on July 16, 2020 (the "Final IDM").

**STANDING OF PLAINTIFFS**

3. Plaintiff OCTAL Inc., is a U.S. importer of the subject merchandise. Plaintiff OCTAL SAOC-FSZ is a foreign producer and exporter of subject merchandise. Plaintiffs are, therefore, interested parties as defined in section 771(9)(A) and 516A(f)(3) of the Tariff Act of 1930, as amended, 19 U.S.C. §§ 1677(9)(A) and 1516a(f)(3). Plaintiffs fully participated in the proceeding being challenged.

4. Accordingly, Plaintiffs individually have standing to bring this action under 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c).

**TIMELINESS OF THIS ACTION**

5. Commerce published its notice of the contested final affirmative determination of sales at less than fair value on July 22, 2020. *See* 85 Fed. Reg. 44,278. The AD Order was subsequently published on September 10, 2020. *See* 85 Fed. Reg. 55,824.

6. This action was commenced with the filing of the Summons on September 29, 2020, which was within 30 days after publication of the AD Order. Accordingly, this action is timely filed under 19 U.S.C § 1516a(a)(2)(A)(i)(II).

**STATEMENT OF FACTS**

7. The underlying agency proceeding started with the filing of a petition on July 9, 2019, seeking the imposition of antidumping ("AD") duties on imports of PET sheet from the Sultanate of Oman on July 9, 2019. *See* Petitions for the Imposition of Antidumping Duties:

Polyethylene Terephthalate Sheet from the Republic of Korea, Mexico, and the Sultanate of Oman (Jul. 9, 2019) (hereinafter, the "Petition").

8. On August 19, 2019, Commerce initiated a less-than-fair-value investigation on imports of PET sheet from Oman. *See Polyethylene Terephthalate Sheet from the Republic of Korea, Mexico, and the Sultanate of Oman: Initiation of Less-than-Fair-Value Investigations*, 84 Fed. Reg. 44,854 (Aug. 27, 2019) ("Initiation Notice").

9. Commerce selected OCTAL SAOC-FSZ as a mandatory respondent in the underlying anti-dumping investigation—since it was the sole producer/exporter identified on the record. *See Polyethylene Terephthalate Sheet From the Sultanate of Oman: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 85 Fed. Reg. 12,513 (Mar. 3, 2020) ("Preliminary Determination").

10. On September 6, 2019, Commerce issued its AD questionnaire to OCTAL. Commerce's AD questionnaire consisted of five sections (Section A through Section E) as well as seven appendices. Appendix I was entitled "Glossary of Terms" and set forth Commerce's definition of "affiliated persons." Commerce's AD questionnaire issued to OCTAL was made available Petitioners' counsel.

11. On October 4, 2019 OCTAL submitted its response to Section A of the Commerce's AD questionnaire. OCTAL's Section A response included 44 pages of narrative responses, and 22 exhibits providing further details and supporting evidence.

12. OCTAL's Section A response included OCTAL's answer to question 2, which was entitled "Corporate Structure and Affiliations." Question 2 contained nine separate sub-questions seeking information about OCTAL's corporate structure and all relationships that

OCTAL had with any entity involved in the production or sale of the PET sheet. Specifically, sub-question 2c asked the following:

> Provide an organization chart and description of your company's legal structure. <u>Include</u> any parent companies and subsidiaries of your company and <u>all other persons affiliated with your company and provide a description of all such persons.</u>

13. DOC Questionnaire, Section A, Question 2c. OCTAL dutifully answered to Section A questionnaire, including question 2. OCTAL's answer included a list of all corporate entities that met Commerce's definition of "affiliated persons." *See* Section A Response, Exhibit A-5, List of OCTAL SAOC FZC Affiliated Companies and Shareholders. Such list of affiliated persons did not include any of OCTAL's U.S. customers.

14. OCTAL's Section A response also included Exhibits. Exhibit A-9 provided examples of OCTAL's written contracts with its U.S. customers.

15. On October 16, 2019, petitioners submitted their comments on OCTAL's Section A response. Petitioners' comments contained 17 pages, including suggested follow-up questions requests for OCTAL. Although petitioners included comments about OCTAL's parent company relationships, petitioners did not make any comments whatsoever about OCTAL's responses (and supporting documentation) that OCTAL was not "affiliated" with any of its U.S. customers.

16. On November 5, 2019, Commerce issued its supplemental questionnaire concerning OCTAL's Section A response. Commerce's supplemental Section A questionnaire contained 19 questions. Although there were separate questions seeking clarification and additional documentation concerning OCTAL's relationship with its parent company, Commerce's supplemental questionnaire did not contain a single question related to OCTAL's response that OCTAL was not "affiliated" with any of its U.S. customers.

17. On November 8, 2019, OCTAL submitted its response to Section C of Commerce's AD questionnaire addressing all of OCTAL's sales to United States customers during the investigation period. Such response and accompanying sales database made clear that "Customer A"[1] was OCTAL's largest U.S. sales customer.

18. On November 22, 2019, petitioners submitted their comments on OCTAL's Section B and C responses. Petitioners' comments contained 34 pages, but provided no comment at all on any of the information or data that OCTAL had provided on Customer A. On December 4, 2019, petitioners submitted additional deficiency comments on OCTAL's Section C responses. Again, none of the those 4 pages of comments discussed OCTAL's information concerning Customer A.

