NONCONFIDENTIAL

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| OCTAL INC., OCTAL SAOC-FSZ, ) | |
| Plaintiffs, ) | |
| v. ) | Court No. 20-03697 |
| UNITED STATES, ) | |
| Defendant, ) | |
| and ) | |
| ADVANCED EXTRUSION, INC., *et al.*, ) | |
| Defendant-Intervenors. ) | |

## DEFENDANT-INTERVENORS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

PAUL C. ROSENTHAL
BROOKE M. RINGEL
DAVID C. SMITH, JR.
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, D.C.  20007
(202) 342-8400

Counsel to Defendant-Intervenors Advanced Extrusion, Inc., Ex-Tech Plastics, Inc., and Multi-Plastics Extrusions, Inc.

Dated:  April 19, 2021

NONCONFIDENTIAL

## Table of Contents

Page

STATEMENT OF THE FACTS ............................................................................................1

SUMMARY OF ARGUMENT ..........................................................................................7

ARGUMENT .....................................................................................................................10

I.    COMMERCE'S AFFILIATION FINDING IS SUPPORTED BY
SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW .........................10

    A.    The Legal Standard for Affiliation Based on a Close Supplier
Relationship ........................................................................................10

    B.    Substantial Record Evidence Demonstrates a Close Supplier
Relationship Between OCTAL and [        ] .........................................12

        1.    The Key Facts Are Not in Dispute..........................................13

        2.    Commerce's Finding of Reliance Is Supported by
Substantial Evidence...............................................................14

            a.    The Supply Relationship Was Significant and Not
Easily Replaced.............................................................14

            b.    The Relative Proportion of Sales Between OCTAL
and [      ] Purchases Is Highly Relevant to
Commerce's Analysis ..................................................16

            c.    Other Sources of Supply Were Not Available to
[       ].........................................................................20

            d.    Restrictions on [       ] Business Activity Were
Not Normal Commercial Terms ...................................22

        3.    Commerce's Finding That OCTAL May Exercise Restraint
over [      ] Is Supported by Substantial Evidence ................23

    C.    The Close Supplier Relationship Between OCTAL and [      ]
Had the Potential to Affect U.S. Price of the Subject Merchandise ....................28

NONCONFIDENTIAL

## Table of Contents
### (continued)

**Page**

    1.    OCTAL Failed to Demonstrate That the Price Paid by OCTAL Extrusion Was a Market Price ....................................................29

        a.    The Price for PET Flake Was Not a Benchmarked Price ...................................................................................29

        b.    OCTAL's Alternative Index Did Not Support the Supply Agreement's PET Flake Price ...........................30

        c.    The Record Lacks Any Explanation for the [    ] Price OCTAL Paid to [    ] for PET Flake ...................................................................31

    2.    OCTAL Had PET Flake Market Information Available, But Failed to Provide It to Commerce ...............................................33

    3.    The PET Flake Price Paid by OCTAL Extrusion to [    ] Had the Potential to Impact [    ] U.S. Price for Subject Merchandise ...................................................35

II.    COMMERCE DID NOT ERR IN REACHING A DIFFERENT CONCLUSION IN THE FINAL DETERMINATION ...................................36

III.    THERE IS NO BASIS TO REOPEN THE RECORD ...................................40

IV.    CONCLUSION...............................................................42

NONCONFIDENTIAL

## TABLE OF AUTHORITIES

Page(s)

### Cases

Am. Signature v. United States,
    598 F.3d 816 (Fed. Cir. 2010)..................................................................37

Atl. Sugar, Ltd. v. United States,
    744 F.2d 1556 (Fed. Cir. 1984)................................................................40

Changshan Peer Bearing Co. v. United States,
    953 F. Supp. 2d 1354 (Ct. Int'l Trade 2014) ...........................................38

Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States,
    178 F. Supp. 2d 1305 (Ct. Int'l Trade 2001) ......................................40-41

Husteel Co. v. United States,
    98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015) .............................................38

Hyundai Steel Co. v. United States,
    319 F. Supp. 3d 1327 (Ct. Int'l Trade 2018) ...........................................38

Mitsubishi Heavy Indus. v. United States,
    54 F. Supp. 2d 1183 (Ct. Int'l Trade 1999) .......................................12, 21

NSK Ltd. v. United States,
    481 F.3d 1355 (Fed. Cir. 2007)................................................................40

NTN Bearing Corp. v. United States,
    74 F.3d 1204 (Fed. Cir. 1995)............................................................37, 41

QVD Food Co. v. United States,
    658 F.3d 1318 (Fed. Cir. 2011)................................................................38

Shanxi Hairui Trade Co. v. United States,
    Slip Op. 21-38, Ct. No. 19-00072 (Apr. 7, 2021) ...................................16

Tension Steel Indus. Co. v. United States,
    179 F. Supp. 3d 1185 (Ct. Int'l Trade 2016) ...........................................11

TIJID, Inc. v. United States,
    366 F. Supp. 2d 1286 (Ct. Int'l Trade 2005) ...........................................19

Timken Co. v. United States,
    166 F. Supp. 2d 608 (Ct. Int'l Trade 2001) .............................................38

NONCONFIDENTIAL

United States v. Eurodif S.A.,
    555 U.S. 305 (2009) ..................................................................................................40

## Statutes and Regulations

19 U.S.C. § 1677(33) .....................................................................................8, 10, 11

19 U.S.C. § 1677(33)(G) .............................................................................................10

19 U.S.C. § 1677a(b) .....................................................................................................7

19 U.S.C. § 1677b(a)(1)(B)(ii) ...................................................................................39

19 U.S.C. § 1677b(a)(1)(C)(ii) ...................................................................................39

19 C.F.R. § 351.102(b)(3) ...................................................................................*passim*

19 C.F.R. § 351.301(c)(2)(i) .......................................................................................39

19 C.F.R. § 351.402(a) ..................................................................................................7

19 C.F.R. § 351.404(c)(ii) ...........................................................................................39

## Legislative

Statement of Administrative Action ("SAA"), H.R. 5110,
    H.R. Doc. No. 316, Vol. 1, 103d Cong., 2d Sess., at 838 (1994), reprinted in
    1994 U.S.C.C.A.N. 4175 ............................................................................11, 14, 16

## Administrative Determinations

Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products
    From Korea: Final Results of Antidumping Duty Administrative Reviews,
    62 Fed. Reg. 18,404 (Apr. 15, 1997) ..........................................................................17

Certain Hot-Rolled Carbon Steel Flat Products from India;
    Issues and Decisions for the Final Results of the Fifth Administrative Review
    (May 30, 2008), ref'd in 73 Fed. Reg. 31,961 (June 5, 2008). .................................13

NONCONFIDENTIAL

Certain Pasta from Turkey:
   Issues and Decision Memorandum for the Final Results of the 14th
   Antidumping Duty Administrative Review (Oct. 26, 2011), ref'd in
   76 Fed. Reg. 68,399 (Nov. 4, 2011)........................................................................19

Certain Polyethylene Terephthalate Resin From Canada, the People's Republic of
   China, India, and the Sultanate of Oman: Amended Final Affirmative
   Antidumping Determination (Sultanate of Oman) and Antidumping Duty
   Orders, 81 Fed. Reg. 27,979 (Dep't Commerce May 6, 2016)....................................1

Decision Memorandum for the Preliminary Determination in the Antidumping
   Duty Investigation of Certain Oil Country Tubular Goods from Taiwan
   (Feb. 14, 2014), ref'd in 79 Fed. Reg. 10,495 (Feb. 25, 2014)................................18

Decision Memorandum for the Preliminary Determination in the Less-Than-Fair-
   Value Investigation of Large Diameter Welded Pipe from Canada
   (Aug. 20, 2018), ref'd in 83 Fed. Reg. 43,649 (Aug. 27, 2018). .............................20

Issues and Decision Memorandum for the 2001-2003 Administrative Review of
   the Antidumping Duty Order on Certain Polyethylene Terephthalate Film,
   Sheet and Strip from India: Final Results (Feb. 17, 2005), ref'd in
   70 Fed. Reg. 8,072 (Feb. 17, 2005) .......................................................................21

Issues and Decision Memorandum for the Final Affirmative Determination in the
   Less-Than-Fair-Value Investigation of Grain-Oriented Electrical Steel from
   the Czech Republic (Sept. 22, 2014), ref'd in 79 Fed. Reg. 58,324
   (Sept. 29, 2014)....................................................................................................21

Issues and Decision Memorandum for the Final Determination in the
   Antidumping Duty Investigation of Steel Concrete Reinforcing Bars from
   Latvia (June 22, 2001), ref'd in 66 Fed. Reg. 33,530 (June 22, 2001)........................ 12, 18-19

Issues and Decision Memorandum for the Final Results of Antidumping Duty
   Administrative Review: Chlorinated Isocyanurates from the People's
   Republic China; 2017-2018 (Feb 14, 2020), ref'd in 85 Fed. Reg. 10,411
   (Feb. 24, 2020). ................................................................................................ 12-13

Issues and Decision Memorandum for the Final Results of Antidumping Duty
   Administrative Review of Corrosion-Resistant Steel Products from the
   Republic of Korea; 2016-2017 (Mar. 18, 2019), ref'd in 84 Fed. Reg. 10,784
   (Mar. 22, 2019). ..............................................................................................18, 26

Issues and Decision Memorandum for the Final Results of the Administrative
   Review of the Antidumping Duty Order on Certain Corrosion-Resistant
   Carbon Steel Flat Products from Canada (Mar. 12, 2007), ref'd in
   72 Fed. Reg. 12,758 (Mar. 19, 2007)....................................................................25

Issues and Decision Memorandum for the Final Results in the 2002/2003
    Administrative Review of Honey from the People's Republic of China
    (July 6, 2005), ref'd in 70 Fed. Reg. 38,872 (July 6, 2005) .................................................21

Issues and Decision Memorandum for the Final Results of the Antidumping Duty
    Administrative Review of Large Residential Washers from the Republic of
    Korea (Sept. 5, 2017), ref'd in 82 Fed. Reg. 42,788 (Sept. 12, 2017)....................................25

Large Newspaper Printing Presses and Components Thereof from Japan,
    61 Fed. Reg. 38,139 (July 23, 1996), remanded by,
    Mitsubishi Heavy Indus. v. United States, 15 F. Supp. 2d 807
    (Ct. Int'l Trade 1998), aff'd upon remand, 54 F. Supp. 2d 1183
    (Ct. Int'l Trade 1999)...........................................................................................................12

Notice of Final Determination of Sales at Less Than Fair Value:
    Stainless Steel Wire Rod From Korea, 63 Fed. Reg. 40,404 (July 29, 1998) .................. 17-18

Polyethylene Terephthalate (PET) Sheet from Korea and Oman,
    USITC Pub. 5111 (Sept. 2020)..........................................................................................1, 23

Stainless Steel Wire Rod from the Republic of Korea:
    Preliminary Results of Antidumping Duty Administrative Review,
    71 Fed. Reg. 59,739 (Oct. 11, 2006)......................................................................................18


**Miscellaneous**

Antidumping Duties; Countervailing Duties,
    62 Fed. Reg. 27,296 (May 19, 1997) (final rule) ("Preamble") ..................................... *passim*

NONCONFIDENTIAL

## DEFENDANT-INTERVENORS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

Defendant-Intervenors Advanced Extrusion, Inc., Ex-Tech Plastics, Inc., and Multi-Plastics Extrusions, Inc. hereby submit this response to the Motion for Judgment on the Agency Record filed by Plaintiffs OCTAL Inc. and OCTAL SAOC-FSZ (collectively, "OCTAL") on February 16, 2021 (ECF No. 25).

