A-523-813
Remand (Court No. 20-03697)
**Public Document**
E&C/OV:  BEB

*OCTAL, INC., OCTAL SAOC-FSZ v. United States*
**Court No. 20-03697, ECF No. 36 (CIT April 30, 2021)**
**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT ORDER**

## I.    SUMMARY

The Department of Commerce (Commerce) has prepared these final results of redetermination pursuant to the remand order of the U.S. Court of International Trade (the Court) in *OCTAL, INC., OCTAL SAOC-FSZ v. United States*, Court No. 20-03697, ECF No. 36 (April 30, 2021) (*Remand Order*).  This litigation relates to Commerce's finding of affiliation between OCTAL SAOC-FZC (OCTAL) and one of its U.S. customers, Customer A,[1] based on a close supplier relationship, in the less-than-fair-value (LTFV) investigation of polyethylene terephthalate sheet (PET sheet) from the Sultanate of Oman (Oman).[2]

Commerce continues to find OCTAL affiliated with Customer A.  Our analysis of the parties' comments on our affiliation finding is included in section IV, below.[3]

---

[1] Because the identity of Customer A and numerous facts surrounding the relationship between this customer and OCTAL are business proprietary in nature, we reference an accompanying business proprietary memorandum throughout our analysis.  *See* Memorandum, "Business Proprietary Memorandum Accompanying the Final Results of Redetermination Pursuant to Court Order:  OCTAL, Inc., OCTAL SAOC-FSZ v. United States," dated concurrently with these final results of redetermination (Remand BPI Memo).

[2] *See Polyethylene Terephthalate Sheet from the Sultanate of Oman:  Final Determination of Sales at Less Than Fair Value*, 85 FR 44278 (July 22, 2020) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM) at Comment 1.

[3] Certain information discussed in section III is business proprietary.  *See* Remand BPI Memo, generally, for discussion of business proprietary information (BPI).

## II.    BACKGROUND

### A.  Commerce's *Final Determination*

On July 22, 2020, Commerce published the *Final Determination* in the underlying LTFV investigation.[4]  In this determination, Commerce found that the sole mandatory respondent under investigation, OCTAL, was affiliated with one of its U.S. customers, Customer A.[5]  Commerce's understanding of the relationship between the companies evolved during the proceeding, and Commerce found OCTAL and Customer A to be affiliated for the first time in the *Final Determination*.  Because Commerce did not have or request downstream sales information from Customer A, Commerce applied neutral facts available to calculate OCTAL's final dumping margin with respect to these sales.[6]  Specifically, Commerce applied the weighted-average antidumping duty margin based on OCTAL's sales to unaffiliated U.S. customers to all sales made to Customer A.[7]

Following issuance of the *Final Determination*, Commerce requested a voluntary remand with the Court to allow parties to provide comments on Commerce's affiliation finding, and the Court granted Commerce's request.[8]

### B.  Remand Proceeding

On May 4, 2021, Commerce released a memorandum which included the *Final Determination* IDM and BPI Memorandum as attachments.[9]  In this memorandum, Commerce stated that it was providing interested parties an opportunity to comment on these documents in

---

[4] *See generally Final Determination*.
[5] *See Final Determination* IDM at Comment 1.
[6] *Id.*
[7] *Id.*
[8] *See Remand Order*.
[9] *See* Memorandum, "Voluntary Remand Concerning the Less-Than-Fair-Value Investigation of Polyethylene Terephthalate Sheet from the Sultanate of Oman," dated May 4, 2021; *see also* Memorandum, "Proprietary Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Polyethylene Terephthalate Sheet from the Sultanate of Oman:  Comment 1," dated July 16, 2020 at 5 (BPI Memorandum).

lieu of releasing a draft remand.  On May 6, 2021, OCTAL requested an extension of the

comment deadline, which Commerce granted.[10]  On May 14, 2021, OCTAL and the petitioners[11]

submitted comments.[12]

On May 18, 2021, we rejected OCTAL's comments because they contained unsolicited

new factual information, and we provided OCTAL an opportunity to refile them after removing

such information; OCTAL refiled its comments with this information removed on May 19,

2021.[13]  On May 21, 2021, OCTAL and the petitioners submitted rebuttal comments.[14]

Commerce has addressed these comments below.

## III.    AFFILIATION DETERMINATION IN THE UNDERLYING INVESTIGATION

### A. Applicable Law and Regulation

Section 771(33) of the Tariff Act of 1930, as amended (the Act) states that the following

persons shall be considered affiliated:  (A) members of a family, including brothers and sisters

(whether by the whole or half blood), spouse, ancestors, and lineal descendants; (B) any officer

or director of an organization and such organization; (C) partners; (D) employer and employee;

---

[10] *See* OCTAL's Letter, "OCTAL Request to Adjust Comment Schedule Polyethylene Terephthalate Sheet from the Sultanate of Oman (Remand)," dated May 6, 2021; and Memorandum, "Voluntary Remand Concerning the Less-Than-Fair-Value Investigation of Polyethylene Terephthalate Sheet from the Sultanate of Oman:  Extension of Time for Comments and Rebuttal Comments," dated May 6, 2021.
[11] The petitioners are Advanced Extrusion Inc., Ex-Tech Plastics, Inc., and Multi-Plastics Extrusions, Inc. (collectively, the petitioners).
[12] *See* OCTAL's Letter, "OCTAL's Comments on Initial Affiliation Issue:  Polyethylene Terephthalate Sheet from the Sultanate of Oman," dated May 14, 2021; and Petitioners' Letter, "Polyethylene Terephthalate Sheet from the Sultanate of Oman:  Petitioners' Voluntary Remand Comments on Final Determination," dated May 14, 2021 (Petitioners Comments).
[13] *See* Commerce's Letter, "Voluntary Remand Concerning the Less-Than-Fair-Value Investigation of Polyethylene Terephthalate Sheet from the Sultanate of Oman – Rejection of OCTAL Submissions," dated May 18, 2021; and Memorandum, "Voluntary Remand Concerning the Less-Than-Fair-Value Investigation of Polyethylene Terephthalate Sheet from the Sultanate of Oman:  Extension of Time to Refile OCTAL Comments," dated May 19, 2021; *see also* OCTAL's Letter, "OCTAL's Comments on Initial Affiliation Issue:  Polyethylene Terephthalate Sheet from the Sultanate of Oman," dated May 19, 2021 (OCTAL Comments).
[14] *See* OCTAL's Letter, "OCTAL's Rebuttal to Comments on Initial Affiliation Conclusion:  Polyethylene Terephthalate Sheet from the Sultanate of Oman," dated May 21, 2021 (OCTAL Rebuttal Comments); and Petitioners' Letter, "Polyehylene Terephthalate Sheet from the Sultanate of Oman:  Petitioners' Voluntary Remand Rebuttal Comments," dated May 21, 2021 (Petitioners Rebuttal Comments).

(E) any person directly or indirectly owning, controlling, controlled by, or holding with power to vote, five percent or more of the voting stock or shares of any organization and such organization; (F) two or more persons directly or indirectly controlling, controlled by, or under common control with, any person; and (G) any person who controls any other person and such other person.  To find affiliation between two companies, at least one of the criteria above must be applicable.

Section 771(33) of the Act further provides that "{f}or purposes of this paragraph, a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person."  Furthermore, Commerce's regulations, at 19 CFR 351.102(b)(3), state that, in finding affiliation based on control, Commerce will consider, among other factors:  (i) corporate or family groupings; (ii) franchise or joint venture agreements; (iii) debt financing, and (iv) close supplier relationships.

Control between persons may exist in close supplier relationships in which either party becomes reliant on the another,[15] but Commerce will not find affiliation on the basis of this factor alone unless the relationship has the potential to affect decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product.[16]

## B.  Analysis

Commerce found that OCTAL and Customer A were affiliated during the period of investigation (POI) through a close supplier relationship because OCTAL was able to influence Customer A's production, pricing, and costs.[17]  Specifically, we found that the following

---

[15] See, e.g., Certain Oil Country Tubular Goods from the Republic of Korea:  Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances, 79 FR 41983 (July 18, 2014), and accompanying IDM at Comment 20.
[16] See 19 CFR 351.102(b)(3) (noting that, in the context of close supplier relationships, Commerce "will not find that control exists on the basis of these factors unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product").
[17] See Final Determination IDM at Comment 1 and BPI Memorandum at 4-5.

considerations supported finding a close supplier relationship:  (1) the nature of the supply relationship between OCTAL and Customer A; (2) the arrangement through which OCTAL's U.S. affiliate purchases back PET flake/scrap from Customer A; (3) loans from OCTAL to Customer A and their terms; and (4) contractual restrictions on Customer A's business activities.[18]  We also noted that the relationship exerted substantial influence on OCTAL's production, and the production of its U.S. affiliate, which sourced a key input from Customer A.[19]  Accordingly, Commerce determined that the relationship was able to affect OCTAL's production and cost of producing the subject merchandise, as well as the price OCTAL could charge and receive for it.  The details of the relationship between OCTAL and Customer A, and the concomitant effects on production, price, and cost are proprietary.  *See* Remand BPI Memo at Note 1 for these details concerning the close supplier relationship analysis.

As discussed further below, because OCTAL did not clearly identify the potential affiliation with Customer A in its responses to the affiliation portion of Commerce's questionnaire, Commerce was unaware of the potential affiliation issue at the start of the proceeding and its understanding of the relationship between OCTAL and Customer A evolved over the course of the investigation; thus, Commerce did not make an affiliation finding until the *Final Determination*.[20]  Accordingly, Commerce had not requested, nor had OCTAL provided, downstream sales information for Customer A.  Given that the information for sales made to Customer A's first unaffiliated U.S. customer was not on the record, Commerce assigned the weighted-average dumping margin for OCTAL's sales to its other unaffiliated U.S. customers to the sales made to Customer A.[21]  Commerce assigned the weighted-average dumping margin to

---

[18] *See Final Determination* IDM at Comment 1 and BPI Memorandum at 4-5.
[19] *See Final Determination* IDM at Comment 1 and BPI Memorandum at 4-5.
[20] *See Final Determination* IDM at Comment 1 and BPI Memorandum.
[21] *See* BPI Memorandum at 5.

