# UNITED STATES COURT OF INTERNATIONAL TRADE

*Before*: The Honorable Judge Timothy M. Reif

| | |
|---|---|
| OCTAL Inc.<br>OCTAL SAOC-FSZ<br>　　　　　　　　　Plaintiffs,<br><br>　　　　　v.<br><br>United States<br><br>　　　　　　　Defendant<br>　　　and<br><br>Advanced Extrusion, Inc *et al*<br><br>　　　　Defendant-Intervenors. | Court No. 20-03697<br><br>**<u>PUBLIC VERSION</u>**<br>*Confidential information is contained in brackets on pages 2, 6, 15, 18, 23, 25-29, 35 and 39 and in Attachments A and B.*<br><br>*Such information has been redacted in the Public Version* |

# PLAINTIFFS' COMMENTS ON COMMERCE'S REMAND REDETERMINATION

Daniel L. Porter
James P. Durling
James C. Beaty
Ana Amador

**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, NW
Washington, DC, 20006

*Counsel for Plaintiffs*

September 2, 2021

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT .................................................... 1

I.  COMMERCE'S REFUSAL TO ACCEPT PLAINTIFFS' TIMELY SUBMITTED
    DIRECTLY RELEVANT NEW FACTUAL INFORMATION IS NOT IN
    ACCORDANCE WITH LAW ................................................................. 2

    A.  Commerce Is Obligated Not To Abuse Its Discretion When Deciding
        Whether To Accept Relevant New Factual Information .............................. 3

    B.  Commerce Abused Its Discretion When Refusing To Accept OCTAL's
        Directly Relevant New Factual Information .................................................. 4

II. COMMERCE'S CONCLUSION THAT OCTAL WAS AFFILIATED WITH
    ONE OF ITS U.S. CUSTOMERS IS NOT SUPPORTED BY SUBSTANTIAL
    EVIDENCE WITH LAW AND IS OTHERWISE NOT IN ACCORDANCE
    WITH LAW ....................................................................................... 6

    A.  Nature Of The Supply Relationship ........................................................... 10

    B.  Purchase Of PET Flake/Scrap .................................................................... 18

    C.  Alleged Restrictions on Business ............................................................... 23

    D.  Financing From OCTAL ............................................................................. 25

III. COMMERCE'S REFUSAL TO OBTAIN NECESSARY DATA TO
    UNDERTAKE AN ACCURATE DUMPING MARGIN CALCULATION WAS
    UNLAWFUL ....................................................................................... 31

    A.  Commerce Has An Obligation To Calculate The Most Accurate AD Margin
        Possible, Which Includes Obtaining An Affiliated U.S. Customer's U.S.
        Sales And Expense Data .............................................................................. 31

    B.  Commerce's Has Not Stated Any Legitimate Justification For Refusing To
        Obtain The Necessary Data from the Affiliated Customer ......................... 33

Public Version

IV.   COMMERCE DID NOT APPLY NEUTRAL FACTS AVAILABLE, BUT
      RATHER APPLIED ADVERSE ASSUMPTIONS THAT RESULTED IN AN
      INCORRECT AND UNFAIR DUMPING MARGIN FOR OCTAL....................37

CONCLUSION ................................................................................................................. 39

Public Version

# TABLE OF AUTHORITIES

### Cases

*AK Steel Corp. v. United States*,
226 F.3d 1361 (Fed. Cir. 2000)................................................................. 33

*Diamond Sawblades Mfrs. Coalition v. United States*,
2021 U.S. App. LEXIS 2279 (Fed. Cir. Jan. 21, 2021) .......................... 32

*Elkay Mfg. Co. v. United States*,
Slip Op. 15-33, 2015 Ct. Intl. Trade LEXIS 33 (Apr. 20, 2015)............. 37

*Grobest & I-Mei Indus. (Vietnam) Co. v. United States*,
815 F. Supp. 2d 1342 (Ct. Int'l Trade 2012) ................................... 3, 4, 5

*Koyo Seiko Co. v. United States*,
92 F.3d 1162 (Fed. Cir. 1996)................................................................. 33

*MacLean-Fogg Co. v. United States*,
100 F. Supp. 3d 1349, 1363 (Ct. Int'l Trade 2015) ...................... 4, 36, 37

*NTN Bearing Corp. v. United States*,
74 F.3d 1204 (Fed. Cir. 1995)................................................................ 3, 4

*Rhone Poulenc, Inc. v. United States*,
899 F.2d 1185 (Fed. Cir. 1990)................................................................ 32

*TIJID, Inc. v. United States*,
366 F. Supp. 2d 1286 (Ct. Int'l Trade 2005) ......................................... 11

*Uttam Galva Steels Ltd. v. United States*,
997 F.3d 1192 (Fed. Cir. 2021)................................................................ 34

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
716 F.3d 1370 (Fed. Cir. 2013)................................................................ 32

### Statutes

19 U.S.C. §1677...................................................................................... 6, 34

19 U.S.C. §1677a................................................................................... 33, 37

19 U.S.C. §1677f-1 ..................................................................................... 34

Public Version

**Regulations**

19 C.F.R. §351.102 ................................................................................. 7, 19

19 C.F.R. §351.402 .................................................................................... 33

**Administrative Determinations**

*Certain Carbon Steel Flat Products From Korea: Final Determination*, 62 Fed. Reg. 18,404
    (Apr. 15, 1997) ................................................................................... 10

*Certain Corrosion-Resistant Steel Products: Final Results* 84 Fed. Reg. 10,784 (March 22, 2019)
    ........................................................................................................ 20, 26

*Certain Oil Country Tubular Goods From Taiwan: Affirmative Preliminary Determination of
    Sales at Less Than Fair Value and Postponement of Final Determination*, 79 Fed. Reg. 10,495
    (Feb. 25, 2014) .................................................................................. 19

*Certain Oil Country Tubular Goods From Taiwan: Final Determination of Sales at Less Than
    Fair Value*, 79 Fed. Reg. 41,979 (July 18, 2014) ................................... 20

*Certain Pasta from Turkey: Final Results 14th Review*, 76 Fed. Reg. 68,399 (Nov. 4, 2011) 11, 15

*Certain Polyethylene Terephthalate Film, Sheet and Strip from India: Final Results of
    Antidumping Duty Administrative Review*, 70 Fed. Red. 8,072 (Feb 17, 2005) ..................... 11

*Grain Oriented Electrical Steel from the Czech Republic: Final Determination of Sales at Less
    Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 79 Fed. Reg.
    58,324 (Sept. 24, 2014) ...................................................................... 12

*Honey from the People's Republic of China: Final Results and Final Rescission, In Part, of
    Antidumping Duty Administrative Review*, 70 Fed. Reg. 38,873 (July 6, 2005) ..................... 12

*Large Diameter Welded Pipe from Canada: Preliminary Determination,* 83 Fed. Reg. 43,649
    (Aug. 27, 2018) .............................................................................. 11, 17

*Large Residential Washers From the Republic of Korea: Final Results of Antidumping Duty
    Administrative Review; 2015-2016*, 82 Fed. Reg. 42,788 (Sept 12, 2017) ............................ 26

*Notice of Final Determination of Sales at Less Than Fair Value: Steel Concrete Reinforcing
    Bars From Latvia*, 66 Fed. Reg. 33,530 (June 22, 2001) ........................................ 27

*Stainless Steel Wire Rod from the Republic of Korea: Preliminary Results* 71 Fed. Reg. 59,739
    (Oct. 11, 2006) ................................................................................ 19

Public Version

## INTRODUCTION AND SUMMARY OF ARGUMENT

**Section I** demonstrates that Commerce abused its discretion when refusing to accept timely submitted new factual information that provided important context for Commerce's affiliation analysis. Commerce simply ignored highly relevant sworn testimony about the very agreement that is the sole basis of the affiliation analysis.

