## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE

_____
)
OCTAL, INC.,                                                    )
OCTAL SAOC-FSZ,                                          )
)
           Plaintiffs,                          )
)
     v.                                                        )        Court No. 20-03697
)
UNITED STATES,                                            )
)        NON-CONFIDENTIAL VERSION
           Defendant,                        )        Business Proprietary Information
)        Removed on Pages 3, 7-10, 12-13
    and                                                         )        16-20, 30, 32-33, 35-36
)
ADVANCED EXTRUSIONS, INC., *et al*        )
)
           Defendant-Intervenors.   )
_____)

---

## DEFENDANT UNITED STATES' RESPONSE TO PLAINTIFFS' AMENDED COMMENTS ON REMAND REDETERMINATION

---

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. MCCARTHY
Director

OF COUNSEL:
MYKHAYLO A. GRYZLOV
Senior Counsel
U.S. Department of Commerce
Office of the Chief Counsel For Trade
Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, D.C. 20230
Tel: (202) 482-0833
Fax: (202) 482-4912
Email:  mykhaylo.gryzlov @trade.gov

SONIA M. ORFIELD
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington D.C. 20044
Tel: (202) 353-0534
Fax: (202) 514-7965
Email: Sonia.M.Orfield@usdoj.gov

November 19, 2021                                   *Attorneys for Defendant, United States*

# TABLE OF CONTENTS

I.   Factual Background ..................................................................................2

ARGUMENT .............................................................................................3

I.   Commerce's Finding  That OCTAL Was Affiliated  with its U.S. Customer Is
     Supported by Substantial Evidence and Is in Accordance with Law..........................3

     1.   The Nature of the Supply Relationship ...........................................7

     2.   Purchase of PET Flake ..............................................................13

     3.   Restrictions on Production.........................................................16

     4.   OCTAL's Financing...................................................................18

II.  Commerce's Properly Declined to Reopen the Administrative Record....................21

     1.   Commerce Properly Declined to Accept the New Factual Information
          from OCTAL .........................................................................22

     2.   Commerce Properly Applied  Neutral Facts Available  and Declined to
          Reopen the Record at the Late Stage of Investigation and on Remand..........29

III. Commerce's Properly Applied Neutral Facts Available...........................................35

CONCLUSION................................................................................................36

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Boomerang Tube LLC v. United States,*
   856 F.3d 908 (Fed. Cir. 2017).................................................................28

*Co-steel Raritan, Inc. v. Int'l Trade Comm'n,*
   357 F.3d 1294 (Fed. Cir. 2004).................................................................23

*Essar Steel Ltd. v. United States,*
   678 F.3d 1268 (Fed. Cir. 2012)...........................................................21, 28

*Grobest & I-Mei Indus. (Vietnam) Co. v. United States,*
   815 F. Supp. 2d 1342 (Ct. Int'l Trade 2012) ...........................................25

*Husteel Co. v. United States,*
   98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015) ...........................................14

*McLean Fogg Co. v. United States,*
   100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) .....................................33, 34

*NEXTEEL Co. v. United States,*
   355 F. Supp. 3d. 1336 (Ct. Int'l Trade 2019) .........................................15

*NTN Bearing Corp. v. United States,*
   74 F.3d 1204 (Fed. Cir. 1995)...........................................................26, 27

*QVD Food Co. v. United States,*
   658 F.3d 1318 (Fed. Cir. 2011).................................................................30

*Tianjin Mach. Imp. & Exp. Corp. v. United States,*
   806 F. Supp. 1008 (Ct. Int'l Trade 1992)................................................30

*Vermont Yankee Nuclear Power Corp. v. Natural Resource Def. Counsel,*
   435 U.S. 519 (1978) ...........................................................................24, 29

**Statutes**

19 U.S.C. § 1677(33)(G)...........................................................................4, 5

19 U.S.C. § 1677a(e) .............................................................................34, 35

19 U.S.C. § 1677e(a) .................................................................29, 30 , 32, 35

**Regulations**

19 C.F.R. § 351.102(b) ...................................................................................*passim*

19 C.F.R. § 351.104(a)(2) ....................................................................................3, 6

19 C.F.R. § 351.301(c) ..........................................................................................24

19 C.F.R. § 351.302(d) ....................................................................................3, 22

19 C.F.R. § 351.304(c)(1) ......................................................................................33

**Other Authorities**

*Polyethylene Terephthalate Sheet from the Sultanate of Oman*,
 85 Fed. Reg. 44,278 (Dep't of Commerce July 22, 2020) ...................................... 2

Statement of Administrative  Action,
 HR 5110, H.R. Doc. No. 316, Vol. 1, 103d Cong., 2d Sess. (1994) ......................................11

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE

_____

|  |  |  |
|---|---|---|
| OCTAL, INC., | ) | |
| OCTAL SAOC-FSZ, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Court No. 20-03697 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | NON-CONFIDENTIAL VERSION |
| Defendant, | ) | Business Proprietary Information |
| | ) | Removed on Pages 3, 7-10, 12-13 |
| and | ) | 16-20, 30, 32-33, 35-36 |
| | ) | |
| ADVANCED EXTRUSIONS, INC., *et al* | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

_____

## DEFENDANT UNITED STATES' RESPONSE TO PLAINTIFFS' AMENDED COMMENTS ON REMAND REDETERMINATION

Defendant, the United States, respectfully submits this response to the comments of plaintiffs, OCTAL, INC. and OCTAL SAOC-FSZ (collectively OCTAL) concerning the Department of Commerce's remand redetermination filed in accordance with this Court's April 30, 2021 order. *OCTAL Inc. v. United States*, Ct. No. 20-03697, (Apr. 30, 2021), Dkt. No. 36 (*Remand Order*). *Final Results of Redetermination Pursuant to Court Remand*, dated July 16, 2021, Dkt. No. 118-1 (Remand Redetermination).

For the reasons set forth below, this Court should sustain Commerce's Remand Redetermination.

I.      **Factual Background**

The agency proceeding under review is *Polyethylene Terephthalate Sheet from the Sultanate of Oman*, 85 Fed. Reg. 44,278 (Dep't of Commerce July 22, 2020) (*Final LTFV Determination*).  On April 30, 2021, the Court issued an order granting our request for a voluntary remand to allow parties to provide comments on Commerce's affiliation finding in the *Final LTFV Determination*.  *See* Remand Order (ECF No. 36).  During the remand proceedings, consistent with the April 30, 2021 order, Commerce provided the parties with the opportunity to comment on the issue of affiliation in the *Final LTFV Determination*, Remand Redetermination at 2-3, although it did not reopen the record on remand or solicit new factual information from interested parties.   *Id.* at 40 ("Absent compelling considerations, Commerce does not normally reopen the record on remand.").  Thus, the administrative record includes the parties' remand comments, but the factual record before Commerce had closed prior to the judicial challenge.

On May 14, 2021, OCTAL and the petitioners submitted comments.  *Id.* at 3.  On May 18, 2021, Commerce rejected OCTAL's comments because they contained unsolicited and untimely filed new factual information -- specifically two affidavits from corporate executives. *Id.*  Commerce explained that the administrative record had closed during the investigation and that parties had been provided with an opportunity to comment on the affiliation decision based on the existing administrative record:

> In this proceeding, the administrative record closed during the less than fair value investigation.  In inviting comments from the parties on remand, Commerce provided them with an opportunity to make arguments on a specific issue based on the existing administrative record and did not reopen the record for submitting new factual information.  An opportunity to submit an argument on an issue does not mean that an interested party is free to disregard Commerce's procedures by submitting new factual information after the deadline for submitting new factual information.  Certain information submitted with your written argument, which we identified above, is untimely filed new factual information within the meaning of 19 CFR 351.302(d) and 351.102(b)(21).