19. Over the following months, Commerce issued additional supplemental questionnaires to OCTAL, who fully responded to each and every one, and petitioners often submitted comments on OCTAL supplemental questionnaire responses. Not once in any of Commerce's supplemental questionnaires, nor in any of petitioners' comments, was there ever any suggestion that OCTAL's response that OCTAL was not affiliated with Customer A was not correct.

20. On February 5, 2020, petitioners submitted "pre-preliminary comments" to Commerce providing Petitioners suggestions on how Commerce should undertake the AD margin calculation for OCTAL. Such comments did not contain any argument that OCTAL and Company A were "affiliated" as defined by Commerce for AD purposes and thereby requiring re-sale data from Company A. *See* Petitioner's Pre-Preliminary Comments Regarding OCTAL's Sales Reporting (Feb. 5, 2020).

---

[1] "Customer A" is the same customer referred to in Commerce's I&D Memorandum. In its Final Determination Commerce concluded that OCTAL and Customer A were "affiliated parties" as defined by the antidumping law.

21. On March 3, 2020, Commerce published in the *Federal Register* its preliminary affirmative AD determination. *See Preliminary Determination*, 85 Fed. Reg. 12,513. All of the Commerce calculation documents confirmed that Commerce had fully accepted OCTAL's data with respect to OCTAL's sales to Customer A. Nothing in Commerce's preliminary AD determination documents indicated in any way that Commerce needed re-sale data from Customer A to undertake a proper AD margin for OCTAL. In its Preliminary Determination Commerce assigned OCTAL SAOC-FZC a 2.78 percent dumping margin.

22. On May 14, 2020 OCTAL submitted its Case Brief to Commerce providing arguments on how Commerce should change it AD margin calculation for OCTAL. Such Case Brief identified a clerical error in Commerce's preliminary AD margin calculation. Correction of the clerical error alone would decrease OCTAL's AD margin to below two percent and require Commerce to render a negative AD determination for OCTAL.

23. On May 14, 2020, Petitioner's submitted their Case Brief to Commerce providing arguments on how Commerce should change it AD margin calculation for OCTAL. Although Petitioner's Case Brief had a general argument about sales through Customer A, the brief did not contain any argument that that OCTAL and Company A were "affiliated" as defined by Commerce for AD purposes and thereby requiring re-sale data from Company A. *See* Petitioner's Case Brief in Polyethylene Terephthalate Sheet from Oman (May 14. 2020).

24. On May 21, 2020,both OCTAL and petitioners submitted their Rebuttal Briefs where they provided further arguments as to how Commerce should conduct its AD margin calculation.

25. On July 22, 2020, Commerce published the final affirmative determination in the anti-dumping duty investigation of PET sheet from the Sultanate of Oman. *See Final*

*Determination*, 85 Fed. Reg. 44,278. In the Final Determination, Commerce corrected the alleged clerical error, but then made other changes to increase the dumping to 4.74 percent. Commerce's Issues and Decision Memorandum made clear that the increase in the AD margin for OCTAL was the result of Commerce's "adjustment" to OCTAL's databases because it did not have re-sale data from Customer A.

26. On September 10, 2020, Commerce published the AD Order with no change made to its final determination. *See AD Order*, 85 Fed. Reg. 55,824 (Sep. 10, 2020).

## STATEMENT OF CLAIMS

27. In the following respects, and for other reasons apparent from the administrative record of Commerce's AD investigation, the *Final Determination* concerning OCTAL is not supported by substantial evidence on the record and is otherwise not in accordance with law.

**Count 1:** **Commerce's Conclusion That OCTAL and Customer A Were Affiliated And Therefore Re-Sale Data from Customer A Was Needed Is Not Supported by Substantial Evidence and Is Otherwise Not In Accordance with Law**

28. Plaintiffs hereby re-allege and incorporate by reference paragraphs 1 through 27.

29. Commerce's Proprietary Decision Memorandum for the Final Determination, which accompanied Commerce's Final Determination, concluded that OCTAL and its U.S. customer, Customer A, were "affiliated parties" as defined by Section 771(33) of the Tariff Act of 1930, as amended. Commerce's conclusion is not supported by substantial evidence and is not in accordance with law.

**Count 2:** **Commerce's Decision To Adversely Apply Facts To OCTAL Is Not Supported by Substantial Evidence and Is Otherwise Not In Accordance with Law**

30. Plaintiffs hereby re-allege and incorporate by reference paragraphs 1 through 29.

31. Commerce's final AD margin calculation for OCTAL was premised upon a Commerce decision to reject a substantial portion of OCTAL's submitted U.S. sales data and instead rely on facts available. Such decision was adverse to OCTAL as it caused the AD margin be above the de minimis threshold. As such, Commerce effectively applied adverse facts available in calculating OCTAL's AD margin. Such Commerce decision to apply adverse facts available is not supported by substantial evidence and is not in accordance with law.

# PRAYER FOR JUDGMENT AND RELIEF

WHEREFORE, for the foregoing reasons, Plaintiffs pray that this Court enter judgment as follows:

(A) Enter judgment in favor of Plaintiffs;

(B) Hold as unlawful Commerce's results of the final less-than-fair-value determination that are the subject of this Complaint,

(C) Remand this proceeding to Commerce with instructions to publish revised final results and recalculate the antidumping rates applicable to Plaintiffs in conformity with the Court's decision; and

(D) Grant Plaintiffs such additional relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Daniel Porter

Daniel L. Porter
James P. Durling

**Curtis Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
202-452-1717

*Counsel for Plaintiffs*

Dated: October 7, 2020