## STATEMENT OF THE FACTS

*"I'm gonna make him an offer he can't refuse."*  Vito Corleone, The Godfather (Paramount Pictures 1972).

This case involves a U.S. thermoformer customer, [      ] buying the subject merchandise, PET sheet from Oman, from OCTAL.[1]  OCTAL was willing to sell PET sheet at low prices,[2] but was also well aware of the U.S. antidumping regime.[3]  The result was a deal that would be impossible to refuse if a firm wanted to continue buying PET sheet at unfairly low prices while helping its supplier avoid scrutiny under the trade laws.

Under a supply agreement between OCTAL, its U.S. customer [

] the customer committed to buying PET sheet

---

[1]    Thermoforming is a downstream process using heat, vacuum, pressure and/or mechanical processes to force PET sheet against the contours of a mold, thereby forming packaging for food, food service, produce, medical uses, and consumer goods.  See Polyethylene Terephthalate (PET) Sheet from Korea and Oman, USITC Pub. 5111 (Final) (Sept. 2020) ("PET Sheet ITC Final"), at I-11 n.41, II-1-II-2.

[2]    In the U.S. International Trade Commission's injury investigation, data showed that imports of PET sheet from Oman undersold the domestic like product in 45 out of 48 quarterly comparisons during the 2017-2019 period.  PET Sheet ITC Final, USITC Pub. 5111 at V-15.

[3]    See Certain Polyethylene Terephthalate Resin From Canada, the People's Republic of China, India, and the Sultanate of Oman: Amended Final Affirmative Antidumping Determination (Sultanate of Oman) and Antidumping Duty Orders, 81 Fed. Reg. 27,979, 27,982 (Dep't Commerce May 6, 2016) (naming OCTAL as an examined respondent with a dumping margin of 7.62 percent).

NONCONFIDENTIAL

[            ] from OCTAL and agreed to [

            ] also agreed to [            ] sell the PET sheet skeletal waste resulting from its

thermoforming production process ("PET flake") to OCTAL Extrusion.[4]  The result of these

restrictions and requirements was a [            ] arrangement between OCTAL, [            ] and

OCTAL Extrusion that made the customer [            ] to OCTAL.  At the same time,

[       ] paid a [            ] price for PET sheet than what OCTAL was charging its

competitors.  See OCTAL Brf. at 52-53.

        The fact that explains why [       ] would enter into a supply agreement that

superficially appeared to be against its commercial interests is that [       ] sold PET flake to its

supplier's affiliate, OCTAL Extrusion, at an [            ] price.  The [       ] price OCTAL

Extrusion paid [       ] for PET flake effectively reduced [            ] net outlay for the subject

merchandise, PET sheet.  This arrangement  made the deal too good to refuse: OCTAL was able

to report what *appeared* to be non-dumped prices to a U.S. customer accounting for [       ]

percent of its period of investigation ("POI") sales, while the ultimate cost to the customer for

subject merchandise was, in fact, [                            ]  That is precisely the

---

[4]     The PET sheet that is trimmed from the final packaging product during the thermoforming process is typically ground into flake and used again in an extrusion process to make new PET sheet, either by the thermoformer (if it has its own PET sheet extrusion equipment) or by a PET sheet extruder that buys the PET flake at market prices from thermoformers.  PET flake sourced from a thermoformer is referred to as "post-industrial" flake.  Post-industrial PET flake is suitable for extruding into PET sheet for most thermoforming applications as long as it is clean and free of contaminates such as other plastics, wood, and paper.  Petitioners' Comments on OCTAL's March 18, 2020 SBCQR ("Pet. Mar. 27, 2020 SBCQR Comments"), at 6.  (CR 251, PR 206).  Documents in the administrative record are cited by their confidential and/or public record number (i.e., "(CR _)" and "(PR __)") provided in the Index to the Administrative Record filed with the Court on Nov. 11, 2020 (ECF No. 17)).  OCTAL Extrusion, for example, uses post-industrial PET flake obtained from thermoformers in the manufacturing of PET sheet.  See OCTAL's Sept. 19, 2019 Request to Exclude OCTAL Extrusion from Reporting Obligations ("OCTAL Extrusion Request to Exclude"), at 2.  (CR 61, PR 101).

kind of arrangement that the law and the Commerce Department's investigatory efforts are designed to detect, as happened here.

In its opening brief, OCTAL emphasizes what it told Commerce early on in the investigation. OCTAL provided a list of corporate affiliations in its October 7, 2019 Section A questionnaire response ("OCTAL AQR"). (CR 62, PR 108). OCTAL also provided a complete copy of its written contract with [          ] Id. at Exh. A-9. (CR 63, PR 109). On November 8, 2019, OCTAL submitted information on its U.S. sales and the U.S. sales database in its Section C questionnaire response ("OCTAL CQR") (CR 98, PR 124). On November 22, 2019, OCTAL responded to supplemental questions from Commerce regarding its Section A response ("OCTAL SAQR"). (CR 135, PR 135). OCTAL also submitted a supplemental Sections A-C questionnaire response on January 16, 2020 ("OCTAL SABCQR"). (CR 169, PR 159). Throughout these submissions, however, OCTAL never explained to Commerce that it was selling subject merchandise to its customer, [          ] at a discount.

As Commerce's preliminary determination deadline approached, the facts started coming into focus. In pre-preliminary comments filed on February 5, 2020, petitioners explained that the arrangement between OCTAL and its customer essentially masked the true U.S. net price to the customer for subject merchandise, requiring an adjustment to U.S. price for sales to that customer. See Petitioners' Pre-Preliminary Comments Regarding OCTAL's Sales Reporting ("Pet. Pre-Prelim. Comments"), at 8-10. (CR 216, PR 175). Shortly following Commerce's preliminary determination, and with new information gained from OCTAL's pre-preliminary rebuttal comments, petitioners laid out for Commerce the record that was coming into shape.

Specifically, the [                    ] deal and other factors indicated a unique relationship and the absence of arm's-length dealing among OCTAL, the customer, and OCTAL

NONCONFIDENTIAL

Extrusion.  See Petitioners' Comments on OCTAL's Sales to the United States ("Pet. Mar. 4, 2020 Comments"), at 5-6. (CR 244, PR 197).  Those other factors included the [

            ] financing OCTAL provided to [        ] and the fact that the POI-average PET sheet price paid by that customer [              ] than OCTAL's overall weighted-average price to all other U.S. customers.  Id.; see also OCTAL Brf. at 52-53.  Although OCTAL asserted prior to the preliminary determination that the price paid by OCTAL Extrusion for PET flake was a market price, there was nothing on the record supporting that.  Id. at 6-7.  As petitioners explained:

> These circumstances suggest that [
>
>                                         ]
>
> . . . . The [
>
>
>                    ]
>
> *For the final determination, the Department should consider that the [*
>
>                         *] creates circumstances that allow for an [*
>
>
>                    *]*  The Department compares comparison market net prices with U.S. market net prices for identical or most similar products.  Here, the true and correct net price for OCTAL's PET sheet sales to [       ] can only be identified and properly utilized in the final dumping calculation by accounting for [
>
>                    ]

Id. at 7 (emphasis added).  Petitioners suggested that Commerce investigate further.  Id. at 7-8.

Just two days later, in a supplemental questionnaire issued on March 6, 2020, Commerce asked OCTAL the following:

NONCONFIDENTIAL

> Please provide evidence demonstrating that the unit price paid by
> OCTAL Extrusion to the U.S. customer at issue for PET
> flake/scrap during the POI were arm's-length transactions and
> consistent with contemporaneous market pricing for PET
> flake/scrap in the United States.

Sections B-C Supplemental Questionnaire ("Mar. 6, 2020 Supp. Questionnaire") at 4. (PR 200).

As demonstrated below in section I.C., OCTAL failed to show that the price paid by OCTAL

Extrusion to [       ] for PET flake was a market price despite being given multiple

opportunities to do so.  OCTAL also failed to rebut petitioners' evidence that the OCTAL

Extrusion-[       ] PET flake price was [                ] Thus, the [       ] price [       ] was

paying OCTAL for subject merchandise – the price ordinarily used to calculate the dumping

margin – was being offset by the [       ] price [       ] was receiving from OCTAL Extrusion

for PET flake.

 The timing of parties' post-preliminary submissions is important.  On March 18, 2020,

after obtaining a requested extension of time, OCTAL responded to Commerce's March 6, 2020

supplemental question.  See OCTAL's Mar. 18, 2020 Supplemental Sections B-C Questionnaire

Response ("OCTAL Mar. 18, 2020 SBCQR"). (CR 246, PR 204).   On March 27, 2020,

petitioners commented on that response with rebuttal factual information demonstrating a

reliable, contemporaneous market price for post-industrial PET flake.   See Petitioners'

Comments on OCTAL's March 18, 2020 SBCQR ("Pet. Mar. 27, 2020 SBCQR Comments").

(CR 251, PR 206).  On April 6, 2020, OCTAL requested additional time to file rebuttal factual

information, which Commerce denied the next day as the request itself was untimely.  See

Commerce Apr. 7, 2020 Denial of Extension of Time to Submit Rebuttal New Factual

Information. (PR 211).

NONCONFIDENTIAL

On April 9, 2020, OCTAL tried to submit its 73-page rebuttal filing over Commerce's denial.  See OCTAL's Submission of Rebuttal Factual Information ("OCTAL Apr. 9, 2020 RFI"). (CR 253, PR 213).  The next day, petitioners urged Commerce to again deny acceptance of the untimely information.  See Pet. Request to Reject OCTAL's Apr. 9, 2020 New Factual Information. (PR 214).  On May 1, 2020, Commerce accepted OCTAL's filing and, on that same day, issued a schedule for final legal briefing, signaling closure of the record in the investigation.  See Memo to the File re: Acceptance of New Factual Information (PR 218); Memo to the File re: Briefing Schedule (PR 219).