Customer A's sales as neutral facts available under sections 776(a)(1) and 782(d) of the Act. Because OCTAL properly reported its other U.S. sales made in the normal course of business to unaffiliated U.S. customers, we found these sales to be a suitable source of neutral facts available to fill the gap in the record regarding downstream sales data from OCTAL's affiliate, Customer A, to unaffiliated customers.

## IV.    COMMENTS ON THE AFFILIATION ANALYSIS

As noted above, interested parties provided comments on Commerce's close supplier relationship finding and on the appropriate sales to rely on in our dumping analysis.  We address these comments in turn.

**Comment 1:   Commerce's Finding of a Close Supplier Relationship between OCTAL and Customer A**

*Petitioners' Comments*

- Commerce should affirm its finding that OCTAL and Customer A are affiliated through a close supplier relationship.  Record evidence[22] demonstrates Customer A's reliance on OCTAL and the ability of OCTAL to restrain or direct Customer A.  These considerations indicate a level of control constituting affiliation under section 771(33) of the Act.  The relationship between the two parties also had the potential to impact the production, pricing, and cost of the subject merchandise or foreign like product.[23]

- Section 771(33)(G) of the Act states that Commerce may find affiliation between "{a}ny person who controls any other person" and, in this context, "control" means that the person is

---

[22] *See* Remand BPI Memo at Notes 2 through 7 for the summarization of petitioners' comments relying on this proprietary record evidence.
[23] *See* Petitioners Comments at 3 (citing 19 CFR 351.102(b)(3)).

"legally or operationally in a position to exercise restraint or direction over the other person." This control need not be legal control; nor must there be evidence of actual control.[24]

- Under 19 CFR 351.102(b)(3), a close supplier relationship is one arrangement through which Commerce can find affiliation by virtue of control.  In determining whether a close supplier relationship exists, Commerce first looks at whether "the supplier or buyer have become reliant on the other."[25]  If the record demonstrates reliance by the buyer or seller, Commerce then determines whether one of the parties is in a position to exercise restraint or direction over the other.[26]  Even if Commerce finds the ability of one party to control the other, it will not find affiliation if the relationship does not have "the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product" or if the relationship is temporary.[27]

- If Commerce finds potential control between parties, the burden is on the respondent to demonstrate that the relationship cannot affect the sales/production of the subject merchandise.[28]  OCTAL did not demonstrate that the relationship in question cannot affect the subject merchandise; instead, the record supports Commerce's finding of affiliation between OCTAL and Customer A, which had the significant potential to impact U.S. prices.

- Commerce uses the price to the first unaffiliated customer in its calculation of the dumping margin.  The arrangement between OCTAL and Customer A is precisely the sort of situation Commerce's investigations are designed to detect.

---

[24] *Id*. at 12 (citing *Antidumping Duties; Countervailing Duties; Final Rule*, 62 FR 27296, 27297-27298 (May 19, 1997) (*Preamble*)).

[25] *Id*. at 13 (citing Statement of Administrative Action, HR 5110, H.R. Doc. No. 316, vol. 1, 103d Cong., 2d Sess. at 838 (1994) (SAA); and *Tension Steel Industries Co., Ltd. v. United States*, 179 F. Supp. 3d 1185, 1198 (CIT 2016) (*Tension Steel*) (quoting *TIJID, Inc. v. United States*, 366 F. Supp. 2d 1286, 1299 (CIT 2005) (*TIJID, Inc.*))).

[26] *Id*. (citing section 771(33) of the Act).

[27] *Id*. (citing 19 CFR 351.102(b)(3)).

[28] *Id*. at 13-14 (citing *Preamble*, 62 FR at 27298).

- Commerce considers the totality of the record evidence when evaluating if a close supplier relationship exists.[29]  Here, Commerce's finding of affiliation was based on several factors demonstrated in the record evidence.  For further discussion of this proprietary record evidence, *see* Remand BPI Memo at Note 2.

- The first factor relied on by Commerce relates to the nature of the supply relationship between OCTAL and Customer A.  *See* Remand BPI Memo at Note 3 for discussion of this issue.  In characterizing the effect that this supply relationship has on prices, OCTAL has failed to consider the record as a whole or the mechanism through which the amount paid by Customer A for PET sheet was subsequently reduced by the amount Customer A received for PET flake.[30]  OCTAL cannot challenge the finding of affiliation without recognizing and addressing how the nature of the relationship between OCTAL and Customer A, as a whole, had the potential to impact PET sheet prices.

  o  In prior cases, Commerce has found that an exclusive or predominant supply relationship creates a significant level of dependence and control, especially when other indications of affiliation are also present, as they are here.  For example, in the *Wire Rod from Korea Final Determination*, Commerce found a close supplier relationship between the sole

---

[29] *Id*. at 14 (citing *Notice of Final Determination of Sales at Less Than Fair Value:  Steel Concrete Reinforcing Bars from Latvia*, 66 FR 33530 (June 22, 2001) (*Rebar from Latvia*), and accompanying IDM at Comment 1; *Notice of Final Determination of Sales at Less Than Fair Value:  Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Japan*, 61 FR 38139 (July 23, 1996) (remanded by *Mitsubishi Heavy Industries, Ltd. v. United States*, 15 F. Supp. 2d 807 (CIT 1998), aff'd by, *Mitsubishi Heavy Industries, Ltd.* 54 F. Supp. 2d 1183, 1190-1191 (CIT 1999)); *Chlorinated Isocyanurates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 FR 10411 (February 24, 2020), and accompanying IDM at Comment 1; and *Certain Hot-Rolled Carbon Steel Flat Products from India:  Notice of Final Results of Antidumping Duty Administrative Review*, 73 FR 31961 (June 5, 2008), and accompanying IDM at Comment 12).

[30] *See* Petitioners Rebuttal Comments at 11 (citing Petitioners Comments at 24-31) and Petitioners Rebuttal Comments at 19-20 (citing Petitioners' Letter, "Polyethylene Terephthalate Sheet from the Sultanate of Oman – Petitioners' Pre-Preliminary Comments Regarding OCTAL's Sales Reporting," dated February 5, 2020 (Petitioners Pre-Preliminary Comments); and Petitioners' Letter, "Polyethylene Terephthalate Sheet from the Sultanate of Oman – Petitioners' Comments on OCTAL's Response Concerning Sales to the United Kingdom and Remaining Issues Concerning OCTAL's Sales to the United States," dated March 4, 2020 (Petitioners Post-Preliminary Comments)).

supplier and the sole Korean buyer of an input because the buyer was unable to develop an alternate supply source.[31]  Record evidence demonstrates that the relationship between OCTAL and Customer A would be hard to replace for either party and, thus, shows reliance, which need not only flow in one direction.[32]  While OCTAL cites *CORE from Korea* in support of its position, in that case an exclusive distribution contract was the only evidence supporting a finding of affiliation between parties, which is markedly different from the multiple factors present in the current case.[33]

o   Conversely, the lack of an exclusive supply agreement, or other legally-binding restriction that required the customer to purchase from only the foreign supplier, was a key factor in cases where Commerce declined to find a close supplier relationship.[34] Unlike in the current case, in past cases where Commerce has declined to find affiliation,

---

[31] *See* Petitioners Comments at 18 (citing *Notice of Final Determination of Sales at Less Than Fair Value:  Stainless Steel Wire Rod from Korea*, 63 FR 40404, 40410 (July 29, 1998) (*Wire Rod from Korea Final Determination*); *Stainless Steel Wire Rod from the Republic of Korea:  Preliminary Results of Antidumping Duty Administrative Review*, 71 FR 59739, 59739-40 (October 11, 2006) (*Wire Rod from Korea Preliminary Results*); and *Stainless Steel Wire Rod from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review*, 72 FR 6528 (February 12, 2007) (*Wire Rod from Korea Final Results*)); *see also* Remand BPI Memo at Note 3 for discussion of how the BPI issue in this case relates to these prior cases.
[32] *See* Petitioners Rebuttal Comments at 5 (citing *Tension Steel*, 179 F. Supp. 3d at 1198 (CIT 2016) (citing *TIJID, Inc.*, 366 F. Supp. 2d at 1299); and *Rebar from Latvia* IDM at Comment 1).
[33] *Id*. at 5 (citing *Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products from Korea:  Final Results of Antidumping Duty Administrative Reviews*, 62 FR 18404, 18441 (April 15, 1997) (*CORE from Korea*)).
[34] *See* Petitioners Comments at 19 (citing *TIJID, Inc.*, 366 F. Supp. 2d at 1299; *Certain Corrosion-Resistant Steel Products from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 10784 (March 22, 2019) (*CORE from Korea Final Results*), and accompanying IDM at Comment 11; *Grain-Oriented Electrical Steel from the Czech Republic:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 79 FR 58324 (September 29, 2014) (*GOES from the Czech Republic*), and accompanying IDM at Comment 1; *Certain Oil Country Tubular Goods from Taiwan:  Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 79 FR 10495 (February 25, 2014) (*OCTG from Taiwan*), and accompanying Preliminary Decision Memorandum (PDM) at 11, unchanged in *Certain Oil Country Tubular Goods from Taiwan:  Final Determination of Sales at Less Than Fair Value*, 79 FR 41979 (July 18, 2014) (*OCTG from Taiwan Final Determination*), and accompanying IDM at Comment 1; *Certain Pasta from Turkey:  Notice of Final Results of the 14th Antidumping Duty Administrative Review*, 76 FR 68399 (November 4, 2011) (*Pasta from Turkey*), and accompanying IDM at Comment 11; *Certain Polyethylene Terephthalate Film, Sheet and Strip from India:  Final Results of Antidumping Duty Administrative Review*, 70 FR 8072 (February 17, 2005) (*PET Film from India*), and accompanying IDM at Comment 1; and *Honey from the People's Republic of China:  Final Results and Final Rescission, In Part, of Antidumping Duty Administrative Review*, 70 FR 38873 (July 6, 2005) (*Honey from China*), and accompanying IDM at Comment 11).

it was because:  (1) parties did not have supply requirement agreements; (2) agreements

were not honored; or (3) parties could, and did, source from other suppliers.[35]  For

instance, in *LDWP from Canada*, Commerce preliminarily found a close supplier

affiliation due to the quantity of merchandise, accompanying financial arrangements,

notification of certain commercial conditions, and establishment of higher technical

standards imposed by the relationship between the parties;[36] Commerce has similarly

considered multiple factors, including the quantity of merchandise and accompanying

financial arrangements between the parties, in the current case.  However, unlike in the

current case, Commerce declined to find affiliation in the *LDWP from Canada Final*

*Determination* because verification showed that the buyer was not, in fact, required to

purchase exclusively from the foreign supplier.[37]

- o   For additional comments related to this issue, *see* Remand BPI Memo at Note 3.