**Section II** explains why Commerce's renewed conclusion that OCTAL and its customer are affiliated is not supported by substantial evidence and is otherwise not in accordance with law.  Commerce continues to assert alleged control over the U.S. price, even though the agreement at question prevented either party from controlling the U.S. price and benchmarked that price to a neutral third party benchmark.

**Section III** argues that Commerce's refusal to obtain necessary data to undertake an accurate dumping margin calculation was unlawful.  Commerce excluded more than half of the U.S. sales at issue and then inexplicably refused to gather the downstream sales and expense data required by the statute.  Commerce's desire to avoid some extra work does not justify such a blatant disregard of its statutory obligations with regard to calculating a proper dumping margin.

**Section IV** demonstrates that, contrary to its claim in its Remand Redetermination, Commerce did not apply neutral facts available to set OCTAL's AD margin, but rather applied adverse assumptions that resulted in an incorrect and unfair punitive dumping margin for OCTAL.

## I.   COMMERCE'S REFUSAL TO ACCEPT PLAINTIFFS' TIMELY SUBMITTED DIRECTLY RELEVANT NEW FACTUAL INFORMATION IS NOT IN ACCORDANCE WITH LAW

Commerce sought a voluntary remand to undertake a more complete analysis of whether OCTAL was affiliated with one of its U.S. customers.  Commerce's original final determination showed that Commerce had not considered this possible OCTAL-customer affiliation until very late in the proceeding.  Accordingly, Defendant asked for a voluntary remand so that Commerce could undertake a more complete analysis.  During the remand proceeding, Plaintiffs timely submitted new factual information directly relevant to the OCTAL customer affiliation issue.  Specifically, OCTAL submitted two sworn declarations, [



].  Each sworn declaration provided important new factual information and context about [                                                  ] and the agreement governing that relationship.[1]

However, Commerce refused to consider this new factual information in its revised analysis.  This refusal constitutes an unlawful abuse of discretion and therefore Commerce's Remand Redetermination is not in accordance with law.

---

[1]  Copies of each Sworn Declaration that was submitted to Commerce and rejected during the remand proceeding are provided in Attachment A.

Public Version

## A.   Commerce Is Obligated Not To Abuse Its Discretion When Deciding Whether To Accept Relevant New Factual Information

Commerce has an affirmative obligation not to abuse its discretion when deciding whether to accept relevant new factual information.  Indeed, Commerce's conclusion that it need not accept OCTAL's proffered new factual information is contrary to well-established court precedent.  The courts have consistently ruled that Commerce does not have *carte blanche* authority to reject proffered factual information just because the information being submitted to Commerce was beyond a regulatory or internal deadline. Rather, courts  will "review on a case-by-case basis whether the interests of accuracy and fairness outweigh the burden placed on the Department and the interest in finality." *Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 815 F. Supp. 2d 1342, 1365 (Ct. Int'l Trade 2012) (citing *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1206-1207 (Fed. Cir. 1995)).

*NTN Bearing* addressed Commerce's refusal to take into account new factual information  because that information had been submitted after the deadline.  *NTN Bearing*, 74 F.3d at 1206-1207.  The Federal Circuit ruled that Commerce's decision to reject the new factual information simply because it had been made after the deadline constituted an impermissible abuse of discretion, noting:

> Inasmuch as Congress has not specified the procedures ITA must use to obtain information, it is within the discretion of ITA to promulgate appropriate procedural regulations.  By the same token, a regulation which is not required by statute may, in appropriate circumstances, be waived <u>and must be waived</u> where failure to do so would amount to an abuse of discretion.

Public Version

*Id.* at 1207 (emphasis added).  This ruling shows that Commerce's underlying legal premise about its authority is wrong.  In fact, the Federal Circuit has confirmed that Commerce has an affirmative obligation not to abuse its discretion when deciding to accept proffered new factual information.  Moreover, the Court of International Trade has ruled that this same obligation applies during Commerce remand proceeding.  *See MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1363 (Ct. Int'l Trade 2015).

In sum, both the Federal Circuit and this court have consistently recognized that Commerce has an affirmative obligation not to abuse its discretion when deciding whether to accept relevant new factual information submitted sufficiently in advance of Commerce's decision

### B.        Commerce Abused Its Discretion When Refusing To Accept OCTAL's Directly Relevant New Factual Information

As noted above, courts review on a case-by-case basis whether Commerce has abused its discretion when analyzing whether to take into account proffered new factual information.  Courts have looked at the following three questions:  (1) was the proffered additional information important for Commerce to render an accurate and correct determination; (2) whether Commerce had sufficient time to review and consider the new factual information, and (3) whether the party was diligent in its efforts.  *See e.g. Grobest & I-Mei Indus.* 815 F. Supp. 2d at 1367.

Regarding the first factor, the additional supporting documentation proffered by OCTAL was undeniably important for Commerce's analysis of the OCTAL-customer affiliation issue.  The additional supporting documentation provided important additional

details and context about the OCTAL – customer relationship and business arrangement. The new information was sworn statements by the parties to the agreement about the factual context leading up to the agreement and its ongoing operation.  Essentially, Commerce decided to interpret and characterize an agreement while ignoring sworn statements by the parties to that agreement about what it meant and how it operated.

Regarding the second factor, courts typically look to whether Commerce has sufficient time to review and consider the new factual information.  *Id.*  Commerce had ample time to consider OCTAL's proffered new factual information given that OCTAL submitted the new factual information on May 14th and Commerce did not render its new affiliation analysis until August 2nd.  Moreover, Commerce could have easily sought additional time to consider the new information.  In short, in this remand proceeding there was no legitimate concern about not having enough time to consider the new factual information.

With respect to the third factor, OCTAL was completely justified in providing additional information, given that OCTAL provided the new factual information by the deadline that Commerce established in the remand for submitting additional comments on the OCTAL-customer affiliation issue.

In short, OCTAL's submission of new factual information that was directly relevant to the OCTAL-customer affiliation issue should not have been rejected by Commerce.  To do so was an abuse of discretion by Commerce.

## II.   COMMERCE'S CONCLUSION THAT OCTAL WAS AFFILIATED WITH ONE OF ITS U.S. CUSTOMERS IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE WITH LAW AND IS OTHERWISE NOT IN ACCORDANCE WITH LAW

Commerce found  affiliation based on a flawed analysis of an incomplete record.

Commerce ignored statutory and regulatory limitations on finding affiliation, and

superficially analyzed an incomplete record.

The statute and regulations provide an express legal framework within which the

Commerce must evaluate claims of affiliation.  But Commerce conducted its analysis

largely focused on one provision in isolation and did not consider the statutory and

regulatory framework as whole or the limitations set forth in those provisions.  Our initial

brief discussed these legal limitations at length.  Plaintiffs' Opening Brief at 20-24, ECF

26-1.  Honoring this Court's request to minimize repetition, we do not repeat that

discussion here but we do incorporate it fully by reference.

In its original final determination and its Remand Redetermination, Commerce

relied exclusively on 19 U.S.C. §1677(33)(G) to conclude that OCTAL and [        ] were

affiliated. Remand Redetermination at 2-3, ECF 42-1.  Although a residual definition,

paragraph 33(G) is not without legal parameters.  Specifically, this catch-all provision

still has a limiting principle in the statute – that for the purposes of finding such

"control," a person must be "legally or operationally in a position to exercise restraint or

direction over the other person."  19 U.S.C. §1677(33).  Mere influence is not enough.