2

Commerce will not consider untimely filed factual information for this proceeding, in accordance with 19 CFR 351.302(d)(1)(i) of Commerce's regulations. While a copy of the originally-submitted comments will remain on the record of this proceeding for the limited purpose of establishing that it contained untimely filed factual information, as required by 19 CFR 351.104(a)(2)(ii)(A), the information in these rejected submissions will not be used in the final remand results.

R.P.R. 7 at 1-2.

Commerce provided OCTAL with an opportunity to refile its comments after removing the unsolicited and untimely filed new factual information. Remand Redetermination at 3. On May 19, 2021, OCTAL refiled its comments with this information removed. *Id*. On May 21, 2021, OCTAL and the petitioners submitted rebuttal comments. *Id*. On August 2, 2021, after considering interested parties' comments and rebuttal comments, Commerce issued and filed with the Court the Remand Redetermination. *Id*. In issuing the Remand Redetermination, consistent with 19 C.F.R. § 351.302(d)(1)(i) and 19 C.F.R. § 351.104(a)(2), Commerce did not consider the untimely filed new factual information.

## **ARGUMENT**

I. **Commerce's Finding That OCTAL Was Affiliated with its U.S. Customer Is Supported by Substantial Evidence and Is in Accordance with Law**

OCTAL contends that Commerce's finding of affiliation between OCTAL and its U.S. customer, [███],[1] is not supported by substantial evidence and is not in accordance with law. OCTAL Cmt. at 6 and 11. In addition, OCTAL contends that Commerce's determination is based on an incomplete administrative record. *Id*. at 11. As we demonstrate below, contrary to

---

[1] Because the customer's identity is business proprietary information, in public documents Commerce referred to [███] as Customer A or customer.

OCTAL's contentions, Commerce's affiliation finding is supported by substantial evidence and is otherwise in accordance with law, and the administrative record in this proceeding is complete.

Commerce found that OCTAL and its U.S. customer are affiliated through a close supplier relationship within the meaning of 19 U.S.C. § 1677(33)(G) and 19 C.F.R. § 351.102(b)(3). Section 1677(33)(G) provides that the "{a}ny person who controls any other person and such other person" shall be considered affiliated. In other words, if Commerce finds that a company controls another company, the statute requires Commerce to consider both companies affiliated. Commerce's regulation, which implements this statutory provision, provides that in determining whether control over another person exists, Commerce will consider various factors, including a "close supplier relationship." 19 C.F.R. § 351.102(b)(3). The regulation further provides that Commerce will not find control unless "the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product." *Id*.

In applying these statutory and regulatory provisions, Commerce evaluated whether a close supplier relationship existed, as well as considering various aspects of the corporate relationship that demonstrated that the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise. Remand at 4-6. Commerce found that "the following considerations supported finding a close supplier relationship: (1) the nature of the supply relationship between OCTAL and Customer A; (2) the arrangement through which OCTAL's U.S. affiliate purchases back PET flake/scrap from Customer A; (3) loans from OCTAL to Customer A and their terms; and (4) contractual restrictions on Customer A's business activities." *Id*. at 4-5. Because "the relationship exerted substantial influence on OCTAL's production, and the production of its U.S. affiliate, which

4

sourced a key input from Customer A," Commerce found that "the relationship was able to affect OCTAL's production and cost of producing the subject merchandise, as well as the price OCTAL could charge and receive for it." *Id.* at 5. Commerce further explained the details of its findings in a proprietary affiliation memorandum, because OCTAL designated most of the information regarding its close supplier relationship with the customer as business proprietary information. *Id.*

Even so, OCTAL contends that Commerce's affiliation finding is unlawful because "its analysis largely focused on one provision in isolation and did not consider the statutory and regulatory framework as a whole or the limitations set forth in these provisions." OCTAL Cmt. at 11. As an initial matter, OCTAL has failed to identify any applicable statutory or regulatory provision that Commerce allegedly violated. In fact, the legal argument in both OCTAL's comments on remand and its initial brief largely consists of reciting the very same regulatory and statutory provisions that Commerce applied. OCTAL acknowledges that Commerce "correctly" stated the standards under the relevant statutory and regulatory provisions. OCTAL Cmt. at 14. ("Commerce correctly noted that the statutory standard under 19 U.S.C. §1677(33)(g) {sic} is "control," and that the regulatory clarification in 19 C.F.R. §351.102(b)(3) focuses on whether a "close supplier relationship" actually has "the potential to impact decisions relating to the production, sales, or cost" of the merchandise at issue.").

OCTAL does not identify any legal error in Commerce's interpretation or analysis of these statutory or regulatory provisions, but instead makes generalized statements that "the statute and regulation thus set specific limits for finding affiliation" and that the "statute does not authorize Commerce to throw together a random set of facts and indicate some generalized suspicion." OCTAL Cmt. at 12. OCTAL further contends that "Commerce only provided a

superficial analysis of an incomplete record." *Id*. Nothing in Commerce's determination indicates that Commerce interpreted or applied the statute and regulation in the manner that alleged by OCTAL. To the contrary, as we demonstrate below, Commerce followed the statute and regulations and its findings are supported by record evidence.

As an initial matter, OCTAL's broad assertions regarding Commerce's analysis of the issue and completeness of the administrative record are untrue. Far from being superficial, Commerce's remand redetermination, which focuses on the issue of affiliation, is 48 pages long and is accompanied by an 18-page proprietary affiliation memorandum. *See* Remand 1-48 and R.C.R. 8 at 1-18. Commerce considered the entire administrative record, which included, among other things, all factual information submitted by the established deadline and subsequent argument made during the remand proceeding, but did not consider the documents that it rejected consistent with its regulations. 19 C.F.R. § 351.104(a)(2) (stating that Commerce "will not use factual information, written argument, or other material that Secretary rejects.").

It is also important to recognize that there is no dispute as to whether a close supplier relationship exists between OCTAL and its customer. OCTAL only disputes whether the relationship has the potential to impact decisions concerning the production, pricing, and costs of merchandise under consideration. OCTAL Cmt. at 8. As explained earlier, Commerce's regulation, 19 C.F.R. § 351.102(b)(3), requires Commerce to consider close supplier relationships in determining whether affiliation exists. Consistent with its regulation, Commerce evaluated various provisions of the close supplier agreement between OCTAL and its customer to determine whether "the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product." 19 C.F.R. §

351.102(b)(3).   Commerce found that the following factors supported an affirmative affiliation finding.

1. The Nature of the Supply Relationship

Commerce found that OCTAL has a close supplier relationship with its customer because the companies are parties to a contract that requires the customer "to purchase [____] its PET sheet from OCTAL and restrains the company from seeking the most advantageous terms available on the open market." R.C.R. 8 at 12.  Commerce found that "this requirement creates a contractually-mandated dependency on OCTAL by [____] for [__] of its PET sheet – a necessary input for [____] own manufacturing." *Id.* at 11-12.  Commerce further explained that through the [_____] contract, the customer "was restrained from purchasing PET sheet from [_____] and it was directed to purchase [_____ _____]." *Id.* at 12.  Commerce found that "[____] represents [__] percent of OCTAL's U.S. sales during the {period of investigation}" and "by the end of this investigation, [____] had been obtaining [_____] of its PET sheet from OCTAL for [_____]." *Id.* at 12-13.

Commerce also found that "dictating the source of [_____] PET sheet supply shows an ability to restrain or direct [____] procurement of its major manufacturing input through the relationship established in the legal contract signed by the parties." *Id.* at 12. Further, Commerce found that the "arrangement has an effect on the production, pricing, or cost of subject merchandise because the price of the PET sheet was set by the contract as well." *Id.* Although OCTAL argues that the contract price is based on a market index and, thus, there can be no control over pricing, "[____] is still bound to the price established in the contract and is not free to seek other available market prices." *Id.* As Commerce explained, "individual

purchase transactions could be higher or lower than the market index at any specific time, but [▮] cannot take advantage of any lower prices; nor is it subject to higher prices that other consumers may face." *Id*. In addition, Commerce expressed "concerns about the reliability of the market index pricing, as it is not for a proprietary product like DPET and it is not a price for PET sheet at all, but rather PET resin, the input used to produce PET sheet." *Id*.