OCTAL faults Commerce for "the belated concern about affiliation at the very end of the investigation."  OCTAL Brf. at 19.  Yet, the record demonstrates that the question of OCTAL's close supplier relationship with [      ] and the effect of that relationship on the price of subject merchandise was raised before the preliminary determination and a focus of Commerce's post-preliminary investigation.  OCTAL's claim of confusion as to "what facts have evolved" is belied by the amount of new information OCTAL itself provided on this issue after the preliminary determination.  As OCTAL admits, petitioners "were making arguments that would only be relevant as between affiliated parties" in their case brief (OCTAL Brf. at 18), indicating that the record had, in fact, evolved to support such an argument.

In the final determination, Commerce concluded that the facts of record, particularly as developed after the preliminary determination, supported affiliation based on a close supplier relationship:

> Our understanding of the nature of the relationship between OCTAL and [      ] has developed over the course of the investigation. . . . .  In this case, given OCTAL's involvement as [                              ] PET Sheet, the stipulation that [      ] must sell the PET flake scrap to OCTAL Extrusion, the

fact that OCTAL [                                                    ], and certain
[                                                                    ], we find that OCTAL
is in a position to exercise restraint or control over [              ], within
the meaning of section 771(33) of the Act and 19 CFR
351.102(b)(3). Therefore, for this final determination, we find
OCTAL and Customer [      ] to be affiliated parties.

Proprietary Decision Memorandum for the Final Determination: Comment 1 (July 16, 2020)

("Affiliation Memo"), at 3, 5. (CR 262, PR 234).

In calculating the dumping margin, Commerce must begin with the price (the "export

price" or "constructed export price") to the first *unaffiliated* purchaser in the United States. 19

U.S.C. § 1677a(b); 19 C.F.R. § 351.402(a). The legal consequence of the affiliation finding was

that OCTAL's sales to [       ] an affiliate, could not be used in the dumping margin

calculation, as Commerce properly determined:

> Because we find OCTAL and [       ] to be affiliated parties,
> OCTAL's sales to [       ] cannot be used in the margin
> calculation, in accordance with section 772(b) of the Act.
> Moreover, we never requested, and therefore the record does not
> contain, downstream sales information for [       ] for subject
> merchandise sourced from OCTAL. . . . Thus, this situation does
> not warrant an adverse inference pursuant to section 776(b) of the
> Act. As neutral facts available, we therefore find it appropriate to
> apply the weighted-average margin calculated for all other U.S.
> sales for the sales that OCTAL sold to [       ] A {sic} during the
> POI.

Affiliation Memo at 5. (CR 262, PR 234).

## SUMMARY OF ARGUMENT

Commerce correctly concluded in the final determination that OCTAL and its U.S.

customer, [       ] are affiliated through a close supplier relationship. The relevant record

facts, primarily set forth in a supply agreement between OCTAL, the customer, [

] – and relied upon by Commerce in making its affiliation

NONCONFIDENTIAL

finding – evince the hallmarks of (1) reliance, and (2) the ability to restrain or direct that rise to the level of control sufficient to constitute affiliation under 19 U.S.C. § 1677(33) and Commerce's regulations.

First, the terms of the supply agreement caused the customer's reliance on OCTAL.  The [          ] supply relationship and the [

          ] (a common practice among thermoformers), made [                    ] reliant on OCTAL for its [        ] PET sheet supply.   [          ] was also reliant on OCTAL for [                    ] financing of [                         ]  The relationship was significant for OCTAL as well, as [        ] accounted for [          ] of its PET sheet sales and OCTAL Extrusion [

          ] for its input supply of PET flake during the POI.  Contrary to OCTAL's argument, it is not the [            ] supply agreement alone, but the totality of this evidence that demonstrates a significant relationship for both supplier and buyer that could not easily be replaced.

Second, OCTAL was in a position to exercise restraint or direction over [          ]  Under the terms of the supply agreement, [          ] agreed to [                  ] purchasing PET sheet from any other supplier *and* from [                             ]  Those restrictions caused the customer to be [                  ] to OCTAL, while OCTAL admits that its prices to [

          *]* than to all other U.S. customers.  That [          ] would agree to terms that are both atypical in the industry and apparently against its commercial interests indicates that OCTAL is able to exercise control over the customer.  With respect to OCTAL's financial support of [        ] OCTAL [                                         ] extended credit to [                             ] required that the [                                    ] and required the customer to [          

                              ] thereby expanding OCTAL's

NONCONFIDENTIAL

business.  In short, the [          ] outlined in the supply agreement leaves no room for [      ] to [                    ] relevant products without OCTAL's direction.

Having concluded that substantial record evidence supports a close supplier relationship between OCTAL and [       ] Commerce also properly concluded that the relationship had "the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product." 19 C.F.R. § 351.102(b)(3).  Specifically, [       ] sale of PET flake to OCTAL Extrusion at a non-market price had the potential to offset the price [      ] paid OCTAL for the subject merchandise.  When instructed by Commerce to demonstrate that the price OCTAL Extrusion paid for PET flake was an arm's-length market price and given two separate opportunities to do so, OCTAL was unable to make such a showing.  In fact, OCTAL effectively conceded that OCTAL Extrusion paid the U.S. customer [              ] price for PET flake, which evidence of actual, contemporaneous post-industrial PET flake prices confirmed.

The law does not require that Commerce find evidence that a close supplier relationship actually affect the production, price, or cost of subject merchandise, but that there exist a potential for such an impact.  The totality of the evidence here demonstrates an [             ] supply arrangement among OCTAL, [       ] and OCTAL Extrusion within which the [     ] price paid to the customer for PET flake could potentially be used to offset the [      ] price the customer paid for the subject merchandise, PET sheet.  Commerce's finding that reported prices to [      ] could not be used for the margin calculation for this reason was supported by substantial evidence and in accordance with law.

OCTAL's additional challenge to Commerce's decision-making process and request for an "alternative" remedy also lack merit.  Commerce's analysis of the affiliation issue evolved as

the record evolved, with new information being placed on the record well after the preliminary determination  Indeed, the courts have affirmed Commerce's discretion to reverse or change its preliminary findings, which are *preliminary* precisely for situations such as these.  That OCTAL delayed in reporting the affiliation to Commerce is not a basis for Commerce to ignore the substantial evidence of affiliation uncovered later in the investigation.  In addition, the absence of a questionnaire to the U.S. customer does not detract from the substantial legal and factual basis for Commerce's final affiliation determination.  Finally, OCTAL's request that the Court remand the determination to Commerce for further investigation *even if the Court sustains the determination* is contrary to law and the strong interests of finality present here.

**ARGUMENT**

I.    **COMMERCE'S AFFILIATION FINDING IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW**

A.    **The Legal Standard for Affiliation Based on a Close Supplier Relationship**

OCTAL accords significance to the fact that it complied with the antidumping duty questionnaire's requirement to report all affiliates.  See OCTAL Brf. at 10-12, 47-48.  Yet, as Commerce explained, "other companies besides OCTAL's sister and parent companies may be considered affiliated parties."  Affiliation Memo at 3. (CR 262, PR 234).  The statute *requires* that Commerce also find affiliation between "{a}ny person who controls any other person and such other person."  Id. § 1677(33)(G).  Commerce relied on this provision in finding affiliation between OCTAL and its U.S. customer.  See Affiliation Memo at 3, 5.

The statute provides that "control" for purposes of paragraph (G) shall be found "if the person is legally or operationally in a position to exercise restraint or direction over the other person."  19 U.S.C. § 1677(33).  Legal control is not required for control sufficient for a finding

NONCONFIDENTIAL

of affiliation to exist, nor must there be evidence of actual control.  See Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,297-98 (May 19, 1997) (final rule) ("Preamble") (the statute requires Commerce to "properly focus" "on the ability to exercise 'control' rather than the actuality of control over specific decisions").  Commerce's regulations further explain that, in finding affiliation by virtue of control referenced in 19 U.S.C. § 1677(33), the agency "will consider the following factors, among others: Corporate or family groupings; franchise or joint venture agreements; debt financings; and close supplier relationships."  19 C.F.R. § 351.102(b)(3).

Against this statutory and regulatory background, Commerce conducts a two-step analysis in determining whether a close supplier affiliation exists.  See Tension Steel Indus. Co. v. United States, 179 F. Supp. 3d 1185, 1197-98 (Ct. Int'l Trade 2016).  First, Commerce examines whether "the supplier *or* buyer have become reliant on the other."  Statement of Administrative Action ("SAA"), H.R. 5110, H.R. Doc. No. 316, Vol. 1, 103d Cong., 2d Sess., at 838 (1994), reprinted in 1994 U.S.C.C.A.N. 4175 (emphasis added); see also Affiliation Memo at 4. (CR 262, PR 234).  Another way to describe the question in this step is whether "'the relationship is significant and could not be easily replaced.'"  Tension Steel, 179 F. Supp. 3d at 1198 (quoting TIJID, Inc. v. United States, 366 F. Supp. 2d 1286, 1299 (Ct. Int'l Trade 2005) ("TJID, Inc.")).  Second, if the record shows reliance by the buyer or supplier, Commerce will then determine "whether one of the parties is in a position to exercise restraint or direction over the other."  Affiliation Memo at 4 (CR 262, PR 234); see also 19 U.S.C. § 1677(33).  This analysis is heavily fact-specific.  See Preamble, 62 Fed. Reg. at 27,298.

Even if Commerce finds evidence of ability to control, the agency will decline to find affiliation (1) when the relationship does not have "the potential to impact decisions concerning

the production, pricing, or cost of the subject merchandise or foreign like product," or (2) when the relationship is "temporary." 19 C.F.R. § 351.102(b)(3); see also Affiliation Memo at 4 (CR 262, PR 234).[5] Importantly, where Commerce's two-step analysis results in a finding of potential control, the burden is on the respondent to demonstrate that the relationship cannot affect the subject merchandise (such as its price). Preamble, 62 Fed. Reg. at 27,298. Notwithstanding arguments to the Court (see, e.g., OCTAL Brf. at 22-24), OCTAL did not meet that burden below, despite multiple opportunities. Instead, the record supports Commerce's conclusion that the affiliation between OCTAL and its customer, in fact, had the significant potential to impact U.S. price.