- The second consideration that demonstrates a close supplier relationship relates to sales of

  PET flake/scrap from Customer A to OCTAL's affiliate, OCTAL Extrusion Corp. (OCTAL

  Extrusion).

  - o   With respect to whether the price paid was a market price, OCTAL suggested that

    Commerce rely on the index published by IHS Markit for post-*consumer* PET flake for

---

[35] *See* Petitioners Rebuttal Comments at 8-9 (citing *PET Film from India* IDM at Comment 1; *GOES from the Czech Republic* at Comment 1; *Honey from China* IDM at Comment 11; *OCTG from Taiwan* IDM at 11, unchanged in *OCTG from Taiwan Final Determination* IDM at Comment 1; *Pasta from Turkey* IDM at Comment 1.C; and *TIJID, Inc.*, 366 F. Supp. 2d at 1296-97)).

[36] *Id*. at 10 (citing *Large Diameter Welded Pipe from Canada:  Preliminary Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 83 FR 43649 (August 27, 2018) (*LDWP from Canada*), and accompanying PDM at 5-7; and OCTAL's Letter, "OCTAL's Supplemental Sections A-C Questionnaire Response Polyethylene Terephthalate Sheet from the Sultanate of Oman," dated January 16, 2020 at Exhibit SABC-2, paragraph 7).

[37] *Id*. at 10-11 (citing *Large Diameter Welded Pipe from Canada:  Final Affirmative Determination of Sales at Less Than Fair Value*, 84 FR 6378 (February 27, 2019) (*LDWP from Canada Final Determination*), and accompanying IDM at Comment 1).

its analysis; yet this is an inappropriate benchmark for the post-*industrial* PET flake

bought by OCTAL Extrusion.[38]  All parties agree that post-consumer and post-industrial

PET flake are very different products, as post-industrial flake is much more common and

it is cleaner and requires no processing, unlike post-consumer PET flake.[39]

o   Commerce gave OCTAL multiple opportunities to provide information regarding the

market price of PET flake, including through the acceptance of OCTAL's untimely

submission.[40]  OCTAL Extrusion purchases PET flake from numerous customers and

could have placed comparable price data on the record, yet the only comparison prices

OCTAL provided were for different products (*i.e.*, PET resin and post-consumer PET

flake).

o   The petitioners disagree with Commerce's conclusion not to apply adverse facts available

(AFA) in light of OCTAL's failure to provide information relating to market prices for

post-industrial PET flake.  Commerce stated that this was due to its developing

understanding of the OCTAL-Customer A relationship during the course of the

investigation.  However, OCTAL repeatedly ignored opportunities to disclose

information to Commerce and declined to provide information in its possession, making

the delay in the affiliation finding not Commerce's fault, but OCTAL's.  Commerce

made the most favorable finding possible by not applying AFA, even when OCTAL

---

[38] *Id*. at 25-26 (citing OCTAL's Letter, "OCTAL's Supplemental Sections B-C Questionnaire Response Polyethylene Terephthalate Sheet from the Sultanate of Oman," dated March 19, 2020 (OCTAL March 19, 2020 SQR) at 8 and 14).
[39] *See* Petitioners Comments at 26 (citing OCTAL March 19, 2020 SQR at 10-14; OCTAL's Letter, "OCTAL's Submission of Rebuttal Factual Information:  Polyethylene Terephthalate (PET) Sheet from the Sultanate of Oman," dated April 9, 2020 (OCTAL Rebuttal Factual Information) at Annex A; and Petitioners' Letter, "Polyethylene Terephthalate Sheet from the Sultanate of Oman – Petitioners' Comments on OCTAL's March 18, 2020 Supplemental Sections B-C Questionnaire Response," dated March 27, 2020 (Petitioners March 27, 2020 Comments) at Attachments 1-3).
[40] *Id*. at 30 (citing OCTAL Rebuttal Factual Information).

withheld necessary information, and Commerce is justified in relying on the only

pertinent information on the record showing the market price for PET flake.

o   The petitioners' BPI comments relating to the sales of PET flake from Customer A to

OCTAL Extrusion are contained in the Remand BPI Memo at Note 4.

• The third consideration in favor of finding a close supplier relationship relates to restrictions

on Customer A's business activities.  The petitioners' BPI comments relating to this issue are

contained in the Remand BPI Memo at Note 5.

• The final consideration indicating a close supplier relationship relates to financing

arrangements between OCTAL and Customer A.  The petitioners' BPI comments relating to

this issue are contained in the Remand BPI Memo at Note 6.

• Not only is Customer A controlled by OCTAL through the four aspects of the relationship

discussed above, but OCTAL is also controlled through its relationship with Customer A.[41]

While the legislative history contemplates control through a close supplier relationship where

the supplier *or* buyer relies on the other, there is nothing in the Act that dictates that mutual

reliance defeats affiliation.[42]  Declining to find a close supplier relationship in this situation,

simply because the controlling party also had a significant stake in the relationship, would

gut the relevant provision in the Act and Commerce's affiliation rules and would be a

template for foreign producers to mask dumping.

o   In other contexts, Commerce has noted that a relationship that is significant for both

parties can still evince influence and control in the buyer-supplier relationship.  For

instance, in *Shanxi Hairui*, the Court sustained Commerce's finding that a respondent

should have been aware of its supplier's fraudulent transshipment activities given the

---

[41] *See* Remand BPI Memo at Notes 2 through 7 for additional discussion of related BPI.
[42] *See* Petitioners Comments at 17 (citing SAA at 838).

"significant" customer-supplier relationship between the firms involved.  There, the
respondent purchased a "significant portion" of the supplier's production volume and the
Court upheld the conclusion that a relationship of this significance gave the respondent
influence over the supplier.[43]

- The burden is on the respondent to demonstrate that the affiliation relationship does not
affect the subject merchandise, including its price.[44]  OCTAL ignored the petitioners'
multiple comments regarding the lack of arm's-length pricing for post-industrial PET flake as
well as Commerce's supplemental questionnaire regarding the issue.[45]  While OCTAL argues
for the need to assess the record "as a whole," it separately examines each factor in isolation
and does not consider the totality of the circumstances in its own analysis.[46]

- Commerce properly found that OCTAL and Customer A have a close supplier relationship
based on the four criteria discussed above.[47]  For further discussion of the petitioners' BPI
comments on the overall relationship between OCTAL and Customer A, *see* the Remand BPI
Memo at Note 7.

*OCTAL's Comments*

- Based on the existing evidentiary record, OCTAL and Customer A are not affiliated.  Neither
the facts nor the law support a finding of affiliation between OCTAL and Customer A, and
OCTAL does not control, or have the potential to control, Customer A.  Section 771(33) of
the Act defines "affiliated person," with subparagraph (G) serving as a residual definition.

---

[43] *Id*. at 17-18 (citing *Shanxi Hairui Trade Co. v. United States*, 503 F. Supp. 3d 1307, 1313-1314 (CIT 2021)
(*Shanxi Hairui*)).
[44] *See* Petitioners Rebuttal Comments at 19 (citing *Preamble*, 62 FR 27298; and 19 CFR 351.102(b)(3)).
[45] *Id*. at 19-20 (citing Petitioners Pre-Preliminary Comments; Petitioners Post-Preliminary Comments; and
Commerce's Letter, "Polyethylene Terephthalate (PET) Sheet from the Sultanate of Oman:  Sections B-C
Supplemental Questionnaire," dated March 6, 2020)).
[46] *Id*. at 3-4 (citing OCTAL Comments at 10-11) and 19.
[47] *See also* Remand BPI Memo at Notes 2-7.

Commerce relied solely on paragraph 771(33)(G) for its finding that OCTAL and Customer A were affiliated, but this paragraph has limiting principles.  For instance, a person must be legally or operationally in a position to control another person by exercising restraint or direction.  This finding of control requires a legal or other concrete basis and requires Commerce to identify what "restraint or direction" is occurring.  Similarly, Commerce's regulations, at 19 CFR 351.102(b)(3), state that Commerce will not find control unless "the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product."  Again, Commerce is instructed not to find control based on generalized concerns about influence; control must relate to the subject merchandise, not concerns about other products.  Commerce's finding cannot be an abstract or hypothetical suspicion but must be based on the actual capacity to exercise control.

o   The standard for a close supplier relationship is high and Commerce cannot merely presume control from the existence of indicia of control.  Close supplier relationships are relationships that are significant and cannot be easily replaced.

- During the investigation, Commerce did not undertake its usual investigation of possible customer affiliation and provided very little analysis of the affiliation issue or the relevant facts.[48]  Commerce based its finding on four factors:  (1) the nature of the supply relationship between OCTAL and Customer A; (2) that OCTAL purchases PET flake/scrap from Customer A; (3) loans from OCTAL to Customer A; and (4) alleged restrictions on Customer A's business activities.[49]  These four features of the OCTAL supply agreement with Customer A were apparent in an October 7, 2019 submission, and later submissions do not

---

[48] *See* OCTAL Comments at 8 (citing BPI Memorandum).
[49] *Id*. (citing BPI Memorandum).

materially add to the issue.[50]  Commerce did not raise this affiliation issue until the 11th hour

and, therefore, had an incomplete record with a lack of detail on several key issues.