There must be a factual basis to find that one party is "legally or operationally" able to

exercise "restraint or direction" over another party.  This statutory language thus requires Commerce findings that are clear about the source of this leverage—either a legal basis or some other concrete basis.  The language also requires Commerce to identify exactly what "restraint or direction" is occurring.  The statute does not authorize Commerce to throw together a random set of facts and indicate some generalized suspicion.  There must be a concrete and well-identified basis to find affiliation.  Pursuant to 19 C.F.R. §351.102(b)(3), Commerce may consider various factors as establishing control, but the regulation then clarifies that "the Secretary will not find that control exists" <u>unless</u> "the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product."  19 C.F.R. §351.102(b)(3).  The statute and regulation thus set specific limits on finding affiliation.  "Control" requires some concrete and specific basis to believe the relationship has "the potential to impact" some specific element—such as the price—of the subject merchandise.  A generalized concern is not enough.

Yet here Commerce has not met this statutory and regulatory standard.  Commerce also provided only a superficial analysis of an incomplete record.  During its original investigation Commerce did not specifically investigate possible customer affiliation as it usually would.  During the 90-day remand proceedings, Commerce did nothing more than review that limited record without seeking any further information of any kind.  Parties could provide comments, but Commerce did not clarify the factual record with either new information or even new questions about existing information.  The

evidentiary record underlying the Remand Redetermination still demonstrates that

OCTAL and its customer are not "affiliated" within the meaning of the statute.

Commerce's Remand Redetermination largely mirrors the earlier errors, albeit

with somewhat more discussion.  The six-page decision memorandum from the final

determination was expanded somewhat in a two-part Remand Redetermination – a purely

public summary document, and a partially BPI accompanying memorandum with more

details.  Most of both documents is simply a summary of the parties' arguments.

Commerce then found affiliation based on the same four factors:

- the nature of the supply relationship between OCTAL and its customer;

- that OCTAL purchases PET flake/scrap from the customer;

- alleged restrictions on the customer's business activities; and

- loans from OCTAL to the customer.

Remand Redetermination at 25-34; Accompanying Memorandum at 11-18 (P.R.R. 14).

At the outset, it is important to keep in mind that these four features of the supply

agreement were readily apparent on the face of the agreement – which was provided as

Exhibit A-9 on October 7, 2019.  Commerce cited to some later submissions in its

original determination, but these submissions do not really add much regarding these four

key features, and mostly address other issues.  Moreover, Commerce's discussion

selectively presents certain facts and ignores other facts.  This determination is simply not

an objective and complete assessment of the record evidence as a whole.

In particular, Commerce does not show how any of these facts actually support the

key legal conclusion that OCTAL actually "controls" or has the potential to control the

Public Version

customer.  Commerce correctly noted that the statutory standard under 19 U.S.C.

§1677(33)(g) is "control," and that the regulatory clarification in 19 C.F.R.

§351.102(b)(3) focuses on whether a "close supplier relationship" actually has "the

potential to impact decisions relating to the production, sales, or cost" of the merchandise

at issue. Remand Redetermination at 4; Accompanying Memorandum at 18 (P.R.R. 14).[2]

This standard requires more than just some generalized concern about close relationships.

Rather, the regulation focuses specifically on whether a close relationship can affect

specific decisions relating to production, sales, or costs.  In this case, the issue is the price

between OCTAL and Customer A for PET sheet, and whether that price is sufficiently

reliable to serve as the basis for a dumping margin.  Yet Commerce never shows the facts

at issue establish that OCTAL's relationship with Customer A has any "potential to

impact" the price that Customer A pays OCTAL for PET sheet.  Commerce repeatedly

makes arguments about expanded production and possible effects on price, but that effect

is on the price to other customers, not to Customer A.

We discuss each of the alleged supporting factors below and demonstrate that

none of them support the ultimate conclusion that Commerce draws about the "potential

to impact" the price paid to OCTAL for PET sheet.  Commerce draws inferences beyond

what the facts would support, overlooks its own prior practice on the significance of these

factors, and ignores other evidence in the record.  But beyond these factual defects,

Commerce discusses the facts without any linkage to the core issue – whether OCTAL's

---

[2]  (P.R.R. and C.R.R. refer to documents identified in Commerce's Remand Record
Index, ECF 43).

alleged control had to potential to impact the price it received for PET sheet sold to Customer A.

### A.      Nature Of The Supply Relationship

Commerce started by describing the exclusive supply relationship between OCTAL and its U.S. customer.  Remand Redetermination at 4; Accompanying Memorandum at 18 (P.R.R. 14).  At the outset, we note there is nothing unusual about such a relationship, which reflects a business choice made by the two parties to the supply contract.  And like any supply agreement, the contract specifies a prices to paid for the goods being purchased.  But this discussion of the supply relationship as somehow implying "control" fails for two key reasons.

First, the finding about "contractually-mandated dependency," Accompanying Memorandum at 11 (P.R.R. 14), is long on rhetoric but short on substance.  Commerce's comments would apply to any exclusive supply agreement.   And this discussion focused on the restrictions on the customer, without any considerations of the benefits that would motivate a customer to enter into such an arrangement.  The trade-off between long-term stable supply and opportunistically shopping the market is a business choice, not a supplier restraining a customer as Commerce alleges.

Indeed, this reality is why long well-settled Commerce practice has consistently found that even an exclusive supply relationship alone is not enough.  Commerce has repeatedly rejected arguments that exclusive or predominate supply relationships establish "control."  Parties frequently make this argument, and Commerce has

consistently rejected it in a variety of situations. *See Certain Carbon Steel Flat Products From Korea: Final Determination*, 62 Fed. Reg. 18,404 (Apr. 15, 1997) and accompanying I&D Memorandum at Comment 39 ("exclusive sales contracts… are a common commercial arrangement all over the world.  These arrangements are typically made at arm's length and do not normally indicate control of one party over the other."); *see also Certain Pasta from Turkey: Final Results 14th Review*, 76 Fed. Reg. 68,399 (Nov. 4, 2011) ("*Certain Pasta from Turkey*") and accompanying I&D Memorandum at Comment 1;  *Large Diameter Welded Pipe from Canada: Preliminary Determination,* 83 Fed. Reg. 43,649 (Aug. 27, 2018) and accompanying Preliminary I&D Memorandum at Comment 1 ("*Large Diameter Welded Pipe*"). This basic principle has been confirmed by the court acknowledging that a close supplier relationship does not exist, even where one company sells 100 percent of its merchandise to the other, if the supplier is free to sell to other customers and there is no other record evidence that the customer had the ability to exercise restraint or direction over its supplier.  *See TIJID, Inc. v. United States*, 366 F. Supp. 2d 1286, 1299 (Ct. Int'l Trade 2005).  These cases reflect the common sense notion that an exclusive supply arrangement itself is a normal business practice and does not itself indicate any ability to control.

In all the cases cited above and others, Commerce has looked at the totality of the circumstances, including many factors that were not addressed at all in the instant case. Commerce now argues there are other factors in this case beyond exclusivity, Accompanying Memorandum at 14 (P.R.R. 14), but Commerce conveniently picks only those factors that favor its narrative.  For example, unlike its prior cases, Commerce in

this case says nothing about the key issue of <u>alternative sources of supply</u>. *Certain Polyethylene Terephthalate Film, Sheet and Strip from India: Final Results of Antidumping Duty Administrative Review*, 70 Fed. Red. 8,072 (Feb 17, 2005) and accompanying I&D Memorandum at Comment 1 ("there are other Indian suppliers of PET film"); *see also Honey from the People's Republic of China: Final Results and Final Rescission, In Part, of Antidumping Duty Administrative Review*, 70 Fed. Reg. 38,873 (July 6, 2005) and accompanying I&D Memorandum at Comment 11 (exclusive U.S. distributor could and did purchase honey "from many countries"). The mere possibility to purchase from an alternative source of supply is usually sufficient. *See Grain Oriented Electrical Steel from the Czech Republic: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 79 Fed. Reg. 58,324 (Sept. 24, 2014) and accompanying I&D Memorandum at Comment 1 ("there is no evidence that {supplier} could not look to other {purchaser}").