The issue is not whether the price is fixed or fluctuates with an index, as OCTAL appears to suggest (OCTAL Cmt. at 18-20), but rather whether the customer purchases PET sheet at the prevailing market prices. The market index used in the agreement does not accurately reflect the prevailing market price of PET sheet, let alone the price of DPET, but rather the price of PET resin. Even though OCTAL contends that "PET resin is actually an excellent proxy, since it reflects the overwhelming majority of the production cost for either PET sheet or PET flake," OCTAL Cmt. at 27, the record evidence refutes OCTAL's contentions. Specifically, OCTAL reported that "{m}ost of OCTAL's PET sheet production is DPET," which is produced either exclusively or predominantly from melt, a different input from PET resin. OCTAL Section D QR, at 4, 34, 36, C.R. 113. In other words, the main input in the production of DPET is melt, [2] and not PET resin. OCTAL produces DPET on two types of production lines: (1) Coex lines, which predominantly use melt but also use PET resin and PET flake in small amounts; and (2) non-Coex lines, which only use melt. [3] OCTAL has [▮] non-Coex lines and only [▮] Coex lines.

---

[2] OCTAL reported that the materials used to produce PET sheet depend on the production line and that it has "three different types of production process: (1) DPET (PET sheet produced directly from melt); (2) APET (PET sheet produced from PET resin, which may include a small amount of recycled content); and (3) RPET (PET sheet produced from mix of PET resin and recycled PET sheet)." OCTAL Section D Response at 4, C.R. 113.

[3] Its "non-Coex DPET lines" are lines that "manufacture PET sheet rolls exclusively from PET MELT" and "Coex DPET lines" are lines "that manufacture PET sheet rolls essentially from PET MELT, but with addition of some PET resin and a very small addition of flakes." OCTAL Section D Response at 35, C.R. 113.

*Id.* at 35.  When OCTAL produces DPET on its non-Coex lines PET resin cannot be used in the production process, but the close supplier agreement uses the PET resin price index (which bears no relation to the price or cost of the finished product) to establish the price of such DPET.  Even when DPET is produced on a Coex line, the melt is still the predominant input while PET resin and PET flakes are relatively minor additions, and, thus, the contract price for the finished product is unlikely to reasonably reflect the market price or cost of PET sheet.

      By tying the price of the finished product to a price index of a relatively small input (which frequently is not even used in production of DPET), the agreement distorts the price of a finished product, particularly when the price of the main raw material input (*i.e.*, melt) moves in the opposite direction from the price of PET resin.  *See* Section D SQR, at 10, C.R. 146 (explaining that OCTAL reported actual values of the main components of melt [████████ ████], because "the values of [████████] are volatile and might change dramatically from month to month."); OCTAL Section D QR, at 8, C.R. 113 (reporting that [████████] account for the bulk of raw material cost in producing melt).  Accordingly, Commerce properly concluded that the contract's mechanism for establishing the price of both PET sheet and PET flake is "unusual" and that OCTAL had failed to demonstrate the contractual price "is consistent with contemporaneous market pricing."  Remand Redetermination at 31.

      OCTAL has not identified any legal or factual error in Commerce's findings.  Instead, OCTAL argues that exclusive supplier relationships are a common business practice and do not automatically constitute ability to control without consideration of additional factors.  OCTAL Cmt. at 16.  OCTAL cites several Commerce determinations in support of its position that a large percentage of, or even all, sales to one customer does not, by itself, constitute affiliation by virtue of close supplier relationship.  *Id.*  As Commerce explained in its remand redetermination, "we

9

do not disagree with this characterization of Commerce's practice, however, in addition to considering the percentage of sales itself, we have found several factors indicative of affiliation through a close supplier relationship in the current case." R.C.R. 8 at 14.

Specifically, Commerce considered, among other things, that the contract requires [███

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████]. *Id*. Thus, the contract is not limited to simply requiring the customer to purchase [█████] PET sheet from OCTAL, but rather it contains additional significant restrictions on the customer's ability to conduct business which have "the potential to impact decisions concerning the production, pricing, or cost" of PET sheet. For example, [█████]'s express prohibition from [███████████████████████], at a minimum has a "potential," if not an actual impact on, decisions concerning production of PET sheet. *Id*. Similarly, the fact that the customer is prohibited from [███████████████████

███████████████████████████], a commercially valuable byproduct of further processing PET sheet, has the potential to impact the pricing and cost for PET sheet. *Id*. Likewise, the customer received a significant infusion of [███████████████████████

███████████████████████████] which has the potential to impact the costs and pricing of PET sheet. *Id*.

Further, OCTAL contends that Commerce's finding regarding contractually-mandated dependency cannot stand because its "discussion focused on the restrictions on the customer, without any consideration of the benefits that would motivate the customer to enter into such an arrangement." OCTAL Cmt. at 15. OCTAL contends that the customer's relationship with OCTAL reflects a "business choice" or "trade off" in exchange for a benefit, and thus, there is no

basis to find that the supplier can exercise control over the customer.  *Id*.  However, the statute does not contain a "business choice" or "trade off" exception to finding control in its affiliation provision.  The Statement of Administrative Action (SAA) explains that the "traditional focus on control through stock ownership fails to address adequately modern business arrangements, which often find one firm "operationally in a position to exercise the restraint or direction" over another even in the absence of equity."  Statement of Administrative Action, HR 5110, H.R. Doc. No. 316, Vol. 1, 103d Cong., 2d Sess. at 838 (1994).  Therefore, the SAA explains that affiliation through control could be based on "business arrangements."  *Id*.  The SAA further explains that such modern business arrangements include close supplier relationships "in which the supplier or buyer becomes reliant on the other."  *Id*.  Virtually any business arrangement, including a close supplier relationship, is based on a business choice with some trade off by each side, but the key issue is whether either the supplier or buyer, or both, become reliant on the other to such a degree as to constitute affiliation.  In this case, the evidence demonstrates such reliance.

In addition, OCTAL argues that "Commerce in this case says nothing about the key issue of *alternative sources of supply*" and that "Commerce tries to minimize the alternative supply, and the contract provision that allows for use of alternative supply but misreads the record."  OCTAL Cmt. at 17.  Commerce, however, did not fail to address the issue of alternative sources of supply; nor did it misread the record.  Instead, Commerce distinguished cases that OCTAL cited, explaining that "the relationship among the parties in those cases either did not involve exclusive supply agreements or there was evidence that exclusivity agreements were not followed."  Remand Redetermination at 26.  "In contrast, here," Commerce explained, "there is

an existing agreement in place and there is no evidence that the parties to the agreement did not honor it." *Id*.

The record is clear. The agreement requires the customer "to purchase [███] its PET sheet from OCTAL and restrains the company from seeking the most advantageous terms available on the open market from [████████████████████]." R.C.R. 8 at 12. Moreover, "the only exemption [████████████] was narrow (*i.e.*, providing for exemptions where there are natural disasters)." R.C.R. 8 at 14. A very narrow exemption in the contract that is limited to [████████████████] does not demonstrate that OCTAL's customer is able to purchase PET sheet from alternative sources of supply outside of these extraordinary circumstances.

OCTAL contends incorrectly that Commerce has not considered the record as a whole. Specifically, OCTAL argues that an ITC report indicates that most parties view PET sheet as a substitutable product, and that other suppliers sold PET sheet to OCTAL's customers when a cyclone disrupted OCTAL's ability to supply its customers for six weeks. OCTAL Cmt. at 18-19. However, the ITC Transcript demonstrates that OCTAL itself argued that substitutability is far from universal because it depends on the intended application:

> Mr. PORTER: Just so I want to highlight and for your purposes, okay. *Petitioners tried to convey that a thermal former could pick and choose you know sort of willy-nilly and substitute. That's actually not true, okay.* You might have a thermal former that might say, okay, for this application I really want to use D-PET, but then is perfectly happy to use another PET sheet for a differ rent application, same thermal former, okay. So really, you need to understand the application.