**B.     Substantial Record Evidence Demonstrates a Close Supplier Relationship Between OCTAL and [        ]**

OCTAL's argument focuses on several facts relied upon by Commerce in reaching the final affiliation finding. See OCTAL Brf. at 25-26; Affiliation Memo at 4-5 (CR 262, PR 234). OCTAL's review of these facts in isolation as not demonstrating control, however, is contrary to Commerce's practice, including in this case, of evaluating the totality of the evidence in determining whether a close supplier relationship exists.[6]

---

[5]     OCTAL does not argue that the temporal nature of the relationship precluded Commerce's affiliation finding because OCTAL was [                                    ] supplier going back to at least [       ] Affiliation Memo at 4. (CR 262, PR 234).

[6]     See, e.g., Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Steel Concrete Reinforcing Bars from Latvia (June 22, 2001) ("Rebar from Latvia IDM"), at Comment 1 (relying on totality of the circumstances in finding a close supplier relationship between foreign producer and trading company), ref'd in 66 Fed. Reg. 33,530 (June 22, 2001); Large Newspaper Printing Presses and Components Thereof from Japan, 61 Fed. Reg. 38,139 (July 23, 1996) (stating that Commerce will make its affiliated party determinations after taking "into account all factors which, by themselves, or in combination, may indicate affiliations"), remanded by, Mitsubishi Heavy Indus. v. United States, 15 F. Supp. 2d 807 (Ct. Int'l Trade 1998), aff'd upon remand, 54 F. Supp. 2d 1183, 1190-91 (Ct. Int'l Trade 1999) ("Mitsubishi Heavy Indus."); see also Issues and Decision Memorandum for the Final Results of
(cont'd on next page)

NONCONFIDENTIAL

1.      __The Key Facts Are Not in Dispute__

The terms of the supply agreement between OCTAL, the customer, [

    ] are generally not in dispute.  See OCTAL Brf. at 11.

[            ] Supply Arrangement:

- [        ] was required to purchase [      *]* of its PET sheet from OCTAL as an [          ] supplier.  OCTAL SABCQR at 3-5 (CR 169, PR 159), Exh.  SABC-2, para. 1(b). (CR 170, PR 160).

- [        ] was required to sell to OCTAL Extrusion [      *]* of the PET flake/scrap produced from [        ] consumption of OCTAL's PET sheet.  Id. at Exh.  SABC-2, para. 1(c). (CR 170, PR 160).

PET Sheet and PET Flake Pricing:

- The price for purchases of *PET sheet* was [

                                                                              ]

    Id. at Exh. SABC-2, para. 1(d).

- The price for OCTAL Extrusion's purchases of *PET flake* from [
                            ] Id. at Exh. SABC-2, para. 1(e).

Restrictions on Business Activity:

- [      ] agreed to [

    ] Id. at Exh. SABC-2, paras. 13(d), 15(g).

Financing:

- OCTAL provided to [

                                                    ] Id. at 52-53. (CR 169, PR 159).

---

Antidumping Duty Administrative Review: Chlorinated Isocyanurates from the People's Republic China; 2017-2018 (Feb 14, 2020), at Comment 1 (relying on totality of the circumstances in determining whether a principal-agent relationship exists), ref'd in 85 Fed. Reg. 10,411 (Feb. 24, 2020); Certain Hot-Rolled Carbon Steel Flat Products from India; Issues and Decisions for the Final Results of the Fifth Administrative Review (May 30, 2008), at Comment 12 (relying on totality of the circumstances in determining whether to collapse affiliated producers), ref'd in 73 Fed. Reg. 31,961 (June 5, 2008).

NONCONFIDENTIAL

- The parties agreed that [


] Id. at Exh. SABC-2, para. 7.  Further, OCTAL had [

] Id.

In addition, OCTAL's POI-average price for subject merchandise sold to [

] OCTAL's overall weighted-average U.S. price during the POI to all U.S.

customers.   See OCTAL Brf. at 52-53;  OCTAL's Apr. 14, 2020 Third Supplemental

Questionnaire Response ("OCTAL Apr. 14, 2020 SQR"), at Exh. SUPP 3-2C (CR 255, PR 217).

That [        ] was [              ] to OCTAL *and* would agree to a [             ] price for

PET sheet than its competitors in the PET packaging market is a commercially unreasonable

result that by itself strongly suggests OCTAL's ability to control the customer.

### 2. Commerce's Finding of Reliance Is Supported by Substantial Evidence

#### a. The Supply Relationship Was Significant and Not Easily Replaced

Commerce's threshold conclusion that OCTAL or [      ] were reliant on the other is

supported by substantial evidence.  Affiliation Memo at 4.  (CR 262, PR 234);  SAA at 838.  The

relationship was particularly significant for [        ] which was effectively [

] under the terms of the supply agreement.

Several facts demonstrate that [       ] was [              ] on OCTAL, as

Commerce found.   Affiliation Memo at 4.  (CR 262, PR 234).   The customer depended on

-14-

OCTAL for [        ] its PET sheet inputs since [                        ]⁷ Id.; OCTAL SABCQR

at 3-5 (CR 169, PR 159), Exh. SABC-2, para. 1(b). (CR 170, PR 160).  [        ] could not

purchase subject merchandise [                        ] nor [

                        ] OCTAL SABCQR at Exh. SABC-2, para. 13(d). (CR 170,

PR 160).    The customer also relied on OCTAL's commitment to [

                        ] Id. at Exh. SABC-2, para. 1(f).

[        ] relied on OCTAL for [                ] financing totaling [

                        ] Id. at 52-53 (CR 169, PR 159), Exh. SABC-2, para. 7 (CR 170, PR

160).   Importantly, [        ] could not have obtained such finance terms from a commercial

bank, nor would any other supplier [                        ] to provide such

loans.  See id.

The relationship was also significant for OCTAL.  As noted above, [

                        ] Id. at Exh. SABC-2, para. 1(f). (CR 170, PR 160).  OCTAL depended on

[        ] for [        ] percent of its U.S. sales during the POI.  Affiliation Memo at 4.  (CR 262, PR

234).  The relationship was also significant for OCTAL because [        ] was required to sell to

OCTAL Extrusion [        *] of the PET flake from its operations.   OCTAL SABCQR at Exh.

SABC-2, para. 1(c). (CR 170, PR 160).  OCTAL reported that [

                        ] Id. at 3. (CR

---

⁷      Although the record does not contain information about OCTAL's sales to [            ] that is not a weakness in the decision.  See OCTAL Brf. at 33 (criticizing Commerce for not asking for the information).  The supply agreement covered a substantial period – [            ] of the five years Commerce would ordinarily review – and was more than sufficient to demonstrate [            ] reliance on OCTAL, particularly when viewed with all the other indicia of potential control.  Moreover, OCTAL is not challenging Commerce's affiliation finding on the basis that the relationship was "temporary."  See 19 C.F.R. § 351.102(b)(3).

NONCONFIDENTIAL

169, PR 159).  Thus, at least during the POI, OCTAL Extrusion was [                    ]

PET flake from [          ] to be able to conduct its operations.

> **b.** **The Relative Proportion of Sales Between OCTAL and [          ] Purchases Is Highly Relevant to Commerce's Analysis**

Contrary to OCTAL's argument, the volume of PET sheet (or share of purchases) that the U.S. customer purchased from OCTAL, and the quantity of PET sheet that OCTAL sold to the customer, are facts highly relevant to the determination.  See OCTAL Brf. at 32-33.  In a very recent Court decision involving an administrative review of steel nails from China, the Court sustained Commerce's finding that a respondent's supplier's fraudulent activity could be attributed to the respondent given the "significant" customer/supplier relationship between the firms.  See Shanxi Hairui Trade Co. v. United States, Slip Op. 21-38, Ct. No. 19-00072 (Apr. 7, 2021), at 9-10.  Specifically, Commerce observed that the respondent purchased a "significant portion" of the supplier's production volume, and that the supplier sold to the respondent a "substantial portion" of its sales.  Id. at 10.  The Court upheld the conclusion that this resulted in a sales relationship of such significance that the respondent had influence over the supplier that it could have exercised to end the fraudulent activity.  Id. at 10-13.  While not specific to a finding of affiliation, the principle that a significant volume of sales is an indication of influence and control between a supplier and customer is equally applicable here.

Moreover, the fact that OCTAL sold [        ] subject merchandise to [        ] during the POI does not detract from [          ] reliance on OCTAL.  See OCTAL Brf. at 32-33.  The legislative history of the statute contemplates control in a close supplier relationship where "the supplier *or buyer* becomes reliant upon the other."  SAA at 838 (emphasis added).  Just as the law does not require that parties in a close supplier relationship be interdependent for reliance to

NONCONFIDENTIAL

indicate control, neither does some benefit to the controlling party (here, OCTAL) defeat affiliation because the is relationship "balance{d}."  See OCTAL Brf. at 32.  [        ] was reliant on OCTAL because it was [              ] PET sheet from OCTAL for a substantial period of time.  Affiliation Memo at 4.  (CR 262, PR 234).  That [      ] could not conduct its business of manufacturing PET packaging without that input supply is the very essence of reliance.  The customer's reliance is not any less significant because OCTAL may have also benefitted from the arrangement or may have had other customers.

OCTAL's argument that an exclusive or predominant supply relationship "alone" is not enough to establish control misconstrues the law and Commerce's final determination.  See OCTAL Brf. at 28-29.  The existence of an exclusive supply relationship by itself may not constitute affiliation, but Commerce examines the totality of the evidence.  Here, numerous other factors, including restrictions on [      ] commercial activity, OCTAL's [          ] financing, and the [        ] sale of PET flake to OCTAL Extrusion also evince a significant buyer-supplier relationship that "could not be easily replaced."  In contrast, the exclusive distribution contract in Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products From Korea[8] cited by OCTAL was the *only* evidence supporting the argument that parties should have been considered affiliated.  See OCTAL Brf. at 28.

Commerce has previously found that an exclusive or predominant supply relationship *does* support a close supplier relationship, particularly where other indicia of affiliation are also present.  In Stainless Steel Wire Rod from Korea, Commerce found a close buyer-supplier

---

[8]    See Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products From Korea: Final Results of Antidumping Duty Administrative Reviews, 62 Fed. Reg. 18,404, 18,441 (Comment 39) (Apr. 15, 1997).

NONCONFIDENTIAL

relationship between a respondent and its input supplier because the supplier was the sole supplier of the input, the buyer was the sole Korean buyer of the input, and the buyer had been unable to develop an alternative supply source – such that "business and economic reality" made the relationship between the parties "not easily replaced."[9]   OCTAL's own citations to a subsequent Stainless Steel Wire Rod administrative review and other Commerce decisions similarly support this proposition: that dependence on an input supplier in the absence of alternative sources of supply is an indication of reliance.[10]   See OCTAL Brf. at 35.   Thus, it is highly relevant to Commerce's analysis that OCTAL is [          ] supply source and that the supply agreement between the parties [

                                                               ]  Those facts made

the relationship very difficult for [        ] at least, to replace.