Commerce's discussion of the record evidence is not objective and selectively presents

certain facts while ignoring others.  Commerce did not show how any of the above four

factors demonstrate actual control by OCTAL over Customer A, nor that there is any

potential impact on the price that Customer A pays OCTAL for PET sheet.  For each of the

four factors, Commerce inferred beyond what the facts will support, overlooked its own prior

practice, and ignored record evidence.

- The first factor concerns the supply relationship between OCTAL and Customer A.  *See*

  Remand BPI Memo at Note 8 for a discussion of OCTAL's BPI comments on this issue.

  o  The Court has confirmed that a close supplier relationship does not exist between two

     companies even when one company sells 100 percent of its merchandise to the other.[51]

     In prior cases, Commerce has looked at the totality of circumstances, which were not

     examined in this case, such as the possibility of purchasing from alternative sources of

     supply.[52]  There are numerous other domestic and international suppliers of PET sheet,

     and Commerce made no comment on the specialized nature of the product at issue that

     may have limited the ability of customers to source from another supplier.[53]  OCTAL

     sells to a variety of customers and the U.S. International Trade Commission (ITC) noted

     that most parties consider PET sheet a highly substitutable product.[54]  For example, due

---

[50] *Id*. at 9 (citing OCTAL's Letter, "Section A Response of OCTAL SAOC – FZC:  Polyethylene Terephthalate Sheet from the Sultanate of Oman," dated October 7, 2019 (OCTAL October 7, 2019 AQR) at Exhibit A-9).
[51] *Id*. at 11 (citing *TIJID, Inc*, 366 F. Supp. 2d at 1299).
[52] *Id*. at 10-11 (citing *PET Film from India* IDM at Comment 1; *Honey from China* IDM at Comment 11; and *GOES from the Czech Republic* IDM at Comment 1).
[53] *Id*. at 12-13 (citing *Honey from China* IDM at Comment 11).
[54] *Id*. at 13 (citing Petitioners' Letter, "Polyethylene Terephthalate Sheet from Oman and the Republic of Korea – Petitioners' Submission of the International Trade Commission's Preliminary Determination – Publication 4970,"

to a cyclone in Oman, OCTAL's ability to supply PET sheet was interrupted for about six weeks, which shows that customers could, and did, source PET sheet from other suppliers.[55]

o   Commerce found "reciprocal" interdependence between OCTAL and Customer A; this means that both parties had leverage over each other and it is not evident who has control over whom.[56]  This offsetting influence makes no sense in the case of a large buyer, and the situation suggests balance and market-based pricing.  At the time the contract was signed, the starting price reflected arm's-length bargaining at market conditions, and because prices were based on a market index and not re-negotiated, a finding of distorted prices makes no sense.

o   Commerce examined the volume of sales, both as a percent of OCTAL's business and of Customer A's business, in its analysis.  But finding that Customer A purchased much of its PET sheet from OCTAL is just another way of characterizing the supply relationship and does not support Commerce's conclusion of control.[57]  In *LDWP from Canada*, Commerce found that a large percentage of sales to one customer "does not, by itself, constitute sufficient evidence to determine affiliation by virtue of a close relationship."[58] Commerce notes that its practice is to examine sales percentages over five years, but Commerce could not do so here because this information is not on the record and Commerce did not ask for it.[59]

---

dated October 15, 2019 (USITC Prelim) at 28-29 ("at least moderately substitutable") and II-7 ("high degree of substitutability")).

[55] *Id*. (citing Petitioners' Letter, "Polyethylene Terephthalate Sheet from Oman and the Republic of Korea – Petitioners' Submission of Final Transcript of the International Trade Commission's Preliminary Staff Conference," dated December 13, 2019 (USITC Preliminary Transcript) at 12, 19, 25, 42, 114, 115).

[56] *Id*. at 15 (citing BPI Memorandum at 4).

[57] *Id*. at 16 (citing BPI Memorandum at 4).

[58] *Id*. (citing *LDWP from Canada* IDM at Comment 1 and *TIJID, Inc*, 366 F. Supp. 2d at 1299).

[59] *Id*. at 16-17 (citing BPI Memorandum at 4).

- The second factor in the relationship, Customer A's sale of PET flake to OCTAL Extrusion, also includes BPI. *See* Remand BPI Memo at Note 9 for the discussion of OCTAL's comments on this point. Commerce has failed to link this second factor, in any way, to the price OCTAL charges Customer A for PET sheet.

  o The product discussed here, PET flake, is a by-product of the manufacture of plastic food storage containers and is a different product from PET sheet. The PET flake price in the contract thus has no bearing on the price of PET sheet or the relationship between OCTAL and Customer A. Commerce's analysis assumes that any product can serve as the basis for influence and control, but Commerce ignored the fact that PET flake is not subject merchandise. Commerce's analysis usually focuses on raw materials or inputs involved in the production of subject merchandise and requires a finding of near impossibility to replace the supplier.[60] In these cases, Commerce has found input supply insufficient for a finding of affiliation, even when the finished product is sold to a U.S. affiliate. Here, the PET flake is sold to OCTAL Extrusion, which recycles it into PET sheet at its facility in Ohio; Commerce does not link this different product from a different country to the price of PET sheet from Oman. Precedent shows that a close supplier relationship needs to affect the merchandise under consideration, but Commerce ignored that point here because it "fundamentally undermines its narrative of control and potential to affect the relevant price of PET sheet."[61]

---

[60] *Id*. at 18 (citing 19 CFR 351.102(b)(3); *Wire Rod from Korea Preliminary Results*; *OCTG from Taiwan* PDM at 10-13, unchanged in *OCTG from Taiwan Final Determination* IDM at Comment 1; and *CORE from Korea Final Results* IDM at Comment 11).
[61] *Id*. at 20-21 (citing *Certain Steel Nails from Taiwan: Final Determination of Sales at Less Than Fair Value*, 80 FR 28959 (May 20, 2015) (*Steel Nails from Taiwan*), and accompanying IDM at Comment 11).

o   With respect to price, Commerce mentions the "price formula" for PET flake only in passing, but the contract does not give OCTAL leverage over the price, which is set by a formula using market benchmarks, as is the price for PET sheet.[62]  The petitioners first noted this issue of using formulas to determine prices in their October 16, 2019, comments, yet Commerce did not raise this issue in any supplemental questionnaires as it did with other aspects of the supply contract.[63]

o   The petitioners argue that post-industrial and post-consumer PET flake cannot be compared, but, although the benchmark is not perfect, it is not unusable, and they can be compared.[64]  There is very little market volume of post-industrial PET flake because approximately 85 percent of the thermoformer market is vertically integrated and producers use their own PET flakes in their production process.[65]  For widely-traded products, like PET resin and post-consumer PET flake, the volume makes prices more reliable than they would be for a thinly-traded product like post-industrial PET flake. OCTAL submitted evidence regarding post-consumer PET flake as the most appropriate benchmark showing that "direct" PET (DPET) flake prices from Customer A were at arm's-length and consistent with contemporaneous market pricing.[66]

o   The petitioners' self-serving, non-public information cannot serve as a benchmark price.[67]  The petitioners' monthly average post-industrial PET flake purchase prices do

---

[62] *Id*. at 19 (citing BPI Memorandum at 4 and OCTAL October 7, 2019 AQR at Exhibit A-9).
[63] *Id*. at 20 (citing Petitioners October 16, 2019 Comments).
[64] *See* OCTAL Rebuttal Comments at 25 (citing Petitioners Comments at 25-26).
[65] *Id*. at 27 (citing OCTAL Rebuttal Factual Information at Annex A, paragraphs 23-27; and OCTAL's Letter, "OCTAL's Request for the Department To Refuse To Initiate AD Investigation for Lack of Standing," dated July 18, 2019 (OCTAL Request Not to Initiate an Investigation) at Attachment B).
[66] *See* Remand BPI Memo at Note 9 for BPI arguments concerning the reliability of Customer A's PET flake prices; *see also* OCTAL October 7, 2019 AQR at 13.
[67] *See* OCTAL Rebuttal Comments at 28 (citing Petitioners Comments at 26-28).

not provide any volume data, supporting documentation, or product information,[68] even though sellers may be selling their lowest quality PET flakes that they themselves did not want to reuse.[69]  Commerce's record is lacking information on such issues.

o   Additionally, there is no record information about how the prices provided by the petitioners are set; these prices may themselves be set by contracts or benchmarked to other products like PET resin or post-consumer PET flake.

o   The petitioners' arguments assume that benchmarks can only be applied to a specific good, but if that were the case, the analysis would need to be based on a price for OCTAL DPET flakes, as they are a unique form of post-industrial PET flakes.  Instead, companies often use reasonable benchmark alternatives, such as prices for similar goods or key inputs.[70]  PET sheet, whether in a roll or shredded into flakes, is basically PET plastic and, thus, PET resin prices are a reasonable benchmark.

o   Finally, Commerce has a preference for publicly available benchmark data and has previously rejected non-public data even if they were more specific.[71]

• The third factor related to alleged restrictions on Customer A's business, which received the least attention in Commerce's analysis and adds the least to the discussion.  Commerce's analysis under this factor simply restates the supply arrangement terms already discussed above.  These alleged restrictions represent standard commercial terms, and Commerce again does not link these contract terms to the core issue of the price paid by Customer A to

---

[68] OCTAL also notes that OCTAL Extrusion uses DPET flakes while petitioners use PET resin supplemented with flakes of unknown quality.  *Id*. at 29.

[69] *Id*. (citing OCTAL Rebuttal Factual Information at Annex A, paragraphs 23 and 26-27; and Petitioners March 27, 2020 Comments).

[70] *See* Remand BPI Memo at Note 9 for further discussion.

[71] *See* OCTAL Rebuttal Comments at 32 (citing 19 CFR 351.408(c)(1); and *Circular Welded Carbon-Quality Steel Pipe from the Socialist Republic of Vietnam:  Final Determination of Sales at Less Than Fair Value*, 81 FR 75042 (October 28, 2016), and accompanying IDM at 18).