If it had considered its record as a whole, Commerce would have realized there were numerous other suppliers of PET sheet, both domestic and foreign. The Petition itself documented nine U.S. suppliers and dozens of foreign suppliers. Indeed, at the outset of this case Commerce conducted a specific polling survey of domestic suppliers that confirmed an even larger number of other U.S. PET sheet producers. Many of these producers manufactured PET sheet for the merchant market – either exclusively for the merchant market, or in conjunction with their own thermoforming operations.

Commerce tries to minimize the role of alternative supply, and the contract provision that allows the use of alternative supply but misreads the record. Commerce

Public Version

asserts "there is no evidence that {the customer} used the exception."  Accompanying Memorandum at 14 (P.R.R. 14).  This assertion, however, is contradicted by Commerce itself when acknowledging the alternative supply during the period when the cyclone Mekunu disrupted OCTAL's ability to supply the customer.

Moreover, alternative supply is relevant even when not used.  Alternative supply informs the pricing decisions when the contract is signed.  Alternative supply during the contract period shapes how the customer perceives the agreement it made. And alternative supply informs whether the customer decides to continue the exclusive supply arrangement.  Commerce reads the contract provision is isolation and ignores the disciplining effect of alternative supply even when not used.

Commerce also fails to connect the exclusive supply feature with the market index pricing.  Alternative supply matters when the price is originally set, because there is no exclusive supply commitment at that point. But after that point, the price is outside the control of either party.  The price changes to follow the index.  The restraint on price that Commerce imagines simply cannot exist here because of the provision linking price changes to the market index.

That DPET was a better version of PET sheet, *id.*, does not mean that other PET sheet could not be used. It was used when DPET was unavailable.  A single throw away sentence does not address the record evidence.  Had it considered its record as a whole, Commerce would have observed the ITC finding that most parties considered PET sheet a highly substitutable product. *Petitioners' Submission of the ITC's Preliminary Determination* (Oct. 15, 2019) at ITC Preliminary Determination pp. 28-29  ("at least

moderately substitutable"), II-7 ("high degree of substitutability") ("ITC Prelim.") (P.R.

113). Commerce also would have seen extensive evidence about other suppliers able to

supply, including other suppliers who actually did supply OCTAL's customers during a

period when a cyclone Mekunu disrupted OCTAL's ability to supply for about six weeks.

*Petitioners' Submission of the Final Transcript of the ITC's Preliminary Staff Conference*

(Dec. 13, 2019) at ITC Preliminary Transcript, pp. 12, 19, 25, 42, 114, 115 (P.R. 145)

(both sides describing cyclone Mekunu and how it led to OCTAL's customers finding

and purchasing from other suppliers).

Second, Commerce does not – because it cannot – link this factor to any possible

distortions in the price paid to OCTAL for PET sheet. In its original determination,

Commerce's discussion conspicuously lacked any discussion of the record evidence

addressing how the price was set between OCTAL and its customer.  Commerce has now

tried to remedy this defect, but that effort just underscores the fallacies in Commerce's

logic.

Commerce notes the contract set the price, Accompanying Memorandum at 12

(P.R.R. 14), but this statement demonstrates little.  What supply contract does not set the

price in some way?  Commerce then mischaracterizes the role of the index for pricing.

This key passage shows the error:

> Individual purchase transactions could be higher or lower than the market
> index at any specific time, but {customer} cannot take advantage of any
> lower prices; nor is it subject to higher prices that other consumers may
> face.

*Id.* This comment simply makes the business case for agreeing to market prices in a contract and then fixing changes to prices based on an index. Avoiding the higher prices is the reason to forego the lower prices. Neither party knows in advance how it will work out. Over time, the advantages and disadvantages will balance out. The record here – particularly the supply agreement and index pricing – shows the lack of any control over the price of PET sheet.

Prior Commerce decisions illustrate that finding control requires that suppliers are able to influence or manipulate a key element, typically the price. These prior decisions confirm that factual circumstances indicating market pricing undermine any allegations of possible influence on the price. Commerce has declined to find affiliation where the prices are set by the parties under market conditions. For example, in *Certain Pasta from Turkey* Commerce addressed the exclusive supply agreement by assessing the level of prices and whether they were established under market conditions, finding that nothing in the factual circumstances "indicates that either party could control the pricing of the other party." *Certain Pasta from Turkey,* at Comment 1.

Commerce tries to distinguish this case, Remand Redetermination at 27, but setting the price based on a market index – that neither party controls – is precisely this type of situation of neither party controlling the price. The contract makes clear that OCTAL and its customer do not regularly negotiate the price or changes to the price – a situation that might allow one party with some leverage to obtain a better price. Rather, the price for PET sheet under the contract is set by a price formula benchmarked to a market index. OCTAL Section A Response at Exhibit A-9, clause 1.d. (C.R. 63).

Public Version

Specifically, the price was based on [



          ].  *Id.* (Proprietary Document).  The price of PET sheet thus automatically

adjusted over time to reflect the changing market conditions affecting the production of

the PET sheet.  Commerce's theory that the customer's reliance somehow contributes to

"control" by OCTAL makes little sense under the specific factual circumstances of this

case.  Such a theory ignores the reality that PET sheet prices here are set based on a

formula benchmarked to third party market indexes, which largely eliminated the

potential for the relationship to affect the price over time.

      Moreover, Commerce's theory of possible influence over the price is undermined

by its recognition of mutual dependence.  In the original determination, Commerce

explicitly referred to "reciprocal" interdependence.  *Affiliation Decision* at 4 (P.R. 234).

In the Remand Redetermination Commerce avoids this term, but still describes the

importance that the customer's large volume has on OCTAL.  Accompanying

Memorandum at 13 (P.R.R. 14).  That both parties depended on each other meant that

both parties had leverage over each other.  In such a situation, it is not at all self-evident

who has control over whom.  Commerce's conclusion rests on its finding that OCTAL

controlled its customer, and thus could somehow extract a higher than market price.  But

this finding makes no sense if OCTAL also depended on the customer and the customer

therefore also had offsetting influence.  This finding makes even less sense when the

customer has its own bargaining leverage as a large buyer.  Absent more, this situation

suggests balance, and market-based pricing.  At the time of the contract, the starting price

reflected the arms-length bargaining in light of the market conditions at the time.  And since the subsequent prices were not re-negotiated and instead were set based on changes to the market index, the conclusion of possible distorted prices makes no sense at all.

The arguments about the possible effect on production, *id.* at 13, do not add much to the overall analysis.  Commerce looked at the volume of sales, as a percentage of OCTAL's business and as a percentage of the customer's business.  *Id.*  Commerce simply notes that higher production can yield lower costs.  This dynamic exists with any additional volume from sales to new customer.   This form of "control" over production would apply to every customer and so adds little to discussion of this particular customer, other than to document the leverage the customer had in the beginning when negotiating the starting point for prices under the contract.

Commerce has previously recognized the relative unimportance of this factor in showing control. In cases such as *Large Diameter Welded Pipe* Commerce assessed relative percentage of sales compared to the total volume of sales of a suppliers and found that a "large part of sales to one customer does not, by itself, constitute sufficient evidence to determine affiliation by virtue of a close relationship."  *Large Diameter Welded Pipe* at Comment 1.  In that case Commerce further cited a court decision in *TIJID* as illustrating the point that this reasoning also applied to cases where the volume of sales amounted to 100 percent of its products to one customer.  Commerce now tries to distinguish this case, Accompanying Memorandum at 14 (P.R.R. 14), but admits this case reflects Commerce practice and points to other factors. But that is our point – this

Public Version

discussion of large production volume simply does not add anything meaningful to

Commerce's other arguments.