Final Transcript of ITC Preliminary Staff Conference at 146, C.R. 145.[4]

---

[4] U.S. purchasers of PET sheet are thermoforming firms. *PET Sheet from Korea, Mexico and Oman*, ITC Publication 4970 (preliminary), at I-3 (September 2019). Thermoforming is a

Further, Commerce specifically addressed OCTAL's arguments regarding alternative

sources of supply during the six weeks following the cyclone Mekunu:

> There is a provision in the contract for [▮▮▮▮▮▮▮▮▮▮▮▮] and
> even if OCTAL were unable to supply PET sheet following the
> cyclone, [▮▮▮▮] sourcing from elsewhere was not a violation of
> the contract. While OCTAL claims that its customers could, and
> did, source PET sheet from other suppliers following the cyclone,
> we note there is no evidence on the record to support its claim that
> [▮▮▮] in specific sourced PET sheet from other suppliers during
> that period.

R.C.R. 8 at 13. Accordingly, Commerce reasonably concluded "that the agreement represents a

[▮▮▮▮▮▮▮▮▮▮▮▮▮▮], except under the most extraordinary circumstances." *Id.*

2. Purchase of PET Flake

The second contractual provision demonstrating OCTAL's control and restraint over its

customer relates to [▮▮▮▮] sale of PET flake. The provision requires that "[▮▮▮] sell [▮] of

its PET flake to OCTAL's U.S. affiliate, OCTAL Extrusion." *Id.* at 15. As Commerce

explained, "PET flake is a valuable byproduct of the further manufacturing of PET sheet; it is

both sold on open markets and also used by vertically-integrated thermoformers in their own

production process." Remand Redetermination at 28. The contract dictates not only the supply

of inputs that [▮▮▮] uses, but it also restricts the disposition of [▮▮▮] outputs of the

production process. *Id.* Accordingly, Commerce reasonably concluded that OCTAL was also

able to restrain or direct Customer A with respect to how the customer uses/sells a byproduct of

further manufacturing of the subject merchandise." *Id.*

---

process by which heat, vacuum, pressure and/or mechanical processes to force PET sheet against
contours of a mold. *Id.* at I-9. Almost all PET sheet is thermoformed to make packaging for
food (bakery, deli), food service (takeaway, single use packaging), and agricultural (berries,
leafy greens, and other produce) uses. *Id.* at II-1.

OCTAL contends that the restrictions on the customer's ability to sell PET flake in the open market are irrelevant, because the only price that Commerce needs to be concerned about is the price of PET sheet. OCTAL Cmt. at 23-24. OCTAL insists that further manufacturing of the subject merchandise is irrelevant for purposes of an affiliation analysis, because in an affiliation analysis "the focus is on factors that might affect the original price of subject merchandise." *Id*. at 24. However, as Commerce explained, "{w}hile the PET flake produced by Customer A during its production in the United States is not subject merchandise, it is still tied, and relevant, to the issue through further manufacturing." Remand Redetermination at 29. Commerce found that "PET flake is a valuable by-product of this further manufacturing of the subject merchandise, which can be resold or reprocessed into other valuable products; this is, in fact, a relevant consideration for the U.S. price as it impacts the costs and profits of Customer A's further manufacturing of the subject merchandise." *Id*. When considering whether the purchase price of PET sheet is acceptable, a customer will factor the expected revenue from further manufacturing, including any revenue from the selling or reprocessing of any resulting byproduct (such as PET flake). If the ability of a customer to sell PET flake in the open market (or reprocess it into PET sheet) is restrained, it will affect the price the customer is prepared to pay for the PET sheet it purchases.

In this regard, Commerce properly considered the fact that a single contract sets the term of sales for both the PET sheet and PET flake, a byproduct for further processing, and OCTAL and its customer "were able to factor the pricing of, and the profit from, Customer A's by-product sales into the overall arrangement between the parties, including in the pricing of PET sheet. *Id*. at 30; *Cf. Husteel Co. v. United States*, 98 F. Supp. 3d 1315, 1348 (Ct. Int'l Trade 2015) (finding affiliation based on a close supplier relationship, where POSCO was involved, in

supplying inputs and reselling further processed product); *NEXTEEL Co. v. United States*, 355 F. Supp. 3d. 1336, 1354 (Ct. Int'l Trade 2019) (same).

OCTAL argues that it does not know the exact price in advance because the price is tied to a market index for PET resin, which could fluctuate.  OCTAL Cmt. at 29.  However, Commerce explained, that the "market index used in the contract as a base *for both the PET sheet and PET flake prices* is, in fact, a price for PET resin."  Remand Redetermination at 30 (emphasis added).  Accordingly, because the contract price mechanism for both PET sheet and PET flake is tied to the same market index, any fluctuation in the index will affect the price of both products in the same manner.  In other words, the pricing mechanism does not prevent the parties from factoring the pricing of byproduct sales into the pricing of PET sheet.

OCTAL further contends that the contract's pricing mechanism is normal because the price is tied to a price index for PET resin, that the price index was the closest index available, and that "PET resin is an excellent proxy since it reflects the overwhelming majority of the product cost for either PET sheet or PET flake – the chemicals combined to make PET resin become the key input for any form of PET sheet or PET flake."  OCTAL Cmt. at 26-27. However, as explained above, the record demonstrates that OCTAL primarily produces DPET, which uses melt, and not PET resin, as its primary input.  OCTAL Section D QR, at 4, 34, 36, C.R. 113.  Depending on the type of production line, PET resin either cannot be used as an input in making DPET or may only be used as a minor input along with PET flake in small amounts. *Id*.

Moreover, the record demonstrates that the price of the two main inputs into melt are highly volatile, and, thus, the exact composition of inputs in producing melt could have significant impact on its cost, because the cost could differ if different blends of inputs are used

to produce melt.  OCTAL Section D QR, at 8 & 40, C.R. 113.  The contractual price index

relates to PET resin, which is a raw material input, which (depending on the production line)

either cannot be used in producing DPET at all or is used in combination with other secondary

inputs in small amounts.  In addition, as Commerce found, "there are several degrees of

separation between PET resin and PET flake, which calls into question the validity of using a

PET resin price as a comparison price for analyzing whether the PET flake price between the

parties reflects a market price."  Remand Redetermination at 30.

Accordingly, Commerce properly concluded that "OCTAL has not shown that the PET

flake price in the contract represents a price that was consistent with contemporaneous market

pricing, and given the unusual nature of the contract by which the prices for both PET sheet from

OCTAL and PET flake to OCTAL Extrusion are established, we find that the totality of the

relationship between OCTAL and Customer A affects the price of PET sheet and supports a

finding of affiliation."  *Id*. at 31.

3.  Restrictions on Production

The third contractual provision indicative of control prohibits [

].  R.C.R. 8 at 16.  PET flake is a

valuable byproduct of [          ] further manufacturing of OCTAL's PET sheet.  As a general

matter, absent any restrictions, PET flake can be sold in the open market or used as an input to

produce certain types of PET sheet.  Commerce reasonably found that this restriction constitutes

control of [        ] business activities.  *Id*.  As Commerce reasoned, "It is one thing to [

], but restricting the company from becoming [

] is a step further."  *Id*.  "In practice," Commerce found, "OCTAL has removed all



16

options, both [███████████████], for [█████] to [████████████] or [█████████████] freely." *Id*. This is a clear example of OCTAL's restraint and direction of [██████], because "it explicitly cuts off [████████] own options for its business." *Id*. Commerce explained that because "OCTAL's [███████████████████████████████████████], this affects the overall price OCTAL charges for the subject merchandise in the United States and also affects OCTAL's production levels and production costs through the aforementioned economies of scale." *Id*.