     The totality of the evidence is also pertinent to putting an exclusive or predominant sales relationship in context.   In Rebar from Latvia, Commerce found a close supplier relationship between a foreign producer and a trading company based on "extensive evidence of affiliation" in addition to an exclusive distribution agreement, including the provision of a large line of credit to finance production and the involvement of the trading company in "the majority" of the

---

[9]   Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Wire Rod From Korea, 63 Fed. Reg. 40,404, 40,410 (Comment 2) (July 29, 1998) ("SSWR Korea IDM").

[10]   See Stainless Steel Wire Rod from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review, 71 Fed. Reg. 59,739 (Oct. 11, 2006); Decision Memorandum for the Preliminary Determination in the Antidumping Duty Investigation of Certain Oil Country Tubular Goods from Taiwan (Feb. 14, 2014), at 11 (finding no affiliation because "Tension Steel could, and did, look to other unaffiliated suppliers of the input"), ref'd in 79 Fed. Reg. 10,495 (Feb. 25, 2014); Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review of Corrosion-Resistant Steel Products from the Republic of Korea; 2016-2017 (Mar. 18, 2019) ("CORE from Korea 2016/2017"), at 55-56 (Comment 11), ref'd in 84 Fed. Reg. 10,784 (Mar. 22, 2019).

NONCONFIDENTIAL

foreign supplier's U.S. sales.  Rebar from Latvia IDM at Comment 1.  Several of these same factual elements, including [                ] sales relationship, the importance of the U.S. customer to OCTAL's overall U.S. sales, and [                ] financing provided by OCTAL demonstrate the significance of the buyer-supplier relationship here.

The other cases cited by OCTAL are inapposite.  See OCTAL Brf. at 28.  In Certain Pasta from Turkey, Commerce declined to find affiliation despite a sole supplier relationship because there was no "law, regulation, or directive, whether formal or informal, mandating that {the buyer} must purchase pasta from {the supplier}, or a restriction on their purchases from non-{supplier} sources."[11]  The opposite is true here, where there is a [

] The Court's decision in TIJID, Inc. is similarly distinguishable.  Even though the foreign supplier examined in that case sold all of its subject merchandise to a particular customer, the supplier and buyer in that case, in contrast with this one, did *not* have an exclusive supply agreement that required the customer to purchase only from the foreign supplier.  TIJID, Inc., 366 F. Supp. 2d at 1296-97.

The preliminary determination in Large Diameter Welded Pipe from Canada, cited by OCTAL, in fact supports Commerce's final determination here.  In that case, Commerce found foreign supplier Evraz and its customer to be affiliated based on a close supplier relationship and excluded sales to that customer from the preliminary margin calculation.  Commerce not only considered "the quantity of merchandise" and "financial arrangements" between the two companies, but also found that the companies' supply agreement required notification of certain

---

[11]   Certain Pasta from Turkey: Issues and Decision Memorandum for the Final Results of the 14th Antidumping Duty Administrative Review (Oct. 26, 2011), at 13 (Comment 1.C.), ref'd in 76 Fed. Reg. 68,399 (Nov. 4, 2011).

NONCONFIDENTIAL

commercial conditions and established higher technical standards.[12]   In this investigation, Commerce similarly and properly considered the quantity of merchandise and the financial arrangements between OCTAL and [            ][13]   Affiliation Memo at 4-5.   (CR 262, PR 234). Thus, the precedent on which OCTAL relies demonstrates that a significant portion of sales, particularly when [                         ] supply agreement, among other factors, is indicative of a close supplier relationship.

**c.      Other Sources of Supply Were Not Available to [        ]**

OCTAL's assertion that the mere availability of other sources of supply makes reliance an impossibility is factually and legally unsupported.   See OCTAL Brf. at 29-30.   OCTAL's argument is premised on the claim (without specific evidence) that [      ] purchased PET sheet from other suppliers after the Cyclone Mekunu, but that was exceptional.[14]   Cyclone Mekunu "interrupted OCTAL's ability to supply" (OCTAL Brf. at 30), [

                                        ][15]   The disruption in OCTAL's operations was also relatively short, lasing for only "about six weeks." Id.   Thus, [        ] did not generally "source from others" as OCTAL suggests. Id.   Instead, the customer was [                              ]

---

[12]   Decision Memorandum for the Preliminary Determination in the Less-Than-Fair-Value Investigation of Large Diameter Welded Pipe from Canada (Aug. 20, 2018), at 5-7, ref'd in 83 Fed. Reg. 43,649 (Aug. 27, 2018).

[13]   The supply agreement here similarly [

                                        ] OCTAL SABCQR at Exh. SABC-2, para. 7. (CR 170, PR 160).

[14]   OCTAL does not cite any other event besides Cyclone Mekunu that would have caused [      ] to purchase PET sheet from other suppliers. OCTAL Brf. at 30.

[15]   [

                                        ] OCTAL SABCQR at Exh. SABC-2, para. 1(b). (CR 170, PR 160).

**NONCONFIDENTIAL**

supply only as a result of the Cyclone Mekunu's brief impact on OCTAL's facility, and was otherwise [                    ] to buy PET sheet from other suppliers or [                                    ]

    This case is distinct from those cases cited by OCTAL.  See id. at 29.  In Polyethylene Film, Sheet and Strip from India, Commerce did not find a close supplier relationship because, in part, there were "other Indian suppliers of PET film," but also because there was "no record evidence indicating that Valencia could not purchase PET film from other suppliers."[16]  The record here involves different facts, where [


    ] supply agreement.  Cf. Grain-Oriented Electrical Steel from the Czech Republic (declining to find a close supplier relationship due to the lack of selling or supply agreement between the two companies);[17] Honey from China (declining to find a close supplier relationship where the "exclusive dealing agreement" was not strictly honored or enforced and the U.S. distributor purchased subject merchandise from many suppliers).[18]  None of these cases stand for

---

[16]   Issues and Decision Memorandum for the 2001-2003 Administrative Review of the Antidumping Duty Order on Certain Polyethylene Terephthalate Film, Sheet and Strip from India: Final Results (Feb. 17, 2005), at 10 (Comment 1), ref'd in 70 Fed. Reg. 8,072 (Feb. 17, 2005).

[17]   Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Grain-Oriented Electrical Steel from the Czech Republic (Sept. 22, 2014), at 8 (Comment 1), ref'd in 79 Fed. Reg. 58,324 (Sept. 29, 2014).

[18]   Issues and Decision Memorandum for the Final Results in the 2002/2003 Administrative Review of Honey from the People's Republic of China (July 6, 2005) ("Honey 2002-2003 Final Results IDM"), at 59, 66 (Comment 11), ref'd in 70 Fed. Reg. 38,872 (July 6, 2005).  Another critical distinction between the administrative review final results in Honey from China and this case is that the supplier did *not* rely on the U.S. distributor for at least 50 percent of its sales – a factor upheld as potentially demonstrative of a close supplier relationship in Mitsubishi Heavy Indus., 54 F. Supp. 2d at 1190-91.  See Honey 2002-2003 Final Results IDM at 67 (Comment 1).  Here, as Commerce observed, sales of PET sheet to [          ] accounted for [     ] percent of OCTAL's U.S. sales during the POI. Affiliation Memo at 4.  (CR 262, PR 234).

NONCONFIDENTIAL

the proposition that the mere existence of other suppliers defeats affiliation.  See OCTAL Brf. at 29.

That there were "numerous other suppliers of PET sheet, both domestic and foreign" (id.) is, therefore, irrelevant as a matter of both fact and law to Commerce's analysis when the customer here was [          ] from purchasing PET sheet from those other suppliers [          ] supply agreement with OCTAL.[19]   The lack of alternative sources of supply (including [                    ]) resulting in reliance on an input supplier supports a finding of a close supplier relationship.  See section I.B.2.b., supra.

### d.    Restrictions on [          ] Business Activity Were Not Normal Commercial Terms

OCTAL's claim that the restrictions on the customer's business activity imposed in the supply agreement are "completely normal commercial terms to avoid overlap in the business activities between the two parties" is baseless.  OCTAL Brf. at 43.

The supply agreement restricts [          ] from [
                                        ]  OCTAL SABCQR at Exh. SABC-2, para. 13(d).  (CR 170, PR 160).  This is a remarkably unusual restriction for this industry.[20]   As OCTAL admits, "many" domestic PET sheet producers are thermoformers that extrude PET sheet for their own thermoforming operations.  OCTAL Brf. at 29.  Those thermoformers that produce and internally consume PET sheet also purchase PET sheet in

---

[19]   In the same vein, the highly substitutable nature of the subject merchandise has no bearing on whether [     ] can purchase substitutable PET sheet from other sources when it is [                    ]  See OCTAL Brf. at 29-30.

[20]   Even if such terms were considered "normal," "there is nothing in the statute or the legislative history that suggests that 'normal commercial relationships' cannot give rise to control.  Preamble, 62 Fed. Reg. at 27,298.

NONCONFIDENTIAL

addition to their own production to meet requirements.[21]  In other words, if any other PET sheet

extruder required that its thermoformer customers [

] the supplier would lose out on sales to a significant portion of the market.

Thus, OCTAL has imposed restrictions on [            ] commercial behavior that is otherwise

quite common in this industry, further indicating the customer's reliance on OCTAL.

OCTAL tries to minimize the unusual nature of restrictions by painting them as [

] terms, to no avail.  OCTAL Brf. at 43.  If that were the case, such terms

would be unnecessary.   The [




] flake to OCTAL Extrusion.

**3.    Commerce's Finding That OCTAL May Exercise Restraint over**
**[          ] Is Supported by Substantial Evidence**

In finding that OCTAL was "in a position to exercise restraint or direction," Commerce

relied on several of the same key facts as those supporting reliance between OCTAL and its

customer:

> The preamble to Commerce's regulations states that section
> 771(33), which refers to a person being "in a position to exercise
> restraint or direction," properly focuses Commerce on the ability to

---

[21]    PET Sheet ITC Final, USITC Pub. 5111 at II-1 n.6 ("Ten U.S. producers reported that they
internally consume the PET sheet that they produce and one reported transferring PET sheet to a
related firm.  All 11 of these producers also reported that they also purchase PET sheet.").

> exercise "control" rather than the actuality of control over specific
> transactions. In this case, given OCTAL's involvement as
> [                                    ] PET Sheet, the stipulation that
> [        ] must sell the PET flake scrap to OCTAL Extrusion, the
> fact that OCTAL [
>                                                    ], and certain
> [                                    ], we find that OCTAL
> is in a position to exercise restraint or control over [        ], within
> the meaning of section 771(33) of the Act and 19 CFR
> 351.102(b)(3).