OCTAL for PET sheet or OCTAL's ability to influence this price and exert control.  *See*
Remand BPI Memo at Note 10 for OCTAL's BPI comments relating to this issue.

- The fourth and final factor, relating to intercompany financing, does not support Commerce's
  finding.  There is nothing suspicious about how OCTAL chose to fund the financing between
  the companies, or how the parties decided that the terms of the financing justified the
  benefits, *i.e.*, Customer A expanding its business and purchasing more PET sheet from
  OCTAL.[72]

  o The provisions regarding financing in the supply agreement do not demonstrate that
    OCTAL exerts control over Customer A.  The supply agreement was made at arm's-
    length and reflected market terms, and included provisions for termination and dispute
    settlement.[73]  Additionally, the purchase of new thermoforming machines, and the
    subsequent increase in PET sheet sales by OCTAL, is not a separate factor for Commerce
    to consider; rather, the provision just restates the first element of the arrangement and the
    quantity supplied should not matter to the analysis.  Commerce did not even attempt to
    explain how increased purchases by Customer A are relevant to the analysis.

  o The agreement, and the financing terms in particular, do not establish OCTAL's control
    or influence because Customer A made its own decisions about what and how much to
    produce, and it had its own incentives and reasons for expanding its business.  Any
    resulting incidental effect of interparty financing on production is not "influence" for the
    purposes of affiliation.  Finally, even if there were an incidental effect on OCTAL's PET
    sheet production, Commerce did not address how this affects the price paid by Customer

---

[72] *See* OCTAL Comments at 23-24 (citing BPI Memorandum at 4).
[73] *Id*. at 25 (citing OCTAL October 7, 2019 AQR at Exhibit A-9, and OCTAL's Letter, "OCTAL's Supplemental
Section D Questionnaire Response:  Polyethylene Terephthalate Sheet from the Sultanate of Oman," dated January
9, 2020.

A for PET sheet.  *See* Remand BPI Memo at Note 11 for OCTAL's BPI comments relating to this factor.

- The petitioners cite prior close supplier affiliation decisions in support of their arguments, but these cases highlight two points:  (1) a comprehensive assessment of the economic relationship between two parties is crucial to the overall analysis; and (2) even a contractual relationship between two parties that limits their commercial choices is not sufficient for affiliation through a close supplier relationship within the meaning of the Act and the regulations.

  o The petitioners cite *Wire Rod from Korea Final Determination* in support of their argument that an exclusive supply relationship creates dependence and control and supports a close supplier relationship, particularly where other sources of supply are not available.[74]  However, in that case the buyer was unable to develop an alternative supply source; that is not the case in the current proceeding.  OCTAL and Customer A have long histories sourcing and selling to other parties and there are numerous other domestic and international producers of PET sheet.[75]

  o In *Shanxi Hairui*, Commerce found that a producer should or could have been aware of a supplier's fraud and should have exercised its influence to stop the fraudulent activity.[76]  However, in *Shanxi Hairui*, Commerce relied on AFA when making the relevant

---

[74] *See* OCTAL Rebuttal Comments at 11-12 (citing Petitioners Comments at 18 (citing *Wire Rod from Korea Final Determination*, 63 FR at 40410, *Wire Rod from Korea Preliminary Results*, 71 FR at 59739-59740, and *Wire Rod from Korea Final Results*)).

[75] *Id*. at 10-11; *see also* Remand BPI Memo at Note 12 for further discussion of BPI related to this point.

[76] *Id*. at 12 (citing *Certain Steel Nails from the People's Republic of China:  Final Results of Antidumping Duty Administrative Review, and Final Determination of No Shipments; 2016-2017*, 84 FR. 17134 (April 24, 2019), and accompanying IDM at 21; *Shanxi Hairui*, 503 F. Supp. 3d at 1313-1314; and *Mueller Comercial De Mexico, S. De R.L. De C.V. v. United States*, 753 F.3d 1227, 1233 (Fed. Cir. 2014)).

affiliation finding and AFA is not warranted in the current proceeding.  Therefore, the case is inapposite.

o   While the petitioners highlight the importance of exclusive supply agreements in findings of affiliation, the following cases instead highlight the important ways in which the agreement in place here, between OCTAL and Customer A, does not reflect a close supplier relationship.[77]  The petitioners argue that Commerce found no affiliation in *TIJID, Inc.* because of the lack of an exclusive sales agreement, but, in fact, the Court found that there were other available customers, that pricing coordination was typical of manufacturing industries, and that business activities pre-dated a capital contribution; these facts contributed to the Court's ultimate finding of no close supplier relationship in the case, rather than the lack of an exclusive supply agreement.[78]  In the current case, OCTAL had significant sales to other customers, including in the United States, and there were no restrictions on its sales to customers other than Customer A.  As in *CORE from Korea Final Results*, the supply agreement in this proceeding reflects a collaboration for mutual benefit that suits both parties during a particular point in time, rather than an arrangement resulting in control.[79]

o   Other cases further illustrate that the availability of multiple suppliers/sources weigh against finding a close supplier relationship.  In *GOES from the Czech Republic*, Commerce found the relationship between two parties, where the producer sold to multiple home market and U.S. customers, to be a result of a long-standing history

---

[77] *Id*. at 14-16 (citing Petitioners Comments at 19).
[78] *Id*. at 14 (citing *TIJID, Inc.*, 366 F. Supp. 2d at 1289, 1299-1300)).
[79] *Id*. at 15-16 (citing *CORE from Korea Final Results* IDM at Comment 11); *see also* OCTAL's Letter, "Section C Response of OCTAL SAOC – FZC:  Polyethylene Terephthalate Sheet from the Sultanate of Oman," dated November 8, 2019 at Exhibit C-6.

between the companies, rather than a close supplier relationship.[80]  In *OCTG from Taiwan*, Commerce found no affiliation because the foreign producer sourced inputs from other unaffiliated suppliers, and the Court confirmed that the relationship was the result of sound business choices, not compulsion.[81]  In *PET Film from India*, Commerce declined to find affiliation because there was no record evidence that a U.S. importer could not purchase PET film from other suppliers and the foreign producer sold PET film to other U.S. customers.[82]  Finally, in *Honey from China*, Commerce did not find affiliation because there was evidence that an exclusive supply agreement was not honored or enforced and the U.S. distributor purchased subject merchandise from many suppliers.

o   In the current case, OCTAL was Customer A's sole supplier of subject merchandise, but Customer A was not OCTAL's only customer.[83]  It also bears noting that OCTAL did not use any of Customer A's PET flake at its facility in Oman; the PET flake supply agreement was with OCTAL Extrusion and merchandise produced there is not subject to this investigation.[84]

o   The petitioners also cite prior cases regarding financing arrangements.  In *Rebar from Latvia*, Commerce found affiliation due to record evidence of an exclusive distribution agreement and a large line of credit.[85]  However, in that case, the affiliation was between a producer and a trading company and Commerce requested the trading company's

---

[80] *Id.* at 16 (citing *GOES from the Czech Republic* IDM at Comment 1).
[81] *Id.* at 16-17 (citing *OCTG from Taiwan Final Determination* IDM at Comment 1; and *Tension Steel*, 179 F. Supp. 3d at 1199); *see also id.* at 17-18 (citing *Pasta from Turkey* IDM at Comment 1.C).
[82] *Id.* at 18-19 (citing *PET Film from India* IDM at Comment 1).
[83] *Id.* at 19 (citing *Honey from China* IDM at Comment 11).
[84] *Id.* at 17 (citing, *e.g.*, OCTAL's Letter, "Section D Response of OCTAL SAOC – FZC:  Polyethylene Terephthalate Sheet from the Sultanate of Oman," dated November 14, 2019 at Exhibit D-4, and OCTAL October 7, 2019 AQR at Exhibit A-9).
[85] *Id.* at 20 (citing *Rebar from Latvia* IDM at Comment 1).

downstream sales data, which it has not done in the current case.[86]  In *Rebar from Latvia*, the trading company does not appear to have had other business operations, unlike Customer A in this case, and there would have been business continuity concerns if the relationship were dissolved.[87]  Although the petitioners cite *CORE from Canada*, that case dealt with a producer holding a significant ownership stake, and therefore equity control, in an input supplier.[88]  There is no evidence that OCTAL or Customer A has equity interests in the other party, or that financing was extended in order to increase OCTAL's influence over Customer A.  Additionally, in *CORE from Canada*, Commerce also found that the input was supplied at prices below the market average.[89]

- Commerce's finding of affiliation is not supported by the record, as none of the above four factors, either individually or collectively, nor prior determinations in other cases, support the notion that OCTAL was able to restrain or control Customer A, as required by the Act and Commerce's regulations.  It is hard to imagine a situation where an interparty price is less influenced by possible affiliation, as the parties here agreed to set the price using a neutral benchmark.  Commerce may have wanted to hide from this fact, because it had no idea how to demonstrate that OCTAL somehow has the potential to influence a price set through a market-indexed formula, but that does not excuse Commerce's failure to address this key fact in its decision.

---

[86] *Id*. (citing *Rebar from Latvia* IDM at Comment 1).
[87] *Id*. at 20-21 (citing *Rebar from Latvia* IDM at Comment 1; and *Wire Rod from Korea Final Determination*).
[88] *Id*. at 21 (citing Petitioners Comments at 21; and *Certain Corrosion-Resistant Carbon Steel Flat Products from Canada:  Final Results of Antidumping Duty Administrative Review*, 72 FR 12758 (March 19, 2007) (*CORE from Canada*), and accompanying IDM at 4).
[89] *Id*. at 22 (citing Petitioners Comments at 26, and *CORE from Canada* IDM at 4); *see also* Remand BPI Memo at Note 12 for BPI details on this comment.

**Commerce Position:**  Commerce has reviewed the record evidence relating to the relationship between OCTAL (and OCTAL's U.S. affiliate) and Customer A anew and has considered the affirmative and rebuttal comments from the parties in this voluntary remand proceeding.  Based upon our review of the evidence and comments, we continue to find that OCTAL and Customer A are affiliated pursuant to a close supplier relationship.