### B.    Purchase Of PET Flake/Scrap

Commerce's Remand Redetermination then turns to the arrangement between

OCTAL and its customer for OCTAL Extrusion to purchase PET flake/scrap.  The key

passage from the original determination had argued the supply contract:

> … also dictates that [        ] shall sell the PET flake/scrap resulting from its
> processing of the PET sheet sourced from OCTAL to one of OCTAL's U.S.
> affiliates, OCTAL Extrusion, and it specifies the price formula for such
> sales. This arrangement indicates the type of intertwined operations
> specifically contemplated in the affiliation questions in Commerce's
> original questionnaire pertaining to control . . .

*Id.* (C.R.R. 8) (Proprietary Document).  The Remand Redetermination notes the same

basic facts, Remand Redetermination at 28-29; *see also* Accompanying Memorandum at

15-16 (P.R.R. 14), and then goes on to address various arguments made during the

remand proceedings.

At issue here are provisions in the supply contract – OCTAL Oman sells PET

sheet to Customer A, the customer makes plastic containers from the PET sheet and

creates PET flake/scrap as a result, and the customer sells that plastic scrap to OCTAL

Extrusion to reprocess into recycled PET sheet in the United States.  Here again

Commerce fails to put this factor into context or to link this factor in any way to the price

that OCTAL charges its customer for PET sheet – the key price at issue.

First, Commerce's discussion misses the point that it is talking about a different

product, not PET sheet.  The product at issue in this case is PET sheet – large rolls of

Public Version

plastic used to manufacture plastic containers for food storage and other applications.

PET flake/scrap is a by-product of that production process.  The provisions about PET

flake/scrap in the supply contract say nothing at all about the price of PET sheet, or how

the relationship between OCTAL and its customer concerning PET flake/scrap has

anything to do at all with PET sheet.

Commerce now insists that PET flake is relevant, but actually does not

demonstrate why.  Commerce's discussion of further manufacturing, Remand

Redetermination at 29, misses the point.  That Commerce has a practice for calculating

dumping margins for further manufactured subject merchandise says nothing at all about

the seller's original price for the subject merchandise.  For affiliation, the focus is on

factors that might affect that original price for the subject merchandise, not how

Commerce might conduct its further manufacturing analysis.

Commerce practice shows that the analysis of affiliation usually focus on supply

of raw materials or inputs for production of subject merchandise as the regulation

specifically requires.  19 C.F.R. §351.102(b)(3) ("of the subject merchandise or foreign

like product").  In these other cases, Commerce has found that input supply is not

sufficient to find affiliation even where the finished product is then sold to an affiliate of

the foreign producer in the United States.  Commerce has set a high threshold and

requires a finding of near impossibility to replace the supplier.  *Stainless Steel Wire Rod*

*from the Republic of Korea: Preliminary Results* 71 Fed. Reg. 59,739 (Oct. 11, 2006)

(finding affiliation because "{supplier} was not able to input from other sources").

Accordingly, no affiliation was found in *Certain Oil Country Tubular Goods from*

*Taiwan* and other cases. *Certain Oil Country Tubular Goods From Taiwan: Affirmative Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 79 Fed. Reg. 10,495 (Feb. 25, 2014) and accompanying I&D Memorandum at pp. 10-13, (undisturbed in the final determination *Certain Oil Country Tubular Goods From Taiwan: Final Determination of Sales at Less Than Fair Value*, 79 Fed. Reg. 41,979 (July 18, 2014) and accompanying I&D Memorandum at Comment 1 (no evidence that purchaser relied exclusively in a supplier for the input given "trial purchases" to another supplier)).; *see also Certain Corrosion-Resistant Steel Products: Final Results* 84 Fed. Reg. 10,784 (March 22, 2019) and accompanying I&D Final Memorandum at Comment 11 ("*Certain Corrosion-Resistant Steel 2016-2017*").

Second, Commerce is focusing on the price of a different product to a different company. OCTAL Extrusion is a U.S. company based outside Cincinnati, Ohio. OCTAL Extrusion processes the PET flakes/scrap into recycled PET sheet. But this recycled PET sheet is U.S. production that has nothing to do with the antidumping investigation of PET sheet from Oman. Commerce's discussion about "control" is about (1) a different product, that is (2) from a different country. In its original determination, Commerce made no effort to link this back to the issue of prices for PET sheet from Oman – the prices between OCTAL Oman and its U.S. customer at issue here.

Commerce now tries to remedy this defect by arguing a single contract sets the price of both PET sheet and PET flake and the arrangement is "circular," Remand Redetermination at 30; Accompanying Memorandum at 15 (P.R.R. 14), but this argument proves too much. That a seller of PET sheet takes into account its overall relationship

with a customer when setting the price is completely normal business practice.  That prices for various products are set in a single contract or multiple contracts does not change the business reality that the seller considers the relationship as a whole.  Commerce stresses that OCTAL sets PET sheet prices "while knowing, in advance, what price it will have to pay to get the by-product back, thus informing its pricing decisions for both products," Accompanying Memorandum at 15 (P.R.R. 14), but this statement is more misleading than useful.  OCTAL actually does not know the price in advance, since that price will vary based on changes in the market index over time.  And whatever general sense OCTAL has of what price it will pay for PET flake is no different than estimates companies always make of what they will buy and sell and what they will pay for each. Commerce is trying to make routine business practice sound unusual when it is not at all unusual.

Third, Commerce mentioned the "price formula" only in passing in the original determination and repeats this point in the Remand Redetermination, *Affiliation Decision* at 4 (P.R. 234); Remand Redetermination at 30; Accompanying Memorandum at 15 (P.R.R. 14), but then does not explain what is happening or how it relates the issue of potential influence over the price of PET sheet sold by OCTAL Oman.  Commerce noted the contract "stipulates" the price – as most sales contracts do. But the contract does not give OCTAL some special power or leverage over the price. On the contrary, the contract benchmarks the price of the PET flake/scrap against market benchmarks. OCTAL Section A Response at Exhibit A-9, clause 1.e. (C.R. 63).  OCTAL had less control over the price of PET flake/scrap because the parties agreed to have the price adjust over time

to reflect the changing market conditions for the key raw materials used to produce the PET plastic.

Commerce now questions the use of a PET resin benchmark to set the price for PET sheet and PET flake, Remand Redetermination at 30-31; Accompanying Memorandum at 16 (P.R.R. 14), but again tries to make the normal seem unusual. Commerce's distinguishes different products but misses two key points. The market index had to be something that was available, and PET resin is the closest product for which any market index is available. Commerce tries to fault the parties for not using indices for other products, but Commerce has cited no record evidence that other indices even exist. The parties chose the best index based on the alternatives available to them. Moreover, PET resin is actually an excellent proxy, since it reflects the overwhelming majority of the product cost for either PET sheet or PET flake – the chemicals combined to make PET resin become the key input for any form of PET sheet or PET flake. *See, e.g.* ITC Prelim. at 6 (P.R. 113).

The parties to the supply agreement at issue reasonably agreed to benchmark price changes price over time to changes in the publicly available market index price for PET resin. The point is not that the price of PET resin properly estimates the price of PET sheet or PET flake. Rather, the point is that changes in PET resin prices will indicate changes in the key input cost for manufacturing any PET products, including sheet and flake. The parties agreed that changes to PET sheet and PET flake prices to reflect these changing costs provided a reasonable basis to set prices over time. term  Commerce's

discussion seeks to obscure this simple business reality does not objectively assess the record evidence on this issue.