OCTAL contends, however, that "the restrictions at issue are completely normal commercial terms to avoid overlap in the business activities between the two parties." OCTAL Cmt. at 28. This argument is unsupported by record evidence. As Commerce found, "the restriction in question is significant when considered in light of how the relevant industry operates." Remand Redetermination at 32. According to OCTAL, "the information and data that the Department received during its examination of industry support for the petition confirmed that the vast majority of U.S. production of PET sheet consisted of thermoformers that were vertically integrated." P.R. 226 at 28. There is no evidence that unaffiliated thermoformers such as [██████] routinely enter arrangements with unaffiliated parties that require them to avoid an overlap in business activities with unaffiliated parties. To the contrary, most of the industry is vertically integrated, *i.e.*, the companies or groups of affiliated companies perform the full range of production activities, which include multiple products. Even though the thermoforming industry is vertically integrated, OCTAL's customer [████████] "is subject to restrictions" [████████████████████████████████████████████████████████████] as a result of its contract with OCTAL. Remand Redetermination at 32. These restrictions put [██████] at a commercial disadvantage compared to its competitors. Accordingly, Commerce

reasonably concluded that "through this provision of the contract, OCTAL has restricted, directed, and controlled the internal business decisions" of its customer. *Id.*

This restriction on the customer's business activities has a significant impact on the customer, and it also affects OCTAL's price, production, and cost of subject merchandise as its customer represents a significant percentage of OCTAL's U.S. sales. *Id.* If, for example, [████] were not restricted and [████████████████████], it would have reduced its need to purchase PET sheet from OCTAL, thereby lowering the demand on OCTAL's PET sheet and, thus, affecting its price.

Finally, OCTAL contends that Commerce's position is that "any new contract with a customer would lead to affiliation" and that the contract at issue reflects "normal business dynamics." OCTAL Cmt. at 30. This is not Commerce's position. Commerce did not find affiliation between OCTAL and all its other customers. Commerce found affiliation with a specific customer based on a close supplier relationship that had significant restrictions on the sources of supply and ability to sell or otherwise utilize a valuable byproduct of further processing, as well as express restrictions on certain business and production activities, and as discussed below, offered unusual financing terms that are not available in the open market. Moreover, to the extent that OCTAL contends that the agreement is a result of "normal business dynamics," nothing in the statute, its legislative history, or Commerce's regulations suggests that normal commercial relationships cannot give rise to control.

4. OCTAL's Financing

The fourth contractual provision indicative of control is the financing in the form of [████████████████████] by OCTAL. R.C.R. 8 at 17. Not only did OCTAL provide this financing [████████████], but OCTAL had to borrow the funds at a cost

18

while not receiving any repayments from [████] during the period of investigation. *Id*. The contract also requires that the thermoforming machines that [████] purchases [████ ████████████████ ], again showing that this is a non-commercial loan as banks generally do not dictate the specifications of the equipment to be purchased. *Id*.

OCTAL contends that the existence of collateral demonstrates the arm's-length nature of the financing and the absence of control. OCTAL Cmt. at 31. However, Commerce explained that while "the existence of collateral may indicate that the loan may have been properly collateralized, other aspects of the financing, such as interest rate charged, must be also evaluated." R.C.R. 8 at 17. Commerce found that "even when a loan is secured with collateral, its other terms could differ from terms that a borrower such as [████] could obtain in the market from a commercial bank." *Id*. OCTAL similarly contends that the existence of termination and dispute settlement provisions in the contract also indicates the absence of control. OCTAL Cmt. at 34. Once again, while contracts routinely contemplate that there may be a possibility that a relationship between parties could be terminated and disputes could ensue, the existence of such provisions does not end the inquiry; all aspects of the contract must be evaluated to determine whether control exists.

The terms of the loans at issue differ significantly from the terms that a normal commercial bank would offer. As an initial matter, the financing is [████████ ], while OCTAL had to borrow money at a cost to extend such financing. R.C.R. 8 at 17. It is difficult to envision a commercial bank providing financing on such terms while incurring a loss under similar circumstances. Further, the financing is explicitly tied to the [████████████ ] in the close supplier contract. *Id*. The contract requires [████] to purchase PET sheet [████████ ] from OCTAL and states that [████████████████████████████]

███████████████████████████████████████████████ ]. *Id.* Furthermore, "for

each thermoformer machine purchased [████████████████ ], OCTAL's benefit grows; the

contract stipulates that, for each [████████████████████ ] purchases, its PET sheet

purchases from OCTAL will increase by [████████████████ ]." *Id.* In other words,

OCTAL's customer is obligated to increase its PET sheet purchases from OCTAL, regardless of

market conditions.  Even if the market demand for both PET sheet and the customer's

downstream products were to plummet dramatically, the customer would still be obligated to

purchase the increased volumes of PET sheet from OCTAL.  Accordingly, Commerce properly

found that "OCTAL controlled  [████ ]  by directing it to accept the [██████ ] arrangement,

which affected the subject merchandise price and resulted in the control, restraint, and direction

of [████ ]." *Id.*

OCTAL contends that providing financing for equipment purchases is a normal

commercial practice, that the contract does not expressly state or imply that OCTAL controls the

customer, that the obligation to buy increased volumes of PET sheet [███████████████████

████ ], and that the relationship between OCTAL and its customer is mutually beneficial.

OCTAL Cmt. at 29-36.  These arguments do not refute Commerce's finding regarding control.

As explained above, neither the statute nor regulations suggest that normal commercial

relationships cannot give rise to control or that affiliated companies cannot have a mutually

beneficial relationship.   Nor is there a requirement that an obligation to buy increased volumes

must be [████████████████ ].  Accordingly, Commerce reasonably determined that a number

of provisions of the contract demonstrate control, including financing, and affect the production,

price, and cost of the subject merchandise.

## II.   Commerce Properly Declined to Reopen the Administrative Record

During the remand proceedings, consistent with the April 30, 2021 order, Commerce provided the parties with the opportunity to comment on the issue of affiliation in the *Final LTFV Determination*. Remand Redetermination at 2-3. The administrative determination of affiliation, which was subject to comment during the remand proceedings, was based on the existing administrative record. Commerce did not reopen the record on remand or solicit new factual information from the interested parties. *Id.* at 40 ("Absent compelling considerations, Commerce does not normally reopen the record on remand."); *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012) ("The decision to reopen the record is best left to the agency, in this case Commerce. We cannot conclude that the agency abused its discretion by refusing to reopen the record and admit evidence in this case. . . . the trial court exceeded its authority when it ordered the agency to do so.").

Even so, OCTAL challenges Commerce's decision not to allow it to submit new factual information after the regulatory deadline for new factual information. Specifically, OCTAL contends that Commerce should have allowed it to submit two declarations containing new factual information during the remand proceeding and also contends that Commerce should have requested that OCTAL submit sales and cost data from OCTAL's affiliated customer. OCTAL Cmt. at 7 & 36. OCTAL's attempt to rely on extra-record material is improper and should be rejected by the Court.[5] Moreover, OCTAL's tacit admission that the existing administrative

---

[5] As set forth in the Government's Motion to Strike OCTAL improperly attached these two declarations to its remand comments submitted to this Court. Although the Court denied the Government's motion, it stated "the court will decide at the appropriate time whether and for what purpose the documents at issue will be considered. . . ." ECF 58.

record does not support OCTAL's contentions lends further support to Commerce's finding that OCTAL was affiliated with its U.S. customer.