<u>Affiliation Memo</u> at 5. (CR 262, PR 234). As Commerce observed, the financing from OCTAL

and the restrictions on [        ] business activities in particular demonstrated OCTAL's ability

to exercise control over the customer.

    First, as discussed above, the restrictions placed on [

                    ] to OCTAL. Such terms put the customer at a commercial disadvantage

to many of its thermoformer competitors that both purchase and extrude PET sheet for internal

consumption. <u>See</u> section I.B.2.d. In agreeing to such restrictions, [        ] gave OCTAL the

ability to control critical [                    ] decisions that are often made in the industry to

control costs and maximize profitability. Importantly, the customer agreed to such restrictions –

and to being [        ] to OCTAL's supply – in return for a [            ] price from

OCTAL than OCTAL's price to all other U.S. customers without similar restrictions on their

business activities. <u>See</u> OCTAL Brf. at 52-53. That [        ] would agree to such terms that are

both atypical in the industry and ***facially against the customer's commercial interests*** indicates

that OCTAL is able to exercise control over the customer.

    Second, with respect to financing, OCTAL's arguments on (1) the provision of collateral,

and (2) the fact that the financial support was used to purchase [            ] are red herrings.

<u>See</u> OCTAL Brf. at 38, 40. OCTAL relies on the collateral and other terms as evidence that the

loan was a "normal commercial transaction." Id. at 39.  Commerce, however, has previously rejected the notion that lending "provided on terms consistent with commercial considerations is necessarily dispositive with respect to the issue of control." Preamble, 62 Fed. Reg. at 27,298; see also CORE from Canada; Final Results 2004-2005 at Comment 2 (finding affiliation between a respondent and its supplier even though the respondent no longer held majority ownership or voting rights because the respondent maintained debt financing of the supplier and, therefore, potential to exercise restraint or direction over the supplier).[22]

OCTAL also relies on the final results of an administrative review in Large Residential Washers for the proposition that the existence of collateral alone defeats evidence of control. See OCTAL Brf. at 38.  OCTAL glosses over important aspects of Commerce's finding in that review, including (1) that the financing entity "did not assume risk in extending credit," (2) that there was no sales exclusivity between the buyer and suppliers, and (3) that the supply agreements were short-term.[23]  Those facts are distinguishable from the record here.  As discussed above, and as Commerce recognized, the supply agreement at issue here [

          ] part and was a [          ] agreement, having been in place since [

     ]  See Affiliation Memo at 4.  (CR 262, PR 234); supra section I.B.2.  Moreover, despite [          ] provision of collateral, OCTAL did, in fact, [                    ] in extending credit to its customer.  Specifically, [

---

[22]   Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Certain Corrosion-Resistant Carbon Steel Flat Products from Canada (Mar. 12, 2007) ("CORE from Canada; Final Results 2004-2005"), at 4 (Comment 2), ref'd in 72 Fed. Reg. 12,758 (Mar. 19, 2007).

[23]   Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review of Large Residential Washers from the Republic of Korea (Sept. 5, 2017), at 14 (Comment 2), ref'd in 82 Fed. Reg. 42,788 (Sept. 12, 2017).

NONCONFIDENTIAL

] OCTAL SABCQR at 52-53.  (CR 169, PR 159).  Collateral is only useful in the case of the customer's default; it does not account for the fact that OCTAL [                                        ] in this transaction.

OCTAL's emphasis on the use of the loan to finance [            ] is also misplaced.  <u>See</u> OCTAL Brf. at 39-40.  Again, OCTAL cherry-picks facts from Commerce's decision in <u>Certain Corrosion-Resistant Steel from Korea</u> while ignoring other relevant information that makes the decision inapposite, including, importantly, the lack of exclusive sales relationships in that case.  <u>See</u> <u>CORE from Korea 2016/2017</u> at 55-56 (Comment 11).  In that case, Commerce found that the outsourcing of specialized parts manufacturing to outside suppliers and the provision of tooling equipment to produce such parts "are commonplace . . . in the American automotive industry."  <u>Id.</u> at 57.  While specialized outsourcing arrangements, including the tooling required to produce such parts, may be typical in the automotive industry, there is no evidence on this record – nor does OCTAL cite to any – that a supplier's financing of a customer's [

] is common in the PET sheet industry.  <u>See</u> OCTAL Brf. at 39.  In fact, it is not.

In addition, OCTAL mischaracterizes the record in asserting that the [

] "provides benefit to both OCTAL and its customer as the customer expanded its business . . . ."  OCTAL Brf. at 40.  On the contrary, the transaction was structured to [            ] OCTAL.  The parties agreed that [

] OCTAL SABCQR at Exh. SABC-2, para. 7. (CR 170, PR 160).  The [            ] financed by OCTAL was also required to [

NONCONFIDENTIAL

] <u>Id.</u>  Further, OCTAL has [

] <u>Id.</u>

This evidence squarely refutes two claims by OCTAL.  OCTAL is wrong that the "U.S. customer made its own decision about what to produce and how much to produc{e}."  OCTAL Brf. at 42.  The requirement that [

] In that same vein, OCTAL's claim that the [                                                       ] (<u>id.</u> at 41) is also refuted by the record, which instead shows that the [

]

OCTAL asserts that "nothing . . . impl{ies} that financing gives control" (<u>id.</u>), but the record shows that the financing by OCTAL was made on non-commercial terms, including the [              ] by OCTAL and the [            ] nature of the loan.  Further, the transaction was designed to benefit OCTAL, as Commerce found, [

] <u>See Affiliation</u> <u>Memo</u> at 5.  (CR 262, PR 234).  The result was *not* an expansion of [        ] business (<u>see</u> OCTAL Brf. at 42), but rather an expansion of OCTAL's business.  OCTAL's financing of its customer, therefore, is substantial evidence indicating OCTAL's ability to exercise restraint and direction (<u>i.e.</u>, control) over [        ]

NONCONFIDENTIAL

## C.    The Close Supplier Relationship Between OCTAL and [        ] Had the Potential to Affect U.S. Price of the Subject Merchandise

With substantial evidence of reliance and the ability to exercise restraint or direction

support a close supplier relationship between OCTAL and [        ] the record also demonstrates

that the relationship had "the potential to impact decisions concerning the production, pricing, or

cost of the subject merchandise or foreign like product." 19 C.F.R. § 351.102(b)(3); see also

Affiliation Memo at 4. (CR 262, PR 234). OCTAL hones in on this, asserting that "the issue {in

this case} is the price between OCTAL and its U.S. customer, and whether that price is

sufficiently reliable to serve as the basis for a dumping margin." OCTAL Brf. at 26-27; see also

id. at 27, 34, 44 (claiming the key facts were not tied to the "core issue"). In fact, the [

] close supplier relationship, in combination with [        ] sale of PET flake to OCTAL

Extrusion at a non-market price (evidence OCTAL has apparently chosen to ignore), made it

possible to offset [        ] price for subject merchandise. Thus, Commerce correctly

concluded that reported prices to [        ] could not be used for the margin calculation.[24]

---

[24]    OCTAL's claim that the sale of PET flake is irrelevant because it is a "different product to a different company" misses the point. See OCTAL Brf. at 35-36. That PET flake is a different product is irrelevant to whether the [        ] price for PET flake paid by one OCTAL company to [        ] could potentially offset the [        ] PET sheet price charged to [        ] by another. In fact, OCTAL and OCTAL Extrusion are [        ] "sister compan{ies}." OCTAL AQR at 13. (CR 62, PR 108). Both OCTAL and OCTAL Extrusion were both [        ] Id. at Exh. A-9. (CR 63, PR 109). When [

] Id. at 10. (CR 62, PR 108). Further, Mr. William J. ("Joe") Barenberg, Jr. serves as (1) [                    ] (2), the Chief Operating Officer of OCTAL, Inc., which is OCTAL's U.S. marketing organization, and (3) President of OCTAL Extrusion. Id. at Exh. A-2 (CR 63, PR 109); OCTAL Apr. 9, 2020 RFI at Annex A (CR 253, PR 213). In addition, OCTAL Extrusion [                    ] OCTAL AQR at 8. (CR 62, PR 108).

NONCONFIDENTIAL

### 1.   OCTAL Failed to Demonstrate That the Price Paid by OCTAL Extrusion Was a Market Price

Given evidence of a close supplier relationship, Commerce issued a post-preliminary supplemental questionnaire on March 6, 2020 requesting that OCTAL demonstrate

> the unit price paid by OCTAL Extrusion to the U.S. customer at issue for PET flake/scrap during the POI were arm's-length transactions and consistent with contemporaneous market pricing for PET flake/scrap in the United States.

Mar. 6, 2020 Supp. Questionnaire at 4. (PR 200). This went precisely to the question of whether the prices between OCTAL and [       ] were reliable. Neither of OCTAL's post-preliminary submissions provided evidence that they were.

### a.   The Price for PET Flake Was Not a Benchmarked Price

OCTAL is incorrect that the agreed-upon price for PET flake from [       ] to OCTAL Extrusion is set "against market benchmarks." OCTAL Brf. at 36. The price established for [       ] purchases of PET *sheet* from OCTAL was [

] but the price established for OCTAL Extrusion's purchases of PET *flake* from

[

]25 OCTAL SABCQR at Exh. SABC-2. (CR 170, PR 160); supra section I.B.1. Further, the record lacks any evidence of a correlation between [                    ] and post-industrial PET flake prices that would explain how the [              ] established by the

---

25  It is not accurate that the PET *flake* price was "adjust{ed} over time to reflect the changing market conditions for the key raw materials used to produce the PET plastic." OCTAL Brf. at 36.  When [

] See OCTAL Mar. 18, 2020 SBCQR at Exh. SBCUK-9(A) (CR 247, PR 205); OCTAL Apr. 14, 2020 SQR at 4 (CR 254, PR 216).  That the [

]

contract was selected.  In other words, there is no evidence anywhere on the record that it was derived from the market.[26]

> **b.**      **OCTAL's Alternative Index Did Not Support the Supply Agreement's PET Flake Price**

In the proceeding below, OCTAL also failed to satisfy Commerce's instruction that it show the PET flake price was "consistent with contemporaneous market pricing for PET flake/scrap in the United States."  Mar. 6, 2020 Supp. Questionnaire at 4. (PR 200).  OCTAL urged Commerce to rely on the IHS index for "LNO Pellet No IV Rebuild Deposit" post-*consumer* PET flake prices.  OCTAL Mar. 18, 2020 SBCQR at 14.  (CR 246, PR 204).  Index pricing for post-consumer PET flake, however, was not an appropriate market benchmark for the sales of PET flake from [      ] to OCTAL Extrusion, which involved solely post-*industrial* PET flake.  See id. at 8.