In our analysis, we considered and relied on contractual provisions from a legal document signed by both OCTAL and Customer A; these provisions, taken together, indicate a degree of entanglement and control that warrants a finding of affiliation.  As noted above, section 771(33) of the Act provides definitions of affiliated persons, and 19 CFR 351.102(b)(3) includes close supplier relationships as one method of control between affiliated parties.  As the parties correctly point out, the Act requires a finding of control through the ability to exercise restraint or direction over the other party, either legally or operationally.[90]  Commerce's regulations also further require the relationship to have the "potential to impact decisions concerning the production, pricing, or cost of the subject merchandise."[91]  Additionally, these effects can apply when either "the supplier or buyer becomes reliant upon the other" and can equally apply when both parties are reliant upon each other.[92]  As will be discussed below and in the Remand BPI Memo in Notes 13 through 21, OCTAL and Customer A are mutually bound together and both are restrained, directed, and controlled through the contract.  Additionally, this mutual reliance by OCTAL and Customer A also affects the production, price, and cost of the subject merchandise.  We have based our finding on the specific provisions of the contract because they show control, restraint, and direction by OCTAL over Customer A, as well as an ability to affect

---

[90] *See* section 771(33) of the Act.
[91] *See* 19 CFR 351.102(b)(3).
[92] *See* SAA at 838.

the price Customer A pays for subject merchandise.  For these reasons, having evaluated the parties' comments regarding these issues, we continue to find Customer A to be affiliated with OCTAL.

The agreement between OCTAL and Customer A contains four key aspects indicating affiliation.  Certain elements may be sufficient, on their own, to show affiliation between the parties.  However, when taken together, these considerations even more strongly demonstrate OCTAL's control of Customer A through this affiliation.  Although OCTAL references numerous past affiliation decisions by Commerce, discussed below, we emphasize that affiliation decisions are fact- and case-specific and must be based on the record evidence presented in this case.

With respect to the four contractual provisions in question, the first relates to the supply arrangement between OCTAL and Customer A.  Although we are unable to discuss the details of this provision publicly, we find that it demonstrates the existence of a close supplier relationship that has "potential to impact decisions concerning the production, pricing, or cost of the subject merchandise."[93]  For discussion of how this first provision relates to production, pricing, and cost, as well as an ability to restrain, direct, and control, *see* Remand BPI Memo at Note 13.

In support of its position that exclusive supply agreements do not demonstrate affiliation, OCTAL cited a number of prior Commerce decisions.  These decisions, however, are inapposite, because the relationships among the parties in those cases either did not involve exclusive supply agreements[94] or there was evidence that exclusivity agreements were not honored.[95]  In contrast,

---

[93] *See* 19 CFR 351.102(b)(3).
[94] *See CORE from Korea Final Results* IDM at Comment 11; *OCTG from Taiwan* IDM at 11; *OCTG from Taiwan Final Determination* IDM at Comment 1; *Pasta from Turkey* IDM at Comment 1; *PET Film from India* IDM at Comment 1; *GOES from the Czech Republic* IDM at Comment 1; and *Tension Steel*, 179 F. Supp. 3d at 1199.
[95] *See Honey from China* IDM at Comment 11.

here, there is an existing agreement in place and there is no evidence that the parties to the agreement did not honor it.[96]  Further, OCTAL stated that it produces proprietary and "distinctive DPET sheet," and there is no evidence on the record that other suppliers had either the production capability or the expertise to produce this distinctive and proprietary product to provide alternate sources for Customer A.[97]

       With respect to *Pasta from Turkey* in particular, OCTAL notes that Commerce declined to find that an exclusive supply agreement indicated that either party could control the pricing of the other, because prices were set in accordance with market conditions.  However, in *Pasta from Turkey*, the respondent argued that it was affiliated with its supplier through all seven subparagraphs of section 771(33) of the Act,[98] but Commerce did not find affiliation through any of these provisions, including the close supplier provision.  While Commerce referenced an "exclusive sales contract," Commerce also found that Marsan (the respondent) was not required to purchase pasta from Birlik (the alleged affiliate) and that Marsan was not restricted in purchasing pasta from other suppliers.[99]  The agreement between OCTAL and Customer A in this case differs from Marsan's agreement in significant ways; *see* Remand BPI Memo at Note 14 for discussion of BPI in this case in comparison to the facts in *Pasta from Turkey*.

---

[96] *See* Remand BPI Memo at Notes 13 and 14.
[97] *See* Petitioners Comments at 27 (citing OCTAL Rebuttal Factual Information at Annex A, pages 1-4 and OCTAL March 19, 2020 SQR at 8), and OCTAL Rebuttal Comments at 31; *see also* USITC Prelim at I-9 describing the different production process for DPET sheet and stating that "the resulting PET sheet has different physical properties."
[98] The alleged affiliation was through members of a family; officers or directors of an organization; partners; employer and employees; any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent  or more of the outstanding voting stock or shares of  any organization and such organization; two or more persons directly or indirectly  controlling, controlled by, or under common control  with, any person; and any person who controls any other person and such other person, including through corporate or family groupings; franchise or joint venture agreements; debt financing; and close supplier relationships.  *See* section 771(33)(A) through (G) and 19 CFR 351.102(b)(3).
[99] *See Pasta from Turkey* IDM at Comment 1.

Similarly inapplicable is *LDWP from Canada*, which OCTAL cited in support of the argument that a large percentage of, or even all, sales to one customer does not "by itself, constitute sufficient evidence to determine affiliation by virtue of a close relationship."[100] However, here, we did not base our findings on the percentage of sales represented by OCTAL's sales to Customer A "by itself." Rather, we additionally considered the contract between the parties and found several aspects of the contract indicative of affiliation through a close supplier relationship, distinguishing *LDWP from Canada* from the situation here.[101] For discussion of each of these considerations, *see* Remand BPI Memo at Note 14.

In sum, this first provision of the contract (*i.e.*, the supply agreement relating to PET sheet) affects Customer A's PET sheet price, as well as OCTAL's production, cost, and price for subject merchandise. Customer A's own production of downstream merchandise is also affected, and restraints are placed on Customers A through its relationship with OCTAL. For discussion of the proprietary components related to each of these points, *see* Remand BPI Memo at Notes 14-16.

The second contractual provision indicative of affiliation, *i.e.*, relating to Customer A's sale of PET flake to OCTAL Extrusion, also reflects OCTAL's restraint and control over Customer A. PET flake is a valuable byproduct of the further manufacturing of PET sheet; it is both sold on open markets and also used by vertically-integrated thermoformers in their own production process.[102] While the first provision dictates the supply of inputs that Customer A uses, this second factor governs the disposition of the outputs produced by Customer A.

---

[100] *See LDWP from Canada* IDM at Comment 1 (citing *TIJID, Inc.*, 366 F. Supp. 2d at 1299).

[101] *See, conversely*, *CORE from Korea CORE from Korea Final Results* IDM at Comment 11 (finding no affiliation because an exclusive sales contract was the only evidence of control on the record).

[102] *See* Petitioners Comments at 23 (citing OCTAL's Letter, "OCTAL's Pre-Preliminary Rebuttal Comments for Sales Issues: Polyethylene Terephthalate Sheet from the Sultanate of Oman," dated February 14, 2020 at 10; and OCTAL Rebuttal Factual Information at Annex A); *see also* OCTAL Rebuttal Comments at 27.

Through this second provision, OCTAL was also able to restrain or direct Customer A with respect to how the customer uses/sells a byproduct of further manufacturing of the subject merchandise.  Discussion related to these points involves BPI.  *See* Remand BPI Memo at Note 16 for a discussion of these points.

As an initial matter, we disagree with OCTAL that the PET flake in question is irrelevant as it is unrelated to subject merchandise (*i.e.*, PET sheet produced in Oman).  While the PET flake produced by Customer A during its production in the United States is not subject merchandise, it is still tied, and relevant, to the issue through further manufacturing.[103]  If Commerce finds a U.S. company affiliated with the foreign respondent, as we continue to do here, any processing of the subject merchandise performed in the United States is considered further manufacturing of said subject merchandise; the costs and profits from such further manufacturing are, thus, accounted for as adjustments to U.S. price.[104]  Therefore, PET flake is a valuable by-product of this further manufacturing of the subject merchandise, which can be resold or reprocessed into other valuable products;[105] this is, in fact, a relevant consideration for the U.S. price as it impacts the costs and profits of Customer A's further manufacturing of the subject merchandise.  When calculating a U.S. further manufactured price, Commerce regularly includes scrap revenue for such by-products generated during further manufacturing.[106]

---

[103] *See* sections 772(d)(2) and (3) of the Act and subsection (e) (regarding further manufacturing with significant value added) and 19 CFR 351.402(c); *see also Steel Nails from Taiwan.*

[104] *See* section 772(d) of the Act; *see also* Commerce's Letter, Initial AD Questionnaire, dated September 6, 2019 (AD Questionnaire) at A-12, I-9, and Section E, "Cost of Further Manufacture or Assembly Performed in the United States."

[105] *See* OCTAL Rebuttal Comments at 27 (citing OCTAL Rebuttal Factual Information at Annex A).