Even after its expanded discussion in the remand, it is still not at all clear what mechanism Commerce has in mind that somehow allows the arrangements about PET flake potentially to affect the price of PET sheet being sold by OCTAL to its U.S. customer.  Commerce tries to obscure this key point because it so fundamentally undermines its narrative of control and potential to affect the relevant price of PET sheet.

### C.    Alleged Restrictions on Business

Commerce also notes alleged restrictions on the customer's business, but the discussion of this factor just confirms Commerce's flawed and overbroad theory to find affiliation.  In its original final determination, Commerce had noted that:

Finally, the contract also prohibits [

].

*Affiliation Decision* at 5 (C.R. 262) (Proprietary Document).  In its Remand Redetermination, Commerce states "through this provision of the contract, OCTAL has restricted, directed, and controlled the internal business decisions of Customer A." Remand Redetermination at 32.

Yet notwithstanding Commerce's broad language, the restrictions at issue are completely normal commercial terms to avoid overlap in the business activities between the two parties.  Agreeing [                                          ] the customer committing to supply all its PET flakes/scrap to OCTAL Extrusion as part of the contractual supply relationship.  It does not add anything.  And agreeing [

- 23 -

]. Again, these restrictions do not add anything to the discussion.

Commerce argues that "is an additional element of control, restraint, and direction imposed on Customer A as a result of this contract," *id.* at 33; *see also* Accompanying Memorandum at 16 (P.R.R. 14), but never explains how it is an additional element rather than just the natural economic consequence of the other provisions of the contract. Contracts are drafted to clarify the relationship between parties, and often spell out concretely the consequences of the various agreements made.

Moreover, like its discussion of the other factors, Commerce's brief discussion of these contract terms says little about the core issue – the price being paid by the U.S. customer to OCTAL for PET sheet, or OCTAL's ability to influence that price. Commerce asserts this provision affects the price of PET sheet, Remand Redetermination at 32 ("impact OCTAL's price, production, and cost of subject merchandise"); Accompanying Memorandum at 16 (P.R.R. 14), but that claim misunderstands the contract. The price for PET sheet for this customer is set by the contract based on the market index.  The only changes in price during the period under investigation were changes triggered by adjustments in the index and were completely beyond the control of OCTAL or its customer.  The only possible effect on the price of PET sheet that results from the alleged increased production and economies of scale is an effect on the price of PET sheet to customers other than Customer A.  Yet Commerce has not and cannot explain how an effect on the price to other customers is relevant to an affiliation finding with respect to Customer A.

Public Version

Under Commerce's theory, any new contract with a customer would lead to affiliation.  Any new contract or new customer leads to expanded sales, which may lead to expanded production, economies of scale, and a potential effect on the price of merchandise.  Commerce does not articulate anything beyond these normal commercial dynamics with respect to this aspect of supply agreement.  And even if these dynamics were at play with respect to other customers, they have nothing to do with the price being charged to Customer A, which is set based on the market index.

### D.    Financing From OCTAL

Finally, Commerce also discussed the financing between OCTAL and its customer [                                                    ].  Commerce had originally described this factor as follows:

> . . . OCTAL provided [        ] with [
>                                       ], another indicator of control. Specifically,
> OCTAL provided to [
>                                                                    ].
> OCTAL [
>            ] on its own books. . . . {T}his financing indicates control given that its
> objective was to expand [       ]'s production capacity, and thus entailing a
> concomitant increase in the quantity of PET sheet supplied by OCTAL to [       ].

*Affiliation Decision* at 4-5 (C.R. 262) (Proprietary Document).  In its Remand Redetermination, Commerce states "that financing between OCTAL and Customer A, and the specific terms of such financing, further support a finding of affiliation." Remand Redetermination at 33.  Here again Commerce fails to reconcile this discussion to its past practice or link this factor in any way to the price that OCTAL charges its customer for PET sheet.

Prior Commerce practice shows the existence of collateral in a transaction suggests that debt financing does not create control.  For example, in *Large Residential Washers*, Commerce found that no close supplier relationship even though there was debt financing associated with certain pieces of equipment.  *Large Residential Washers From the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2015-2016*, 82 Fed. Reg. 42,788 (Sept 12, 2017) and accompanying I&D Memorandum at Comment 2.  In that case, Commerce found that "LG did not assume inappropriate risk in extending credit to its top suppliers because the agreements required the suppliers to post collateral on the loans in the form of bank certificates." *Id.*  Further, Commerce indicated that any risk involved would have been accepted by unaffiliated parties as a normal commercial transaction.  Similarly, in *Certain Corrosion-Resistant Steel 2016-2017* Commerce rejected claims of affiliation even though Hyundai was providing machinery to one of Hyundai's customers in the United States. *Certain Corrosion-Resistant Steel 2016-2017* at Comment 11.  Thus, providing loans to buy equipment or even providing equipment directly do not necessarily indicate undue influence or control.

Commerce tries to distinguish this past practice, Remand Redetermination at 33-34; Accompanying Memorandum at 17 (P.R.R. 14), but those efforts just underscore the point that this final factor adds little to the overall affiliation discussion.  Commerce admits that its finding here actually depends on the "other factors at play." Remand Redetermination at 33.  Commerce never addresses what the financing point adds to the earlier discussion.  Commerce also cites specifically to *Rebar from Latvia*, but ignores the absence of any index pricing in *Rebar from Latvia*.  *Notice of Final Determination of*

Public Version

*Sales at Less Than Fair Value: Steel Concrete Reinforcing Bars From Latvia*, 66 Fed.

Reg. 33,530 (June 22, 2001) and accompanying I&D Memorandum at Comment 1.  The

potential impact on price to a particular customer disappears when the price to that

customer is set by a market index, a key factor that Commerce simply ignores when it

undermines the argument being proffered.

OCTAL provided financial support to its U.S. customer to assist with [

].  But as Commerce's own

past practice confirms, such financial support is a common place business practice.

Commerce has considered such arrangements in the past and has found them not to

establish affiliation.  Yet here, Commerce provided a perfunctory analysis of the

financing between the parties, acting as if financing itself – without more – independently

provides additional support for a finding of affiliation.

Moreover, although Commerce addresses some feature of the financial support, it

ignores other features.  Commerce stressed [

],

Accompanying Memorandum at 17 (C.R.R. 8) (Proprietary Document), but ignores how

the terms of the financing fit into the overall structure of the business relationship.  As the

supply agreement makes clear—and as Commerce itself acknowledged (*Id.* at 5

(Proprietary Document))—the customer [                                                    ] provides

benefit to both OCTAL and its customer as the customer expanded its business and thus

bought more PET sheet from OCTAL Oman and sold more PET flake/scrap to OCTAL

Extrusion.  There is nothing wrong or suspicious about two parties deciding that the

- 27 -

benefits of the expanded business justified the terms for financial support. And there is nothing wrong or suspicious about how OCTAL chose to fund its ability to provide this negotiated financial support. These details simply do not establish any basis to infer control.

Commerce alleges other non-commercial aspect for the financing, Remand Redetermination at 34; Accompanying Memorandum at 17-18 (P.R.R. 14), but these arguments misunderstand the contract and what are normal commercial terms. Commerce repeats its point about exclusivity, but this point adds little to the discussion. Moreover, exclusively not a non-commercial term. Parties often agree to deal exclusively for some period of time, and that contract term may affect other contract terms.

Commerce's entire theory of control really comes down a single argument, but this argument actually confirms the inadequacy of Commerce's affiliation finding. After discussing the terms of the loans, Commerce noted:



> As stated in the [                              ], and further elaborated upon in a
> supplemental response, this financing indicates control given that its objective
> was to expand [        ]'s production capacity, and thus entailing a concomitant
> increase in the quantity of PET sheet supplied by OCTAL to [        ].