    1.   Commerce Properly Declined to Accept the New Factual Information from OCTAL

    During the remand proceedings, OCTAL submitted comments, which contained unsolicited and untimely filed new factual information (specifically two affidavits from corporate executives). Remand at 3. In rejecting the new factual information, Commerce explained that an "opportunity to submit an argument on an issue does not mean that an interested party is free to disregard Commerce's procedures by submitting new factual information after the deadline for submitting new factual information." R.P.R. 7 at 1-2. Commerce also explained that for purposes of submitting new factual information "the administrative record closed during the less than fair value investigation" and that Commerce "did not reopen the record for submitting new factual information" during the remand proceeding. *Id.*

    Contrary to OCTAL's contentions, Commerce did not abuse its discretion in declining to reopen the record. "The decision to reopen the record is best left to the agency, in this case Commerce." *Essar*, 678 F.3d at 1278. Moreover, "Commerce generally does not consider untimely filed factual information." *Id.* (quoting 19 C.F.R. § 351.302(d)(1) ("The Secretary will not consider or retain in the official record of the proceeding . . . . untimely filed factual information. . . .")). Here, OCTAL could (and should) have disclosed the existence of its close supplier arrangement and provided any information relevant to consideration of whether affiliation based on the close supplier arrangement existed in its response to affiliation questions in Commerce's questionnaire.

However, OCTAL did not submit its contract with the customer "as part of OCTAL's affiliation response, but only submitted it along with other documents for "Sample Sale Documentation for OCTAL Sales to US (Contract)," and OCTAL "in no way stated or indicated that affiliation was a potential issue for this customer." Remand Redetermination at 36. Commerce's questionnaire provides the definition of affiliated person and lists close supplier relationship as an example of a situation that may give rise to control, states that respondents should consider the exclusivity of the relationship, and instructs them to contact Commerce if a respondent is uncertain if the relationship constitutes affiliation. *Id.* at 36-37. Accordingly, OCTAL should have submitted the new factual information that it seeks to submit, long after the deadline for submitting new factual information, early in the underlying proceeding. Commerce did not abuse its discretion by declining to accept this new factual information after it had issued the final determination and litigation regarding that determination had commenced.

As the Court of Appeals for the Federal Circuit has explained, to "allow constant reopening and supplementation of the record would lead to inefficiency and delay in the finality." *Essar*, 678 F.3d at 1277; *Co-steel Raritan, Inc. v. Int'l Trade Comm'n*, 357 F.3d 1294, 1316 (Fed. Cir. 2004) (interest of finality of agency decisions is best served by not reopening or supplementing the record.). Quoting the U.S. Supreme Court, the Federal Circuit cautioned against reopening the administrative record during litigation even in a situation when the newly discovered evidence was not available during the administrative proceeding:

> Administrative consideration of evidence . . . . always creates a gap between the time the record is closed and the time administrative decision is promulgated and {we might add, the time the decision is judicially reviewed} . . . . If, upon the coming down of the order litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact has been discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening.

23

*Essar*, 678 F.3d at 1277 (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Resource Def. Counsel*, 435 U.S. 519, 554-55 (1978)).

Commerce's regulations provide specific deadlines for submitting various categories of factual information, including information that is responsive to Commerce's questionnaires. *See generally* 19 C.F.R. § 351.301(c). In this instance, OCTAL attempted to submit new factual information long after all deadlines for submitting such information in the underlying investigation passed. In fact, OCTAL attempted to submit such information *after* Commerce already issued the final determination, which OCTAL challenges in this litigation.

This Court granted Commerce's request for voluntary remand so that Commerce could allow parties to comment on Commerce's existing affiliation determination, which was based on the existing administrative record. In commenting on the agency's determination, interested parties can either identify a legal error or demonstrate that determination is not supported by substantial evidence on the administrative record. However, an interested party may not change the administrative record by fiat, as OCTAL attempted to do here. OCTAL's attempt to expand the record not only violates the agency's procedures, but also undermines the ability to meaningfully comment on the existing determination.

Were Commerce to accept the new factual information -- which it did not -- Commerce would have had to issue a new determination based on the new administrative record and allow parties to comment on that new determination. There would be little to no hope that the administrative process would ever come to completion, if the agency were to adopt a policy that allows interested parties to submit new factual information in their comments on the agency's determinations. Thus, Commerce did not abuse its discretion by not allowing submission of new factual information here.

24

The Federal Circuit has allowed a small number of narrow exceptions that allow supplementation of an administrative record. *Essar*, 678 F.3d at 1277. For example, the administrative record may be supplemented when a "fraud" occurs, or when the agency determination is based on "inaccurate data" and the agency generating those data indicates that the data are incorrect. *Id*. These exceptions do not apply here, because this case neither involves fraud nor the agency's statement that it generated inaccurate data.

OCTAL's contentions that Commerce should have accepted the untimely submitted new factual information rest on two cases. However, the facts in those cases are inapposite. In *Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 815 F. Supp. 2d 1342, 1365-66 (Ct. Int'l Trade 2012), this Court reversed Commerce's decision to reject an untimely filed separate rate certification, which in a non-market economy case demonstrates that a respondent is not under government control. The Court explained that Commerce has discretion to set and enforce its deadlines, but the respondent, "Amanda Foods received separate-rate status in the initial investigation and has maintained that status in each subsequent review prior to the fourth due to it being wholly foreign-owned; thus, it appears likely that, but for the untimeliness of its submission, Amanda Foods would have received a separate rate in the fourth administrative review, as it remains wholly foreign-owned" and, thus, the rejection of its submission "resulted in an inaccurate dumping margin." *Id*. at 1366. The Court also explained that while Amanda Food's certification was late, "it arrived early in the review process: more than seven months before Commerce released the preliminary results and one year before Commerce released the final results." *Id*. at 1367. Moreover, the Court found that "Amanda Foods was diligent in seeking to correct the omission of SRC, promptly filing its late submission as soon as it discovered its omission." *Id*. Finally, the Court concluded that the "burden on Commerce in

considering the late-filed SRC would likely be minimal given that only one SRC was filed late, the late SRC appears to maintain the *status quo*, and no follow up was conducted with regard to other separate-rate requests." *Id.*

In contrast, here, unlike Amanda Foods, which submitted its certification seven months before the preliminary determination, OCTAL attempted to submit new factual information *long after* Commerce published its final determination, which is the subject of OCTAL's appeal. Accordingly, the concerns regarding finality of administrative determinations are particularly strong in this case. Further, any information relevant to affiliation should have and could have been submitted by OCTAL early in the proceeding in response to Commerce's questionnaire, which was due on October 7, 2019. There is no indication that OCTAL was diligent in providing any information regarding potential affiliation at the first available opportunity. To the contrary, OCTAL did not submit information regarding the existence of the close supplier agreement in response to Commerce's questions regarding affiliation, even though Commerce's questionnaire specifically listed close supplier relationship as an example of a situation that may give rise to control leading to affiliation, stated that respondents should consider the exclusivity of the relationship, and instructed them to contact Commerce if a respondent is uncertain whether a relationship constitutes affiliation. Remand Redetermination at 36-37. Finally, this is not a situation, where Commerce had a history of consistently finding OCTAL and its customer unaffiliated and OCTAL's untimely submission simply maintained the *status quo*. *Id.*

Similarly, OCTAL's reliance on *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1206-1207 (Fed. Cir. 1995) is misplaced. In *NTN*, the Federal Circuit held that Commerce abused its discretion by refusing to allow the correction of a clerical error in the U.S. sales database, which resulted from transcribing incorrect codes. *Id.* at 1208. NTN discovered the

error while reviewing Commerce's calculations underlying its preliminary determination. *Id*. at 1207. Among other things, NTN discovered that due to the entry of an improper code number, it "mistakenly included in its U.S. sales database four sales which were actually sales to a Canadian, not a U.S., customer for goods that never entered the United States." *Id*. at 1208. NTN sought to correct the clerical errors and exclude Canadian sales from its U.S. database. *Id*. The Federal Circuit held that "preliminary determinations are 'preliminary' precisely because they are subject to change." *Id*. Accordingly, the Federal Circuit found that "the tension between finality and correctness simply did not exist at the time NTN requested correction." *Id*.