All the parties agreed below that post-consumer and post-industrial PET flake are very different products.  See id. at 8-15 (CR 246, PR 204), Exhs. SBCUK-6, SBCUK-8, SBCUK-10 (CR 247, PR 205).  OCTAL confirmed that post-industrial PET flake (i.e., what [      ] sold to OCTAL Extrusion) is cleaner and requires no processing compared to post-consumer PET flake. Id. at 14.  OCTAL's own description of the significant collection and processing requirements (all added costs) to arrive at "LNO Pellet" material proved the unsuitability of post-consumer PET flake pricing as a proxy for the post-industrial PET scrap that is sold directly to PET sheet producers.  See id. at 10-13.

---

[26]    In the underlying proceeding, OCTAL asserted that the PET flake price OCTAL Extrusion paid reflected [                                        ] OCTAL Mar. 18, 2020 SBCQR at 9.  (CR 246, PR 204).  That claim was entirely lacking in record support and unverifiable.  See Pet. Case Brf. at 9-10.  (CR 259, PR 224).

NONCONFIDENTIAL

The parties also agreed below that post-consumer PET flake is rarely used in PET sheet production, including by OCTAL Extrusion.  OCTAL Apr. 9, 2020 RFI at Annex A, para. 17. (CR 253, PR 213); Pet. Mar. 27, 2020 SBCQR Comments at Att. 1, para. 3, Att. 2, para. 3, Att. 3, para. 3 (domestic producer affidavits confirming that [

] uses post-industrial, not post-consumer, PET flake). (CR 251, PR 206).  Because the use of post-consumer PET flake to make PET sheet is highly uncommon, a post-consumer PET flake price index could not be used to demonstrate that OCTAL Extrusion's purchases of PET flake from [       ] were in line with the market.

        c.      **The Record Lacks Any Explanation for the [       ] Price OCTAL Extrusion Paid to [       ] for PET Flake**

Petitioners placed on the record evidence that OCTAL Extrusion, in fact, paid a [       ] price to [     ] for PET flake relative to the market.  The three petitioners provided *actual* post-industrial PET flake purchases from thermoformer customers during the POI.[27]  The average price paid for post-industrial PET flake from customers between July 2018 and June 2019 was [

]  See Pet. Mar. 27, 2020 SBCQR Comments at Atts. 1-3. (CR 251, PR 206).  By comparison, the average price paid by OCTAL Extrusion to [     ] for post-industrial PET flake during the same period was [       ]  See OCTAL SABCQR at 5 (providing monthly quantity and value for OCTAL Extrusion's purchases of PET flake from

---

[27]   Petitioners are unaffiliated competitors representative of the domestic PET sheet extrusion industry and also significant buyers of post-industrial PET flake.

NONCONFIDENTIAL

[         ] July 2018-June 2019).[28]  (CR 169, PR 159); OCTAL Mar. 18, 2020 SBCQR at 6 (CR 246, PR 204).

Have conceded that OCTAL Extrusion paid the U.S. customer [         ] price for PET flake, OCTAL attempted to argue, unsuccessfully, that the [         ] price OCTAL Extrusion paid [         ] for PET flake during the POI was due to the "overall quality of the material being sold" (i.e., flake from OCTAL's proprietary "DPET" sheet) and its intrinsic viscosity ("IV").  See OCTAL Apr. 9, 2020 RFI at Annex A, at pages 1-4.  (CR 253, PR 213); see also OCTAL Mar. 18, 2020 SBCQR at 8 (CR 246, PR 204).  OCTAL's arguments lacked record support.

First, OCTAL's claim that the [         ] PET flake price from [         ] to OCTAL Extrusion reflected the alleged superior quality of DPET-derived flake was contradicted by OCTAL's previous assertion that the PET flake price reflected prices [

         ] (although that also lacked record support).[29] Compare OCTAL Mar. 18, 2020 SBCQR at 9 (CR 246, PR 204) (emphasis added) with OCTAL Apr. 9, 2020 RFI at Annex A, at pages 1-4 (CR 253, PR 213).

Second, the record refuted OCTAL's claim that intrinsic viscosity ("IV") drives post-industrial PET flake price.  See Pet. Mar. 27, 2020 SBCQR Comments at 5 (CR 251, PR 206); Pet. Case Brf. at 13-17 (CR 259, PR 224).  OCTAL's response below focused on the differences in IV between OCTAL's PET *sheet* and other PET *sheet* (see OCTAL Apr. 9, 2020 RFI at

---

[28]   It is noteworthy that OCTAL put forth an argument as to why the PET flake prices were [                    ] *before* petitioners placed data on the record showing that the price paid by OCTAL Extrusion for PET flake was [                                                                    ] suggesting [                    ]  See OCTAL Mar. 18, 2020 SBCQR at 8.  (CR 246, PR 204).

[29]   OCTAL admits to the Court that PET sheet (and, presumably, the PET flake resulting from the processing of that sheet) "is a highly substitutable product."  OCTAL Brf. at 30.

NONCONFIDENTIAL

Annex A, at pages 1-2, Att. 1 (CR 253, PR 213)), rather than how such differences translate to the PET flake – a reheated *scrap* product – or how technical differences, if any, impact PET flake value.  In fact, [

            ]  Pet. Mar. 27, 2020 SBCQR Comments at Att. 1, paras. 5-6.  (CR 251, PR 206).

Moreover, once minimum quality standards are met, any differences in PET flake are not commercially significant.  PET sheet producers are [

            ]  See id. at Att. 1, para. 5.  Further, the IV of PET flake is [

                                                                        ]  See id.

Petitioners corroborated this point with evidence that [

                                                            ]  Id. at Att. 1, para. 7.  Thus, the

[          ] price OCTAL Extrusion paid [          ] for PET flake was not explained by OCTAL's arguments below regarding quality.

###     2.     **OCTAL Had PET Flake Market Information Available, But Failed to Provide It to Commerce**

OCTAL could have demonstrated that the PET flake price was consistent with OCTAL Extrusion's *other* purchases of PET flake, but did not provide such information to Commerce.  In the affidavit supplied by OCTAL, Mr. Barenberg stated that "OCTAL established OCTAL Extrusions in Cincinnati, Ohio to take advantage of the availability of *significant quantities of skeletal DPET sheet leftovers from OCTAL's thermoformer customers*."  OCTAL Apr. 9, 2020 RFI at Annex A, para. 15 (emphasis added).  (CR 253, PR 213).  He also stated that OCTAL Extrusion is "largely dedicated to buying OCTAL DPET scrap *from our customers* and reprocess

NONCONFIDENTIAL

that high-quality post-industrial flake back into PET sheet." Id. at Annex A, para. 16 (emphasis added).  Finally, Mr. Barenberg noted that "much post industrial flake is sold back {by the thermoformer} to the supplier who provided the PET sheet," which "is how OCTAL {Extrusion} obtains its post-industrial PET flake." Id. at Annex A, para. 29.  Thus, by their own admission, OCTAL and OCTAL Extrusion had pricing from OCTAL Extrusion's own regular purchases of post-industrial (D)PET flake from other "customers" – plural.[30]  ***OCTAL had such information and declined to provide it***, despite Commerce's clear request and multiple opportunities to do so (including the March 18, 2020 supplemental questionnaire response *and* Commerce's acceptance of OCTAL's untimely April 9, 2020 rebuttal factual information).

Mr. Barenberg further testified, "Every PET sheet producer (whether merchant or vertically integrated) has the following options for raw materials to produce PET sheet: (a) PET resin, (b) PCW {post-consumer waste} flake (in the form of either resin pellets or bottle flake), or (c) post-industrial thermoform flake." Id. at Annex A, para. 25.  Of those three "options," the pricing for only one – post-industrial thermoform flake – was relevant to Commerce's inquiry regarding whether OCTAL Extrusion's PET flake purchases from [     ] were at an arm's-length market price.  Yet, the only prices OCTAL provided to Commerce were for the *other* input types even though OCTAL Extrusion admitted it is a purchaser of post-industrial thermoform flake from numerous customers.  Lacking relevant data from OCTAL, Commerce

---

[30]  Assuming arguendo that OCTAL's statement regarding [
     *]* is accurate (OCTAL SABCQR at 3 (CR 169, PR 159)), it is evident from Mr. Barenberg's testimony that, at the very least, OCTAL must have had information regarding OCTAL Extrusion's purchases of PET flake from other U.S. thermoformer customers [                    ]  Even though such data would [
     ] it would have contributed to the Department's inquiry regarding whether OCTAL's PET flake purchase price from [     ] is an arm's-length market price.

NONCONFIDENTIAL

was entitled to rely on the only pertinent information on the record – evidence of pricing for petitioners' contemporaneous purchases of post-industrial PET flake – showing that OCTAL Extrusion's PET flake price was, indeed, [                    ] the market.

**3.    The PET Flake Price Paid by OCTAL Extrusion to [          ] Had the Potential to Impact [            ] U.S. Price for Subject Merchandise**

OCTAL is wrong that the supply agreement terms related to PET flake have nothing to do with the price of subject merchandise, PET sheet.  See OCTAL Brf. at 34.   The statute and Commerce's regulations do not require evidence of the "actual impact of a relationship" on prices (Preamble, 62 Fed. Reg. at 27,298), but rather "the *potential* to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product." 19 C.F.R. § 351.102(b)(3) (emphasis added); see also Affiliation Memo at 4 (CR 262, PR 234).

Substantial record evidence here demonstrates the significant *potential* for the PET flake pricing to impact [          ] ultimate net price for the subject merchandise.   In claiming that there was no "control" over PET *sheet* prices (see OCTAL Brf. at 31-32), OCTAL obfuscates how the overall arrangement – the totality of the evidence – created the opportunity to [

              ] price the customer paid for the subject merchandise.   OCTAL's repeated statements about how the individual facts of the unique relationship "add nothing" to Commerce's analysis are mere rhetoric and ignore the evidence, taken together, of reliance and restraint giving rise to a close supplier relationship.  See supra section I.B.

The same record evidence of the [              ] arrangement [

              ] created a situation within which the price paid for one product could be used to offset the price paid for another.  Specifically, the price [                              ] that the U.S. customer received for PET flake from OCTAL's sister company, OCTAL

NONCONFIDENTIAL

Extrusion, possibly – and likely – impacted the ultimate subject merchandise price experienced by the customer.  OCTAL cannot feign ignorance of this potential impact (see OCTAL Brf. at 37, 44), which was fully briefed below and considered by Commerce.  See Affiliation Memo at 1-2 (considering petitioners' argument that, "{t}aken together, these circumstances suggest that the high price paid for OCTAL Extrusion's purchases of PET flake from [      ] operates as a discount against [      ]'s purchases of PET sheet from OCTAL"), 4-5. (CR 262, PR 234).  Commerce's final determination of affiliation is, therefore, supported by substantial evidence and in accordance with law.