[106] *See Notice of Final Determination of Sales at Less Than Fair Value:  Certain Cold Rolled Carbon Steel Flat Products from Germany*, 67 FR 62116 (October 3, 2002), and accompanying IDM at Comment 15 (noting that in other cases involving insurance payments and scrap revenue, Commerce "allowed an offset to the respondents' further manufacturing costs for actual revenues received as a result of an economic activity or economic events related to processing costs that occurred in the United States" (citing *Stainless Steel Sheet and Strip in Coils from Mexico; Preliminary Results of Antidumping Duty Administrative Review*, 67 FR 51204, 51208 (August 7, 2002), unchanged in *Stainless Steel Sheet and Strip in Coils from Mexico; Final Results of Antidumping Duty*

Importantly, the single sales contract sets the terms of sale for Customer A's sales of this by-product as well as for OCTAL's sales of PET sheet to Customer A; thus, OCTAL and Customer A were able to factor the pricing of, and the profit from, Customer A's by-product sales into the overall arrangement between the parties, including in the pricing of PET sheet. This is particularly critical here, because we note that there are lingering questions about the true "market price" for PET flake used in the contract. The market index used in the contract as a base for both the PET sheet and PET flake prices is, in fact, a price for PET resin. PET resin is only one step removed from PET sheet, but PET flake is even further removed and requires additional further manufacturing steps, as it is created after the processing of PET sheet into other products. Therefore, there are several degrees of separation between PET resin and PET flake, which calls into question the validity of using a PET resin price as a comparison price for analyzing whether the PET flake price between the parties reflects a market price. Further, we find that OCTAL did not adequately demonstrate the market price-based nature of the contract's PET flake prices, because Customer A's PET flake sold to OCTAL Extrusion is post-industrial, yet OCTAL provided post-consumer prices to attempt to show the arm's-length nature of the prices. The use of post-consumer PET flake for the production of PET sheet is uncommon;[107]

---

*Administrative Review*, 68 FR 6889 (February 11, 2003), and accompanying IDM); *see also, e.g.*, *Notice of Final Results of Antidumping Duty Administrative Review:  Stainless Steel Sheet and Strip in Coils from France*, 67 FR 78773 (December 26, 2002), and accompanying IDM at Comment 12; *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany:  Final Determination of Sales at Less Than Fair Value*, 82 FR 16360 (April 4, 2017), and accompanying IDM at Comment 18; *Certain Carbon and Alloy Steel Cut-to-Length Plate from France:  Final Determination of Sales at Less Than Fair Value*, 82 FR 16363 (April 4, 2017), and accompanying IDM at Comments 14 and 15; and *Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from Switzerland:  Final Determination of Sales at Less Than Fair Value*, 83 FR 16293 (April 16, 2018), and accompanying IDM at Comment 10.  In all of these cases, Commerce included in its calculations scrap revenue from further manufacturing of the subject merchandise performed in the United States by the respondent's U.S. affiliate.

[107] *See* OCTAL Rebuttal Factual Information at Annex A, paragraph 17; and Petitioners March 27, 2020 Comments at Attachment 1, paragraph 3, Attachment 2, paragraph 3, and Attachment 3, paragraph 3.

the use of post-industrial PET flake is more common because it is cleaner and requires no processing (*i.e.*, added costs).[108]

Finally, OCTAL has not demonstrated how relevant any of these price sources, *i.e.*, market indexes, post-industrial prices, or post-consumer prices, are for a proprietary product like DPET.  As OCTAL itself has said, DPET flakes are "a unique form of post-industrial PET flakes that result from processing OCTAL's distinctive DPET sheet."[109]  Yet, to demonstrate the arm's-length nature of a unique post-industrial product OCTAL provided prices of post-consumer product.  Thus, OCTAL has not shown that the PET flake price in the contract represents a price that was consistent with contemporaneous market pricing, and given the unusual nature of the contract by which the prices for both PET sheet from OCTAL and PET flake to OCTAL Extrusion are established, we find that the totality of the relationship between OCTAL and Customer A affects the price of PET sheet and supports a finding of affiliation.[110]

The petitioners assert that OCTAL's failure to provide contemporaneous market pricing warrants application of AFA.  We do not find that AFA is warranted.  Even though OCTAL was less than forthcoming in its reporting when responding to our questions relevant to our affiliation analysis, sufficient information for making an affiliation decision is on the record.  We do note, as discussed further below, certain aspects of OCTAL's reporting did impact our ability to solicit additional information within the time frame set forth by our statutory deadlines.  Accordingly, we decline to apply AFA in this situation, but instead we make our affiliation determination based on the information and facts that exist on the record.  OCTAL's arguments related to the

---

[108] *See* OCTAL March 19, 2020 SQR at 14.
[109] *See* OCTAL Rebuttal Comments at 31.
[110] *See* Remand BPI Memo at Note 16 for discussion of the BPI about the effects of this relationship.

timing of this affiliation decision, and the development of the record in this case, are addressed in Comment 2.

In sum, the second contractual provision governs the disposition of Customer A's PET flake price, which is a valuable byproduct of further manufacturing of PET sheet.  Although questions remain regarding the usefulness of the prices on the record for assessing a benchmark for the flake in question (*i.e.*, proprietary DPET flake) it is undisputed that the contract restricts Customer A's options for its PET flake sales.  Thus, we find that this second factor supports finding affiliation through a close supplier relationship by affecting the production, price, and costs for OCTAL, Customer A, and OCTAL Extrusion, and demonstrates the restraint and direction OCTAL has over Customer A through the contract.  *See* Remand BPI Memo at Note 16 for discussion of BPI related to this provision.

The third provision of the contract supporting Commerce's affiliation finding relates to restrictions on select business activities of Customer A.  For further discussion of this provision, including its effects on production, price, and cost, *see* Remand BPI Memo at Note 17.

We note that the restriction in question is significant when considered in light of how the relevant industry operates.  Both the petitioners and OCTAL agree that the vast majority of companies in the thermoforming industry are vertically integrated,[111] yet Customer A is subject to restrictions as a result of its contract with OCTAL.  Therefore, through this provision of the contract, OCTAL has restricted, directed, and controlled the internal business decisions of Customer A.  These restrictions on Customer A's business activities have a significant impact on Customer A itself, and they also impact OCTAL's price, production, and cost of subject

---

[111] *See* U.S. International Trade Commissions Publication, "Polyethylene Terephthalate (PET) Sheet from Korea and Oman, Investigations Nos. 731-TA-1455 and 731-TA-1457 (Final)," USITC Pub. 5111 (USITC Final) at III-2-III-3, OCTAL Rebuttal Factual Information at Annex A, paragraphs 27-28, and OCTAL Request Not to Initiate an Investigation at Attachment B.

merchandise as Customer A represents a significant percentage of OCTAL's U.S. sales.[112]
Therefore, this third provision is not simply a repetition of the first two factors, but rather is an
additional element of control, restraint, and direction imposed on Customer A as a result of this
contract.  Moreover, the provision provides a corresponding benefit to OCTAL as well.

The fourth and final contractual provision involves financing provided by OCTAL to
Customer A.  We find that financing between OCTAL and Customer A, and the specific terms of
such financing, further support a finding of affiliation.  For discussion of the BPI related to this
provision, *see* Remand BPI Memo at Note 18.

While OCTAL argues that the existence of collateral for loans between OCTAL and
Customer A demonstrates their arm's-length nature, and argues that even the more extreme case
of directly providing machinery to another party does not alone evince control,[113] there are other
factors at play in this relationship beyond the mere existence of loans themselves.  At the outset,
Commerce has previously stated that lending "on terms consistent with commercial
considerations" does not preclude control between the parties.[114]  Thus, the existence of
collateral does not undermine our decision; nor does it demonstrate that the remaining terms of
the loans are consistent with commercial considerations.  More importantly, as discussed
throughout, this case involves multiple indicia of control.  In cases where there is both financing
and another element of control,[115] Commerce has found parties to be affiliated.  For example, in
*Rebar from Latvia*, Commerce found a close supplier relationship due to "extensive evidence of

---

[112] *See* Remand BPI Memo at Note 13 for the precise percentage and Note 17 for further discussion of BPI related to this provision.
[113] *See* Remand BPI Memo at Note 11; *see also Large Residential Washers from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review; 2015-2016*, 82 FR 42788 (September 12, 2017), and accompanying IDM at Comment 2; and *CORE from Korea Final Results* IDM at Comment 11.
[114] *See Preamble*, 62 FR at 27298; *see also CORE from Canada* IDM at Comment 2.
[115] *See* Remand BPI Memo at Notes 13 through 21 for further discussion of other elements of control present in this case.

affiliation," including an exclusive distribution agreement and a large line of credit for production financing.[116]  For discussion of how *Rebar from Latvia* relates to specific proprietary facts of this case, *see* Remand BPI Memo at Note 19.  For additional discussion related to the non-commercial terms of this financing, and how it relates to the production and costs of subject merchandise, as well as the restraint, control, and direction of Customer A, *see* Remand BPI Memo at Note 20.

Through the four contractual provisions discussed above and in the Remand BPI Memo at Note 21, we find that the record of this case shows that OCTAL and Customer A are affiliated through a close supplier relationship.  Through each of these factors, OCTAL has control over Customer A and is able to restrain and direct it in a manner that affects the price, production, and cost of the subject merchandise.  When taken as a whole, these provisions show a high degree of control and influence over Customer A.[117]  For these reasons, we continue to find that OCTAL and Customer A are affiliated through a close supplier relationship in accordance with 771(33)(G) and 19 CFR 351.102(b)(3).

**Comment 2:  Sales Used in the Margin Calculation for OCTAL**

*Petitioners' Comments*

- Commerce uses the price to the first unaffiliated customer in its calculation of the dumping margin.  The arrangement between OCTAL and Customer A is precisely the sort of situation Commerce's investigations are designed to detect.  When Commerce found this affiliation, OCTAL's sales to its affiliate Customer A could not be used in the margin calculations, as

---

[116] *See Rebar from Latvia*.
[117] *See* Remand BPI Memo, generally, for discussion of the BPI.

they do not represent the price to the first unaffiliated customer.[118]  Therefore, Commerce

should continue to exclude the sales to Customer A from the margin calculation.

*OCTAL Comments*

- Commerce should recalculate OCTAL's antidumping duty margin with its sales to Customer
  A included.[119]

**Commerce Position:**  We continue to find that reliance on OCTAL's sales to customers other

than Customer A for calculation of OCTAL's dumping margin, as facts available, is appropriate.

As an initial matter, the Act states that Commerce must consider the price to an

unaffiliated purchaser in the United States in its dumping analysis.[120]  Having determined that

OCTAL and Customer A are affiliated, we cannot examine sales to Customer A in our margin

analysis.  Therefore, we disagree with OCTAL that its suggested approach of using sales

between affiliated companies in calculating export price or constructed export price (CEP) is

permissible.