*Affiliation Decision* at 5 (C.R. 262) (Proprietary Document). Commerce doubled down on this theory in its Remand Redetermination, rephrasing the argument as:

> Thus, according to the contract, [        ] had to accept the [              ]
> arrangement as well as an [                                        ]
> from OCTAL through a specified formula in order to receive the [        ]
>        ] financing.

- 28 -

Public Version

But this argument is woefully deficient in several key respects and does not support

Commerce's ultimate conclusion.

First, nothing in the supply agreement or the supplemental response that

Commerce cited in any way states or imply that financing gives control.  The supply

agreement reflects the memorialization of the arms-length terms agreed by the two

parties, including provisions for termination (clause 18) and dispute settlement (clause

30).  OCTAL Section A Response at Exhibit A-9 (C.R. 63). Nor does the supplemental

response cited by Commerce imply any control.  The supplemental response made the

specific point that the financial support [

                                         ], and that the expense of this financing had been reported

as a financial expense in the Section D response.  *OCTAL's Supplemental Section D*

*Questionnaire Response* at (Jan. 9, 2020) (P.R. 152).

Second, the discussion of expanded purchases by the U.S. customers – additional

sales of PET sheet by OCTAL Oman – just restates the point about the [

            ].  It does not add anything.  If even an exclusive supply arrangement does

not establish control – as Commerce has repeatedly found and reconfirmed – then the

quantity being supplied should not matter.  That OCTAL may have been supplying more

because of the new thermoforming machines is not relevant and Commerce has not even

attempted any explanation of how it is relevant other than repeating its overbroad

argument that increased production somehow affects price.

Third, nothing about this arrangement establishes any "control" or "influence"

over the U.S. customer's production.  The U.S. customer made its own decision about

- 29 -

what to produce and how much to product.  The U.S. customer had its own incentive to expand its business for its own reasons.  OCTAL was controlling or influencing nothing. An incidental effect on production is not "influence" on production for purposes of affiliation.

Fourth, nothing about this alleged influence on production says anything about the core issue – the price being paid by Customer A to OCTAL for PET sheet.  Even if there were some incidental effect on PET sheet production, and some incidental effect on the price to other customers, Commerce never addresses how that affects in any way the price for PET sheet to Customer A or in any way undermines the reliability of the price for PET sheet to Customer A.  Like its discussion of the arrangement for buying and selling PET flake/scrap, Commerce's discussion of the production of PET sheet ignores the core issue about possible control that might affect the price of PET sheet to Customer A.

In sum, none of these factors – either individually or collectively – support Commerce's finding that OCTAL was "in a position to exercise restrain or control" over its U.S. customer as required by the statute and regulation.  In this case, Commerce spent most of its discussion on issues related to a different product (PET flake, not PET sheet), and said little at all about the core issue of PET sheet pricing.  And what Commerce argued about PET sheet pricing simply did not apply to Customer A.  Commerce perhaps downplayed PET sheet pricing because it had no idea how to demonstrate that OCTAL somehow has the potential to influence a price to Customer A being set by a formula

benchmarked to neutral third-party market indices.  It is hard to imagine a situation where the price was less influenced by any possible affiliation.

## III.   COMMERCE'S REFUSAL TO OBTAIN NECESSARY DATA TO UNDERTAKE AN ACCURATE DUMPING MARGIN CALCULATION WAS UNLAWFUL

We now turn to what is perhaps Commerce's most egregious decision of the remand proceeding – the failure to request the customer's sales and further manufacturing data to calculate an accurate AD margin.  Commerce's Remand Redetermination states effectively that Commerce had no obligation to obtain the sales and cost data from the customer.  *See* Remand Redetermination at 40-41.  As a matter of law and long-standing Federal Circuit precedent, however, Commerce is wrong and therefore Commerce's Remand Redetermination is unlawful.

### A.   Commerce Has An Obligation To Calculate The Most Accurate AD Margin Possible, Which Includes Obtaining An Affiliated U.S. Customer's U.S. Sales And Expense Data

Commerce's Remand Redetermination ignores two fundamental principles.  The first fundamental principle is that Commerce has an obligation to "calculate dumping margins as accurately as possible."  *Diamond Sawblades Mfrs. Coalition v. United States*, 2021 U.S. App. LEXIS 2279 at *30 (Fed. Cir. Jan. 21, 2021) (quoting *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013) (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990))).

The second fundamental principle is that a conclusion of affiliation with a *U.S. customer* under the statute only has one purpose; namely, then requiring that the affiliated

customer to provide the necessary data to undertake an accurate AD margin calculation. There is no other purpose of an affiliation conclusion.  Such affiliation conclusion is for Commerce to obtain downstream sales and expense data from the U.S. customer.

Specifically, 19 U.S.C. §1677a(b) provides a definition of "constructed export price" and then mandates that U.S. sales prices to <u>unaffiliated</u> U.S. customers be used in the AD margin calculation.  19 U.S.C. §1677a(b).  Sales prices to affiliated U.S. customers cannot be used in the AD margin calculation.  Moreover, 19 U.S.C. §1677a(d) also mandates that, when calculating the "constructed export price", the sales prices from the affiliated U.S. company to its unaffiliated U.S. customer must be reduced by "the cost of any further manufacture or assembly."  19 U.S.C. §1677a(d)(2).  In short,  when the investigated exporter sells the subject merchandise to an affiliated company, the statute requires that Commerce obtain the sales and expense data from the affiliated company to calculate an accurate AD margin.

Commerce's own regulations fully reflect the statutory requirement to utilize an affiliated U.S. company's sales price to its unaffiliated customer in the AD margin calculation.  Indeed, Commerce's regulations refer to the U.S. affiliated company's sales prices as the "starting price" for the United States side of the AD margin calculation.  *See* 19 C.F.R. §351.402(a).  And long-standing Federal Circuit precedent confirms the statutory requirement of using a U.S. affiliated company's sales prices in the U.S. AD margin calculation.  *See AK Steel Corp. v. United States*, 226 F.3d 1361, 1367 (Fed. Cir. 2000) (observing that if "the first sale to an unaffiliated purchaser occurs in the United States, then that sale must be used to determine the U.S. Price."); *see also Koyo Seiko Co.*

*v. United States*, 92 F.3d 1162, 1167 (Fed. Cir. 1996) (highlighting the statute's focus on obtaining sales data from affiliated companies); *Uttam Galva Steels Ltd. v. United States*, 997 F.3d 1192, 1195 (Fed. Cir. 2021) (quoting 19 U.S.C. §1677a(b) when discussing the basis for U.S. sales price in the context of affiliated company sales).

Moreover, when determining the dumping margin, the statute instructs Commerce to use *all* U.S. sales, not just some of them.  The basic rule in 19 U.S.C. §1677f-1(c)(1) is to determine a "weighted average dumping margin" for each exporter, such as OCTAL.  19 U.S.C. §1677f-1(c)(1).  The statute in turn defines this weighted average dumping margin as the percentage from dividing the "aggregate margins" by the "aggregate export prices and constructed export prices" of the exporter.  19 U.S.C. §1677(35)(B) (emphasis added). The statute provides some exceptions, but Commerce has invoked none of them and none of them are relevant here.  So the statute requires Commerce to use all export prices – the "aggregate export prices" – and cannot determine a distorted and inaccurate weighted average margin of dumping by excluding more than half of OCTAL's actual export transactions.

### B.  Commerce's Has Not Stated Any Legitimate Justification For Refusing To Obtain The Necessary Data from the Affiliated Customer

Commerce's Remand Redetermination offers three purported justifications for refusing to obtain the necessary sales and expense data from the affiliated U.S. customer. All three fail.