In contrast, here, there is no clerical error and there is no indication that data underlying Commerce's calculations are inaccurate. Moreover, unlike in *NTN* where the clerical error was identified at the preliminary stage, OCTAL seeks to submit new factual information *long after* Commerce issued and published its final determination in this investigation. The interests of timeliness and finality are particularly compelling, when a final determination in an investigation has been already issued and new factual information is offered during litigation challenging that determination. *Essar*, 678 F.3d at 1278 ("Important principles of timeliness and finality undergird all aspects of litigation.").

This case is similar to the Federal Circuit decision in *Essar*, where the plaintiff had an opportunity to present the information regarding certain subsidies to Commerce during the review, but it failed to submit such information before the administrative record closed during the underlying administrative proceeding. *Essar*, 678 F.3d at 1278. In *Essar*, only after the record closed, after Commerce decided to apply adverse facts available, and after the case came before the Court for judicial review, did the documents surface and the plaintiff attempt to submit them. *Id*. Although this court required that the agency reopen the record and accept the

document, the Federal Circuit reversed determining that it "c{ould}not conclude that the agency abused its discretion by refusing to reopen the record and admit evidence in this case." *Id.* Similarly, in this case, OCTAL had an opportunity to submit all relevant information regarding affiliation during the administrative proceeding in response to Commerce's questionnaire, but it did not do so before the record closed and instead attempted to submit the information after litigation over Commerce's final determination commenced. Although Commerce has applied neutral facts available here, whereas in *Essar* it applied adverse facts available, this distinction is not material, because the interests of timeliness and finality are identical in both cases.

Further, OCTAL argues that Commerce should have accepted untimely submitted new factual information because its untimely information provides important additional details and context about OCTAL's relationship with its customer. OCTAL Cmt. at 4-5. OCTAL also contends that Commerce had sufficient time to review this new factual information and could have sought additional time from the Court. *Id.* at 5. Finally, OCTAL claims that it was diligent in its efforts to provide the new factual information, because it was "completely justified" in providing additional information by submitting it before the deadline for submitting its remand comments. *Id.*

OCTAL's contentions lack merit. Commerce had extensive information on the record to make an affiliation decision, including the close supplier agreement. *Boomerang Tube LLC v. United States*, 856 F.3d 908, 913 (Fed. Cir. 2017) (finding when information is on the record, parties should have known that Commerce could consider it and that Commerce has no obligation to notify interested parties that it could change its methodology between preliminary and final determinations). To the extent OCTAL considers any particular details or context for an affiliation decision important, it should

have submitted such information in response to Commerce's affiliation questions during the administrative proceeding. Further, OCTAL's contention that Commerce had sufficient time to review new factual information during the remand and could have asked the Court for additional time provides no basis for reversal. As explained earlier, Commerce requested the voluntary remand to provide interested parties with an opportunity to comment on the issue of affiliation in the challenged determination, which was based on the existing administrative record. Commerce did not open the record for the submission of additional factual information nor was it required to do so.

Allowing such a late and unwarranted modification to the administrative record would alter the nature of this remand proceeding because it would require Commerce to allow all interested parties the opportunity to submit new factual information, to issue a new determination based on a new administrative record, provide a new opportunity to comment, and issue yet another new determination in response to such comments. Under these facts, "there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening." *Essar*, 678 F.3d at 1278 (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Resource Def. Counsel*, 435 U.S. 519, 554-55 (1978)).

### 2. Commerce Properly Applied Neutral Facts Available and Declined to Reopen the Record at the Late Stage of Investigation and on Remand

OCTAL contends that Commerce has an obligation to calculate accurate dumping margins and, thus, Commerce had an obligation to seek data regarding sales from OCTAL's affiliate to unaffiliated customers. OCTAL Cmt. at 31. There is no dispute that Commerce should calculate accurate dumping margins. In this investigation, Commerce calculated an accurate dumping margin for OCTAL in a manner consistent with the statute. 19 U.S.C. § 1677e(a). The statute recognizes that sometimes the necessary information is not on the record

29

and provides Commerce with authority to calculate dumping margins using facts available, 19 U.S.C. § 1677e(a), which is exactly what the agency did in this case. Such dumping margins are accurate and consistent with the statute. Commerce used OCTAL's own sales and cost information to calculate margins for sales to other unaffiliated U.S. customers and used such margins as neutral facts available to determine the margin for sales through its affiliate, [█████], to unaffiliated U.S. customers.

OCTAL is mistaken that Commerce has an obligation to seek additional costs and sales information, which OCTAL could have submitted early in the proceeding. The Federal Circuit and this Court have held that "the burden of creating an adequate record lies with {interested parties} and not with Commerce." *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011); *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 806 F. Supp. 1008, 1015 (Ct. Int'l Trade 1992) (same) (rejecting the argument that Commerce had an obligation to 'seek out' information through verification to resolve questions regarding companies' separation, when companies provided insufficient data). A requirement that Commerce must seek out new information, as OCTAL suggests, "is really a mandate that Commerce must shoulder any burden that the plaintiffs chose not to meet." *Tianjin*, 806 F. Supp. at 1015.

OCTAL argues that if OCTAL and its customer are affiliated, then the margin should be based on the price of its sales through its affiliated customer to unaffiliated U.S. customers. OCTAL Cmt. at 32. However, OCTAL did not report information regarding such sales in the US sales and cost databases it submitted to Commerce and, thus, Commerce properly determined the price of such sales based on facts available under 19 U.S.C. § 1677e(a). Significantly, OCTAL did not report that it was affiliated with its customer in providing responses to Commerce's questions regarding affiliation. Had it done so, Commerce would have had an

opportunity to request such downstream sales data through questionnaires early in the proceeding.

OCTAL contends that it provided the close supplier agreement in its first questionnaire response and that "Commerce had the supply agreement 151 days prior to Commerce's preliminary determination." OCTAL Cmt. at 34. However, OCTAL's arguments ignore the elephant in the room. OCTAL did not submit the close supplier agreement or even mention potential affiliation with its customer in response to Commerce's question regarding affiliation, even though the questionnaire specifically instructed it to consider close supplier relationships and exclusivity as potential bases for affiliation and further instructed OCTAL to contact Commerce if it was uncertain whether such a relationship constituted affiliation. Remand Redetermination at 36-37. Instead of being forthcoming with the agency regarding the affiliation issue, OCTAL submitted the close supplier agreement along with other documents in an unrelated item titled, "Sample Sale Documentation for OCTAL Sales to US (Contract)." *Id*. It is completely disingenuous for OCTAL to claim that its actions with respect to reporting the existence of affiliation are above reproach and that it properly reported its potential affiliation to Commerce.

Commerce explained that because of "the manner in which OCTAL responded to Commerce's affiliation questions, Commerce was not alerted to the potential affiliation until late in the investigation." *Id*. at 37. "Because Commerce must complete investigations within statutory deadlines, at that late stage in the proceeding," Commerce found that it "did not have sufficient time to request and analyze an entire downstream sales database and a Section E Questionnaire response pertaining to further manufacturing costs of products sold by Customer A." *Id*. Commerce explained that "such an analysis would be an immense and time-intensive

undertaking, as PET sheet undergoes a significant transformation to plastic containers before being sold to the first unaffiliated customer." *Id*. "Such an analysis, and the likely supplemental questionnaires it would require," Commerce found, "were simply not possible at the late stage of the investigation due to how this case unfolded." *Id*. Commerce further explained that if OCTAL was more forthcoming in its affiliation response and clearly identified the potential affiliation with its customer, Commerce "could have resolved the issue early in the proceeding and would have had sufficient time to collect and analyze additional information, including potentially a downstream sales database." *Id*.

Given OCTAL's less than forthcoming responses, which left Commerce with insufficient time to collect and analyze the affiliated customer's downstream data within the statutory deadlines, Commerce reasonably resorted to neutral facts available under 19 U.S.C. § 1677e(a) to determine the dumping margin for such downstream sales. *Id*. at 38. In making this determination, Commerce used available record information regarding OCTAL's direct sales to other unaffiliated U.S. customers, and assigned margin from those sales to the sales to unaffiliated customers made through [ ██ ]. *Id*. This approach is reasonable and consistent with the statute. 19 U.S.C. § 1677e(a).