## II.   COMMERCE DID NOT ERR IN REACHING A DIFFERENT CONCLUSION IN THE FINAL DETERMINATION

In urging the Court to remand the final determination to Commerce, OCTAL relies heavily on the timing of Commerce's affiliation finding, claiming that Commerce "reversed its preliminary determination" concerning the issue of affiliation.  See OCTAL Brf. at 48-49.  OCTAL's argument fails to demonstrate any error by Commerce.

As a factual matter, OCTAL is wrong that "Commerce did not seek further information on these {affiliation} issues, even though Commerce issued post-preliminary supplemental questionnaires seeking other information."  Id. at 49.  On the contrary, Commerce *did* issue a post-petition supplemental questionnaire on March 6, 2020, that specifically requested information on the potential for the sale of PET flake to OCTAL Extrusion to affect [      ] price for the subject merchandise, PET sheet.  See Mar. 6, 2020 Supp. Questionnaire at 4.  (PR 200).  Commerce clearly requested that OCTAL demonstrate that the price OCTAL Extrusion paid to [      ] for PET flake was an arm's-length, market-determined price, with the

NONCONFIDENTIAL

underlying question being whether manipulation of price in one part of the [                    ] arrangement had the potential to lead to price manipulation in the other part.

The factual information gathered by Commerce and highlighted by petitioners over the course of the investigation developed into substantial evidence of the close supplier relationship between OCTAL and its U.S. customer.[31]  See Affiliation Memo at 3.  (CR 262, PR 234).  But the period between the start of the investigation and Commerce's statutory preliminary determination deadline is short.  Although petitioners had raised concerns regarding the unusual relationship between OCTAL and [          ] Commerce did not address petitioners' arguments in the preliminary determination.  Compare Pet. Pre-Prelim. Comments at 8-10 (CR 216, PR 175) with Preliminary Decision Memorandum (PR 183).  Thus, OCTAL's suggestion that Commerce "reversed" a preliminary determination finding is not correct.  See OCTAL Brf. at 48-49.  Shortly after the preliminary determination, however, Commerce had an opportunity to continue its investigation and properly hone in on the question of whether that close supplier relationship had the potential to impact the price of the subject merchandise – hence, the March 6, 2020 targeted supplemental question to OCTAL on the topic, issued just over a week after the preliminary determination.

OCTAL's arguments also fail as a legal matter on multiple levels.  First, it is well-settled that Commerce has discretion to reverse or change its preliminary findings even if interested parties did not request the particular change.  See Am. Signature v. United States, 598 F.3d 816, 826 (Fed. Cir. 2010); NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208 (Fed. Cir. 1995) (finding preliminary results "are 'preliminary' precisely because they are subject to change");

---

[31]  See, e.g., Pet. Pre-Prelim. Comments at 8-10 (CR 216, PR 175); Pet. Mar. 4, 2020 Comments at 5-8 (CR 244, PR 197); Pet. Mar. 27, 2020 SBCQR Comments (CR 251, PR 206).

NONCONFIDENTIAL

Hyundai Steel Co. v. United States, 319 F. Supp. 3d 1327, 1343 (Ct. Int'l Trade 2018) ("'Commerce has the flexibility to change its position from the preliminary to the final results,' provided it 'explains the basis for the change' and its decision is supported by substantial evidence and in accordance with law.") (quoting Timken Co. v. United States, 59 F. Supp. 2d 1371, 1376 (Ct. Int'l Trade 1999)); Husteel Co. v. United States, 98 F. Supp. 3d 1315, 1357 (Ct. Int'l Trade 2015) (concluding that "Commerce was not prohibited from reconsidering its analysis of the evidence" in the final determination, despite no new post-preliminary evidence); Changshan Peer Bearing Co. v. United States, 953 F. Supp. 2d 1354, 1363 (Ct. Int'l Trade 2014) (observing that parties may "not presume Commerce would not adopt a different approach in determining the Final Results").

Second, that OCTAL did not report its close supplier relationship with [        ] as part of its affiliations questionnaire response does not preclude Commerce from later determining that substantial evidence supports such a finding.  See OCTAL Brf. at 46-47.  Commerce has broad discretion in deciding what constitutes the best available information in order to calculate accurate dumping margins, which OCTAL acknowledges is Commerce's overriding purpose. See id. at 46; Timken Co. v. United States, 166 F. Supp. 2d 608, 626 (Ct. Int'l Trade 2001) ("While {the duty to calculate margins as accurately as possible} implied that Commerce is under the obligation to seek and use the best information available, it does not mean that Commerce is bound to any particular mode of collecting such information.") (citation omitted); see also QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011).

Finally, while it is important that a respondent disclose affiliations early in an investigation (unlike OCTAL's disclosure of the close supplier relationship with [        ] here), no law, rule, or precedent requires that evidence of affiliation be ignored if developed later in the

NONCONFIDENTIAL

proceeding.  OCTAL's reliance on the reporting deadline related to home market viability is misplaced.  See OCTAL Brf. at 47-48.  Reporting on home market viability, if in question, carries specific regulatory deadlines because if the home market is not viable, Commerce may be required to collect an additional third-country database and must allow for sufficient time in the investigation to accomplish that.  See 19 U.S.C. §§ 1677b(a)(1)(B)(ii), (a)(1)(C)(ii); 19 C.F.R. § 351.404(c)(ii).  For this reason, the antidumping duty questionnaire expressly requires a respondent to contact Commerce no later than 14 days after issuance of the questionnaire if the respondent's home market is not viable.  See Antidumping Questionnaire at A-2. (PR 94).  Further, allegations and factual information from any interested party regarding home market viability are due to Commerce no later than 10 days after the relevant questionnaire response (e.g., Section B related to home market sales) is filed.  19 C.F.R. § 351.301(c)(2)(i).

Here, contrary to OCTAL's suggestion, Commerce's final affiliation finding was appropriately based on record evidence that developed over the course of the investigation, including after the preliminary determination.  That Commerce did not have time to issue a questionnaire response to [      ] was not the result of Commerce's delay, having given OCTAL every opportunity to disclose the close supplier relationship and to prove that pricing with [     ] was market-based (including by accepting an untimely factual filing by OCTAL).  See Preamble, 62 Fed. Reg. at 27,298 ("where a control relationship exists, the respondent will have to demonstrate that the relationship does not have the potential to affect the subject merchandise or foreign like product.").  Nor does the absence of a questionnaire to the U.S. customer detract from the substantial legal and factual basis for Commerce's final affiliation determination.

NONCONFIDENTIAL

### III.   THERE IS NO BASIS TO REOPEN THE RECORD

OCTAL argues "in the alternative" that the Court must direct Commerce to reopen the record and continue its investigation.  See OCTAL Brf. at 49-54.  OCTAL makes clear that it seeks such a remedy *in the event the Court concludes that Commerce's final determination was supported by substantial evidence and in accordance with law*.  Id. at 54.   In other words, OCTAL is seeking the absurd and unlawful result that the Court remand Commerce's final determination even if OCTAL loses this appeal.

The "alternative" remedy OCTAL requests is contrary to the statutory standard of review. The Court sustains any determination, finding or conclusion made by Commerce unless it is "'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" NSK Ltd. v. United States, 481 F.3d 1355, 1359 (Fed. Cir. 2007) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)); see also United States v. Eurodif S.A., 555 U.S. 305, 316 n.6 (2009). Further, the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even when the record contains evidence that detracts from the agency's conclusions.  Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984).   Commerce's final determination here is supported by substantial evidence and in accordance with the law on how the agency determines and treats affiliation, and must, therefore, be sustained by the Court pursuant to this standard.  There is no legal authority for the Court to order Commerce to take further action if its decision is found to be lawful.  OCTAL instead bases its argument on a challenge to Commerce's final determination methodology of applying neutral facts available.  See OCTAL Brf. at 50-54.  Commerce, however, has broad discretion in selecting a methodology that supports the calculation of accurate dumping margins.  See Fujian

NONCONFIDENTIAL

Mach. & Equip. Imp. & Exp. Corp. v. United States, 178 F. Supp. 2d 1305, 1327 (Ct. Int'l Trade 2001).[32]

Moreover, because the final determination is lawful, there is no tension between the interests of finality and accuracy, which must often be balanced by the Court.  NTN Bearing Corp., 74 F.3d at 1208 ("'Whenever a question concerning administrative, or judicial, reconsideration arises, two opposing policies immediately demand recognition: the desirability of finality, on the one hand, and the public interest in reaching what, ultimately, appears to be the right result on the other.'") (quoting Civil Aeronautics Bd. v. Delta Air Lines, Inc., 367 U.S. 316, 321 (1961)).  Interests of finality weigh heavily against reopening the record for further investigation where, as here, the propriety of the agency's decision is not in question.

---

[32]   Commerce's methodology here (Affiliation Memo at 5 (CR 262, PR 234)) is supported by substantial evidence because nearly [     ] of OCTAL's sales to [          ] were [          ] than sales to other customers (OCTAL Brf. at 52-53).  Thus, it was reasonable for Commerce to conclude that applying a dumping margin to just a portion of [          ] sales, when [          ] of those sale prices were [                    ] the rest of the market, would not result in the most accurate dumping margin.

NONCONFIDENTIAL

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Defendant-Intervenors respectfully request that the Court deny OCTAL's Motion for Judgment on the Agency Record and affirm Commerce's final antidumping determination.

Respectfully submitted,

/s/ Brooke M. Ringel
PAUL C. ROSENTHAL
BROOKE M. RINGEL
DAVID C. SMITH, JR.
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, D.C.  20007
(202) 342-8400

Counsel to Defendant-Intervenors Advanced
Extrusion, Inc., Ex-Tech Plastics, Inc., and
Multi-Plastics Extrusions, Inc.

Dated:  April 19, 2021

**CERTIFICATE OF COMPLIANCE**
**WITH COURT OF INTERNATIONAL TRADE**
**STANDARD CHAMBERS PROCEDURES**

Pursuant to the Court of International Trade Standard Chambers procedures, counsel for Defendant-Intervenors Advanced Extrusion, Inc., Ex-Tech Plastics, Inc., and Multi-Plastics Extrusions, Inc. hereby certify that the attached Response in Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record contains 13,689 words, including footnotes.  The word count certification is made in reliance on the word-count feature contained in Microsoft Word Office 2013.

Respectfully submitted,

/s/  Brooke M. Ringel
PAUL C. ROSENTHAL
BROOKE M. RINGEL
DAVID C. SMITH, JR.
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, D.C.  20007
(202) 342-8400

Counsel to Defendant-Intervenors

Dated:  April 19, 2021