OCTAL does not argue in its comments that Commerce should have requested Customer

A's downstream sales and cost data as part of this remand redetermination, so as to meet the

requirements of section 772 of the Act.  Rather, it merely points out that, in another case,

Commerce has found it appropriate to solicit such data.[121]  We note, however, that the factual

---

[118] *See* Petitioners Comments at 11.
[119] *See* OCTAL Comments at 39.
[120] *See* section 772(a) of the Act ("The term "export price" means the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted under subsection (c)."), and section 772(b) ("The term 'constructed export price' means the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under subsections (c) and (d)"); and 19 CFR 351.402(a) ("In order to establish export price, constructed export price, and normal value, the Secretary must make certain adjustments to the price to the *unaffiliated purchaser* (often called the "starting price") in both the United States and foreign markets.") (emphasis added).
[121] *See* OCTAL Rebuttal Comments at 20 (citing *Rebar from Latvia*).

circumstances surrounding the development of this issue, including the degree to which OCTAL disclosed relevant information, are distinct to this proceeding.

In particular, the gradual progression of Commerce's understanding of OCTAL's relationship with Customer A impacted Commerce's ability to solicit or analyze Customer A's downstream sales. To the extent that OCTAL faults Commerce for not making its affiliation decision earlier in the proceeding, this investigation involved a respondent, OCTAL, that had not previously been examined by Commerce, and OCTAL did not identify Customer A as a potential affiliate in its responses. Additionally, while OCTAL argues that the contract with Customer A has been on the record since its initial section A response on October 7, 2019, this exhibit was not presented as part of OCTAL's affiliation response, but rather was submitted along with other documents for "Sample Sales Documentation for OCTAL Sales to US (Contract)," and in no way stated or indicated that affiliation was a potential issue for this customer.[122] The glossary of Commerce's AD Questionnaire provides a definition of affiliated persons, including through control of another person, based on section 771(33) of the Act and then further lists a close relationship with a supplier as an example of a situation which may indicate control.[123] Additionally, the "Corporate Structure and Affiliations" section of the AD Questionnaire instructs respondents to identify all resellers and other persons involved in the sale or distribution of the merchandise which Commerce may consider affiliated under section 771(33) of the Act and 19 CFR 351.102(b) and 351.401(f). This question further instructs respondents to consider factors such as the length of time of the relationship and "*the exclusivity of the relationship*."[124] Further, the next question asks respondents to also identify business transactions, such as loans

---

[122] *See* OCTAL October 7, 2019 AQR at 23 and Exhibit A-9.
[123] *See* AD Questionnaire at I-1-I-2.
[124] *Id.* at A-6 (emphasis added).

made to an affiliate.[125]  Finally, at the beginning of the AD Questionnaire, the respondent is

instructed to contact Commerce if it is uncertain whether a company is affiliated with the

respondent.[126]  Accordingly, while OCTAL faults Commerce for making the affiliation decision

late in this proceeding, in responding to specific questions regarding affiliation, OCTAL did not

report to Commerce the potential affiliation with Customer A, as was required by the AD

Questionnaire.[127]

      Due to the manner in which OCTAL responded to Commerce's affiliation questions,

Commerce was not alerted to the potential affiliation until late in the investigation.  Because our

understanding of the OCTAL-Customer A relationship developed over the course of the

proceeding, and given that OCTAL's responses to our affiliation questions were not forthcoming

and clear regarding OCTAL's relationship with Customer A, we were unable to inquire into the

issue earlier in the proceeding, and we made our final affiliation decision only after we gathered

sufficient information during the investigation.  Because Commerce must complete

investigations within statutory deadlines, at that late stage in the proceeding, we did not have

sufficient time to request and analyze an entire downstream sales database and a Section E

Questionnaire response pertaining to further manufacturing costs of products sold by Customer

A.  Indeed, such an analysis would be an immense and time-intensive undertaking, as PET sheet

undergoes a significant transformation to plastic containers before being sold to the first

unaffiliated customer.  Such an analysis, and the likely supplemental questionnaires it would

require, were simply not possible at the late stage of the investigation due to how this case

unfolded.  Had OCTAL been more forthcoming in its answers to our questions regarding

---

[125] *Id.*
[126] *Id.* at G-10.
[127] For further discussion of these examples, *see* Remand BPI Memo at Notes 13 through 21.

affiliation by clearly identifying potential affiliation with its customer,[128] we could have resolved the issue early in the proceeding and would have had sufficient time to collect and analyze additional information, including potentially a downstream sales database.

However, given OCTAL's less-than-forthcoming responses to our affiliation questions, we did not have sufficient time to collect and analyze Customer A's downstream sales data.  In particular, we made a neutral facts available determination in the *Final Determination* to determine the dumping margin related to downstream sales from Customer A to unaffiliated U.S. customers; in making this determination, we used available record information concerning OCTAL's sales to other unaffiliated U.S. customers, and assigned the margin from these sales to the sales made to Customer A.

As we continue to find Customer A affiliated with OCTAL, Customer A's sales become CEP sales, and because Customer A uses the PET sheet to produce a new product, these sales are also further manufactured.  However, we do not have the data available to perform either CEP or further manufacturing calculations.

It is relevant to note that, when making further manufacturing calculations, Commerce may either perform specific calculations under section 772(d) of the Act or determine the appropriate margin under the "special rule" for merchandise with value added after importation.[129]  If Commerce calculates a dumping margin for an affiliate's value added sales under the "special rule," it may do so by "us{ing} the weighted-average dumping margins calculated on sales of identical or other subject merchandise sold to unaffiliated persons."[130]  In

---

[128] For further discussion about the elements of the relationship indicative of affiliation, *see* Remand BPI Memo at Notes 13 through 21.
[129] *See* sections 772(e) and 19 CFR 351.402(c).
[130] *See* 19 CFR 351.402(c)(3); *see also Preamble*, 62 FR at 27353 ("Section 772(e) authorizes {Commerce} to use an alternative means of calculating the dumping margin where merchandise has a substantial amount of U.S. value added, including reliance on the dumping margins calculated on sales for which there is no U.S. value added").

the *Final Determination*, we used such a calculation as neutral facts available:  "As neutral facts available, we therefore find it appropriate to apply the weighted-average margin calculated for all other U.S. sales for the sales that OCTAL sold to Customer A during the POI."[131]

We do not have all the necessary information on the record of this case to make a determination of value added under the "special rule," but because the application of the margin for all other unaffiliated sales is specifically listed as a calculation option, we find it a reasonable method to use for the calculations as neutral facts available in this case.  As evidenced by the extensive Section E Questionnaire, full further manufacturing calculations require significant data and such an involved calculation is not feasible using the facts currently available on the record.  The legislative history of the "special rule," specifically notes that "{i}n situations where the amount of value added in the United States was very large, the process of calculating this deduction was very difficult and time-consuming for the Department"  and that the "SAA indicates that the focus of section 772(e) was on reducing the burden on the Department."[132]  Applying the margin from OCTAL's unaffiliated U.S. sales satisfies the other requirements of the "special rule" - – namely that there is a sufficient quantity of sales[133] and that the prices are for identical or other subject merchandise.[134]

The "special rule" also states that the estimated value added should be "at least 65 percent of the price charged to the first unaffiliated purchaser for the merchandise as sold in the United States."[135]  While the record does not contain information regarding the specific value

---

[131] *See Final Determination* IDM at Comment 1.
[132] *See Preamble*, 62 FR at 27352-27353.
[133] *See* section 772(e) of the Act.  OCTAL's sales to unaffiliated U.S. customers represent a significant percentage of its U.S. POI sales.  *See* Remand BPI Memo at Note 13 for the percentage of sales.
[134] *See* section 772(e)(1) and (2) of the Act and 19 CFR 351.402(c)(3).  OCTAL made sales of 17 control numbers (CONNUMs) to Customer A. Of those 17 CONNUMs, 12 were also sold to unaffiliated U.S. customers.  All of the non-identical merchandise is still acceptable under these regulations as "other subject merchandise."
[135] *See* 19 CFR 351.402(c)(2).

added by Customer A in the United States, the history of this regulation states that it does not require Commerce to make a precise calculation of the value added and that this 65 percent "bright-line standard" is not intended to "operate as an irrebuttable presumption for all cases. {Commerce} may use a different threshold where it is satisfied, based on the facts, that a different threshold is more appropriate in a particular case."[136]  While we do not have information about the prices of Customer A's downstream products, the ITC report notes that PET sheet generally accounts for around 50 to 64 percent of the *cost* of thermoformed packaging/products.[137]  In ordinary business operations, sellers usually price their products above cost, so it is reasonable to expect that the price as contemplated by the "special rule" contains a significant amount of value added by further manufacturing in the United States.  Thus, given the facts and record of this case, it is reasonable to approximate the margin related to the further manufactured price through facts available using the calculation methodology listed in the "special rule" for merchandise with value added after importation.

Finally, we find that it would not be appropriate to reopen the administrative record on remand.  Absent compelling considerations, Commerce does not normally reopen the record on remand.  In this matter, Commerce requested a remand to allow parties the opportunity to comment on the affiliation determination in the underlying investigation, and to permit Commerce to reevaluate the facts of the record in light of such comments.  We have done so, and after considering the comments and rebuttal comments, which interested parties submitted, we continue to find that our determination that OCTAL and Customer A were affiliated via a close supplier relationship is appropriate.  We also considered the fact that the record contains high quality data, such as OCTAL's reported actual sales to unaffiliated parties, that can be used to

---

[136] *See Preamble*, 62 FR at 27352-27353.
[137] *See* USITC Prelim at II-5 and USITC Final at II-8 (emphasis added).

make a neutral facts available determination with respect to OCTAL's margin calculations for its transactions with affiliated Customer A.

## V.   FINAL RESULTS OF REDETERMINATION

For these reasons, and after consideration of the comments provided by the parties, we continue to find Customer A to be affiliated with OCTAL through a close supplier relationship. We properly accounted for this finding in the calculation of the margin by using neutral facts available.

8/2/2021

X _____

Signed by: CHRISTIAN MARSH

Christian Marsh
Acting Assistant Secretary
 for Enforcement and Compliance