Commerce's <u>first</u> purported justification is that it was somehow OCTAL's fault that Commerce did not focus on the potential customer affiliation issues until very late in the AD investigation proceeding. Such excuse is both factually wrong and irrelevant.

Commerce's claim is factually wrong because the sole basis of Commerce's conclusion of affiliation is the existence of the supply agreement between OCTAL and [    ] that had been provided to Commerce on October 4, 2019 in OCTAL's Section A response, which was the <u>very first</u> questionnaire response. Commerce had the customer very supply agreement at issue 151 days prior to Commerce's preliminary determination, and 292 days prior to Commerce's final determination. Moreover, Commerce's insinuation that OCTAL somehow hid the fact that OCTAL had long-term supply agreements in its Section A response is just preposterous. We set forth below actual quotes from the OCTAL's <u>narrative</u> Section A response:

> . . . OCTAL only has two types of PET sheet sales; "spot sales" in which individual purchase orders are negotiated and "contract sales" pursuant to which OCTAL ships PET sheet to the customer over a longer period of time. . . .

> "Contract sales" refer to those sales transactions made pursuant to <u>a written sales/supply agreement</u> that covers shipments for a certain period of time.

*See* OCTAL Section A Response, dated October 4, 2019, at pp 21 and 23 (P.R. 108) (emphasis added).

Commerce's scapegoating claim that OCTAL somehow hid the fact of its written-supply agreement with its U.S. customer is directly contradicted by the evidentiary record.

In addition, Commerce's factually incorrect allegation that OCTAL somehow hid the existence of its supply agreement during the original investigation is completely irrelevant to what Commerce's actions during the remand proceeding. The sole question *now* before this Court is whether Commerce's Remand Redetermination is supported by substantial evidence and otherwise in accordance with law. Commerce was fully aware of the existence of the agreement at issue long before the start of the Commerce's remand proceeding, given that Commerce itself relied upon the existence of the agreement in Commerce's initial affiliation conclusion rendered as part of Commerce's final determination. *Affiliation Decision* (P.R. 234). The question before this Court is whether Commerce, having undertaken a new examination of the customer affiliation issue and having rendered a new conclusion of affiliation, now had a legal obligation to obtain the necessary sales and expense data (from the affiliated customer) to calculate the most accurate AD margin. As we demonstrate above, Commerce had such an obligation.

Commerce's second purported justification for refusing to obtain the necessary data is that "Commerce does not normally reopen the administrative record on remand." *See* Commerce Remand Redetermination at 40. Such justification also fails. A reference to Commerce's supposed *general* practice during remand cannot possibly overcome a statutory obligation that Commerce to calculate an accurate antidumping margin in this particular case. Indeed, the court has rejected this same excuse when the issue on remand concerned a statutory obligation for the calculation of an AD margin. For example, in *MacLean-Fogg*, 100 F. Supp. 3d at 1363, the court explicitly noted that the importance of

Commerce complying with a statutory obligation in conducting its remand outweighed

Commerce's general preference not to reopen the record.  The court explained as follows:

> while Commerce is correct that it has no general duty to reopen the record
> during remanded proceedings, the particular circumstances presented here
> require that, where the necessary data is missing from the record due to
> Commerce's own failure to fully administer the legal framework, it is the
> agency's responsibility to go back and fix errors that are material to the
> remand proceeding.

*Id.* at 1363.

In addition, we note that in a remand proceeding there is no legitimate concern

about the amount of time it would take for Commerce to comply with its statutory

obligations.  Remands are not subject to the same time constraints as original

investigations.  Statutory deadlines for agency investigations have no bearing on timing

during remands because "{t}he remand proceeding is being conducted under the

authority of this Court pursuant to statutory provisions governing judicial review, not the

provisions governing the time limits for the agency's conducting of the investigation

prior to the publication of the contested determination."  *Elkay Mfg. Co. v. United States*,

Slip Op. 15-33, 2015 Ct. Intl. Trade LEXIS 33 at *7 (Apr. 20, 2015).

Commerce's <u>third</u> purported justification is that the statute provides Commerce

with the ability to ignore sales of U.S. affiliated company when the subject merchandise

is further processed after importation.  *See* Commerce Remand Redetermination at 39-41.

But Commerce's legal interpretation of the applicable statutory provision (referred to as

the "special rule") is wrong.  By its own terms 19 U.S.C. §1677(a)(e) sets forth a specific

factual predicate for applying the special rule; namely:

{w}here . . . the value added in the United States  . . .is likely to exceed substantially the value of the subject merchandise

19 U.S.C. §1677a(e)(emphasis added).  This factual predicate for invoking the special rule does not exist in the PET sheet case.  Commerce does not attempt to claim that it does.  Given that this factual predicate does not exist (and Commerce made no effort to gather the information), Commerce has no legal authority to ignore the affiliated company's sales of subject merchandise that has been further processed. And therefore its refusal to obtain necessary data to undertake an accurate dumping margin calculation was unlawful.

## IV.   COMMERCE DID NOT APPLY NEUTRAL FACTS AVAILABLE, BUT RATHER APPLIED ADVERSE ASSUMPTIONS THAT RESULTED IN AN INCORRECT AND UNFAIR DUMPING MARGIN FOR OCTAL

Commerce's Remand Redetermination claims it applied neutral facts available in the calculation of OCTAL's AD margin.  On this issue, Commerce's Remand Redetermination is virtually identical to this same conclusion from the original AD determination.  *Compare* Remand Redetermination at 40-41 with *Affiliation Decision* at 5 (P.R. 234).  However, Commerce's conclusion that it did not apply adverse inferences, but rather only applied "neutral facts available" is wrong.  Commerce's approach – applying the AD rate for the remaining OCTAL U.S. sales transactions to all OCTAL sales transactions to [          ] – was premised upon adverse assumptions.

Specifically, Commerce's approach assumes that all – 100 percent – of OCTAL's sales to [      ] were made at dumped prices.  But there is no factual basis on the record for this assumption.  Even when just focusing on OCTAL's U.S. sales to all other

customers, the evidence before Commerce was that not all of OCTAL's U.S. sales transactions consisted of "dumped" U.S. prices.

We recognize that we made this very same argument in our opening brief. Accordingly, we simply refer to and incorporate by reference the detailed evidentiary arguments made therein. *See* Plaintiff's Opening Brief at 49-54 ECF 25-1, 26-1.[3] Should the Court not agree with our other arguments made herein, we respectfully ask that the Court address this argument.  Commerce incorrectly asserts it applied neutral facts available because it knows it could not comply with the statutory requirements to impose adverse facts available.  The Court should not allow Commerce to side step its obligation to determine a correct margin of dumping.

---

[3] Attached as Attachment B for this Court's convenience.

<u>Public Version</u>

## CONCLUSION

For all of the foregoing reasons, OCTAL respectfully requests this Court hold unlawful Commerce's Remand Redetermination.  The Court should find Commerce's renewed decision of affiliation to be unlawful, and instruct Commerce to recalculate the dumping margin including the sales to OCTAL's unaffiliated customer.  In the alternative, the Court should remand to Commerce to gather the necessary information – including resale price data from OCTAL's customer – to allow a correct  and accurate calculation of the dumping margin.

Respectfully submitted,

<u>/s/ Daniel L. Porter</u>

Daniel L. Porter
James P. Durling
James C. Beaty
Ana Amador

*Counsel for Plaintiffs*

Dated:  September 2, 2021

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2010 using a proportionally spaced typeface 13-point Times New Roman font.

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in the Chambers Procedures.  Specifically, excluding those exempted portions of the brief as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains 9,969 words.   In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Daniel L. Porter

Daniel L. Porter

Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, NW
Washington, D.C., 20006

*Counsel for Plaintiffs*

Dated: September 2, 2021