Apparently realizing that its arguments regarding the underlying investigation are not supportable, OCTAL contends that Commerce could have requested such information during the remand proceeding, because Commerce was fully aware of the existence of the close supplier agreement during the remand proceedings. OCTAL Cmt. at 35. OCTAL contends that "remands are not subject to the same time constraints as original investigation" and, thus, Commerce had an obligation to seek additional information on remand. *Id*. at 36. OCTAL's arguments provide no basis for reversal.

As an initial matter, Commerce did not request, and the Court did not grant, a remand to beef up the administrative record with additional cost and sales data, which was not on the record of the original determination that is the subject of OCTAL's judicial challenge. Rather, the remand was granted for a limited purpose "to allow parties the opportunity to comment on the affiliation determination in the underlying investigation, and to permit Commerce to reevaluate the facts of the record in light of such comments." Remand Redetermination at 40.  Commerce has done so, continuing to find that OCTAL and [█████] were affiliated via a close supplier relationship.  *Id*.

Nor did Commerce abuse its discretion by not reopening the record on remand.  *Essar*, 678 F.3d at 1278.  Commerce does not generally reopen the administrative record on remand. *Id*.  Moreover, in deciding whether compelling considerations existed to depart from this general approach, Commerce "considered the fact that the record contains high quality data, such as OCTAL's reported actual sales to unaffiliated parties, that can be used to make a neutral facts available determination with respect to OCTAL's margin calculations."  *Id*.

OCTAL's reliance on *McLean Fogg* is misplaced.  In *McLean Fogg*, the Court faulted Commerce for failure to enforce its regulation and require voluntary respondents to submit public summaries of proprietary data, which were necessary to calculate the "all others" rate without disclosing business proprietary information:  "That the necessary public data are absent from the record here is due to Commerce's own decision not to enforce its regulatory requirement and request the necessary data from the submitting parties."  *McLean Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1362 (Ct. Int'l Trade 2015); *see also* 19 C.F.R. § 351.304(c)(1) (requiring submissions with proprietary information to be accompanied by public versions in sufficient detail to understand the substance of information).  The factual

circumstances of McLean Fogg are not present here because there is no failure by the agency to enforce its regulations, which led to necessary data missing from the record. Moreover, in *McLean Fogg*, the Court reaffirmed the rule that there is no general duty to reopen the record on remand, although it concluded that Commerce abused its discretion on the specific facts of that case. *McLean Fogg*, 100 F. Supp. 3d at 1363.

Furthermore, while OCTAL correctly notes that remand determinations are not subject to statutory deadlines and are conducted pursuant to statutory provisions governing judicial review, Commerce, as a defendant, has a strong interest in a prompt resolution of disputes and it reasonably determined an accurate margin based on high quality data from direct sales to other unaffiliated U.S. customers on the existing administrative record. This approach is reasonable and mimics the calculation methodology under the special rule of 19 U.S.C. § 1677a(e), which applies when an affiliated person imports subject merchandise to the United States and further processes it.

Subject to certain conditions, even when the actual data regarding further processed products from the affiliated party is available on the record, 19 U.S.C. § 1677a(e), permits Commerce to determine constructed export price by using the price of identical or other subject merchandise sold by exporter or producer to an unaffiliated person. Commerce clarified that the special rule applies in "situations where the amount of value added in the United States was very large, the process of calculating this deduction was very difficult and time-consuming for the Department" and that the "SAA indicates that the focus of section 772(e) was on reducing the burden on the Department." Remand Redetermination at 39. Commerce found that the record did not contain the necessary information to make a determination regarding the value added under the special rule. *Id.* However, because the statute specifically lists this method as a

calculation option in a different context, Commerce concluded that it further supports reasonableness of a substantially similar method in applying neutral facts available. *Id.*

OCTAL mischaracterizes Commerce's determination by implying that Commerce applied the special rule under 19 U.S.C. § 1677a(e) and, thus, misinterpreted the statutory provision. OCTAL Cmt. at 36. We agree with OCTAL that the special rule does not apply in this case, because the value-added component cannot be determined on the current record. In this case, however, Commerce determined the margin of OCTAL's sales to unaffiliated customers through its affiliated customer by using information regarding OCTAL's direct sales of subject merchandise to other unaffiliated customers as neutral facts available under a different statutory provision, 19 U.S.C. § 1677e(a). This is a reasonable methodological approach, which is underscored by the fact that the statute sets forth a similar calculation methodology in 19 U.S.C. § 1677a(e).

### III. Commerce's Properly Applied Neutral Facts Available

Commerce properly used OCTAL's own sales and cost information from sales to other unaffiliated U.S. customers as neutral facts available to calculate the margin for sales through its affiliate, [▮], to unaffiliated U.S. customers. Remand Redetermination at 39. Inexplicably, OCTAL asserts that Commerce did not apply neutral facts available and contends that Commerce's "approach was premised on adverse assumptions." OCTAL Cmt. at 37. OCTAL's assertions are unsupported.

In responding to petitioners' arguments, which urged Commerce to apply adverse facts available (AFA) to OCTAL, Commerce concluded that information sufficient to make an affiliation determination was on the record and expressly stated: "We do not find that AFA is warranted." Remand Redetermination at 31. Commerce further explained that it "used available record information concerning OCTAL's sales to other unaffiliated U.S. customers" as "a neutral

facts available determination" for downstream sales from affiliated customer [■■■] to unaffiliated U.S. customers, "and assigned the margin from these sales to the sales made to Customer A." Remand Redetermination at 38. There is nothing adverse about using OCTAL's own calculated margin as neutral facts available.

## **CONCLUSION**

For these reasons, we respectfully request that the Court sustain Commerce's Remand Redetermination in its entirety and enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

s/Patricia M. McCarthy
PATRICIA M. MCCARTHY
Director

OF COUNSEL:
MYKHAYLO A. GRYZLOV
Senior Counsel
U.S. Department of Commerce
Office of the Chief Counsel For Trade
    Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, D.C. 20230
Tel: (202) 482-0833
Fax: (202) 482-4912
Email: mykhaylo.gryzlov @trade.gov

s/Sonia M. Orfield
SONIA M. ORFIELD
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington D.C. 20044
Tel: (202) 353-0534
Fax: (202) 514-7965
Email: Sonia.M.Orfield@usdoj.gov

November 19, 2021

*Attorneys for Defendant, United States*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Standard Chambers Procedure ¶ 2(B)(2), I hereby certify that the brief,
Defendant's Response To Comments On Remand Redetermination,  complies  with the word-
count limitation.   In making  this certification, I have relied upon the word count function of the
Microsoft Word processing system used to prepare the brief.  According to the word count, the
brief contains  10,923  words.

<u>/s/ Sonia  Orfield</u>
November 19, 2021

# UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE

_____
                                                                    )
OCTAL, INC.,                                                )
OCTAL SAOC-FSZ,                                       )
                                                                    )
                        Plaintiffs,                           )
                                                                    )
            v.                                                      )          Court No. 20-03697
                                                                    )
UNITED STATES,                                         )
                                                                    )
                        Defendant,                          )
                                                                    )
            and                                                   )
                                                                    )
ADVANCED EXTRUSIONS, INC., *et al*        )
                                                                    )
                        Defendant-Intervenors.       )
_____)

## **ORDER**

Upon consideration  of final results of remand, *Final Results of Redetermination Pursuant to Court Remand, dated July 16, 2021,* ECF No. 118-1, the comments on the remand filed by the parties, the administrative  record, and all other pertinent papers, it is hereby

ORDERED that the Department of Commerce's Remand Results are sustained in all respects; and it is further

ORDERED that judgment  is entered in favor of the United States.

_____
                                                                        JUDGE

Dated: _____