NONCONFIDENTIAL

## UNITED STATES COURT OF INTERNATIONAL TRADE

### BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

_____

OCTAL INC., OCTAL SAOC-FSZ,   )
                              )
                Plaintiffs,   )
                              )
        v.                    )                 Court No. 20-03697
                              )
UNITED STATES,                )
                              )
                Defendant,    )
                              )
        and                   )
                              )
ADVANCED EXTRUSION, INC., *et al.*,  )
                              )
            Defendant-Intervenors.  )
_____)

### DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS' COMMENTS ON COMMERCE'S REMAND REDETERMINATION

Respectfully submitted,

/s/ Brooke M. Ringel
PAUL C. ROSENTHAL
BROOKE M. RINGEL
DAVID C. SMITH, JR.
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, D.C.  20007
(202) 342-8400

Counsel to Defendant-Intervenors Advanced
Extrusion, Inc., Ex-Tech Plastics, Inc., and
Multi-Plastics Extrusions, Inc.

Dated:  November 22, 2021

NONCONFIDENTIAL

## Table of Contents

Page

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................1

ARGUMENT ................................................2

I.  COMMERCE'S REMAND RESULTS WARRANT THE COURT'S APPROVAL ................................................2

    A.  The Remand Results Comply with the Court's Remand Order................................2

    B.  The Remand Results Are Supported by Substantial Evidence and Lawful ................................................3

        1.  Commerce Properly Applied the Legal Standard for Affiliation................................................3

        2.  Commerce Explained How the Record *as a Whole* Supports Affiliation................................................5

        3.  OCTAL Has Not Identified Any Factual or Legal Error in the Remand Results................................................9

            a.  Exclusive Supply Agreement................................................9

            b.  The Customer's Sale of PET Flake to OCTAL Extrusion................................................15

            c.  Restrictions on the Customer's Business Activities ................................................18

            d.  Financing from OCTAL ................................................20

II.  COMMERCE'S CONDUCT OF THE REMAND PROCEEDING WAS LAWFUL................................................24

    A.  Commerce Did Not Abuse Its Discretion in Rejecting Unsolicited Information ................................................24

    B.  Commerce Properly Deferred Investigation into Customer A ................................................27

NONCONFIDENTIAL

**<u>Table of Contents</u>**
**(continued)**

**<u>Page</u>**

III.    COMMERCE'S NEUTRAL FACTS AVAILABLE METHODOLOGY
        IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND THERE IS NO
        BASIS TO REOPEN THE RECORD ...............................................................................30

IV.    CONCLUSION.................................................................................................................33

NONCONFIDENTIAL

# **TABLE OF AUTHORITIES**

**Page(s)**

### Cases

ArcelorMittal USA LLC v. United States,
 399 F. Supp. 3d 1271 (Ct. Int'l Trade 2019) ..........................................................28

Atl. Sugar, Ltd. v. United States,
 744 F.2d 1556, 1562 (Fed. Cir. 1984)....................................................................31

Canadian Solar Int'l v. United States,
 399 F. Supp. 3d 1379 (Ct. Int'l Trade 2019) ..........................................................24

Chemours Co. FC, LLC v. United States,
 443 F. Supp. 3d 1315 (Ct. Int'l Trade 2020) ............................................................9

Corus Staal BV v. United States,
 502 F.3d 1370 (Fed. Cir. 2007)..............................................................................28

CS Wind Vietnam Co., Ltd. v. United States,
 219 F. Supp. 3d 1273 (Ct. Int'l Trade 2017) ..........................................................25

Cultivos Miramonte SA v. United States,
 7 F. Supp. 2d 989 (Ct. Int'l Trade 1998) ................................................................26

Dorbest Ltd. v. United States,
 604 F.3d 1363 (Fed. Cir. 2010)..............................................................................28

Elkay Mfg. Co. v. United States,
 180 F. Supp. 3d 1245 (Ct. Int'l Trade 2016) ..........................................................27

Essar Steel Ltd. v. United States,
 678 F.3d 1268 (Fed. Cir. 2012)..........................................................................24, 28

Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States,
 178 F. Supp. 2d 1305 (Ct. Int'l Trade 2001) ..........................................................32

Grobest & I-Mei Indus. (Vietnam) Co. v. United States,
 815 F. Supp. 2d 1342 (Ct. Int'l Trade 2012) .....................................................24-25

Guizhou Tyre Co. v. United States,
 523 F. Supp. 3d 1312 (Ct. Int'l Trade 2021) ..........................................................26

**NONCONFIDENTIAL**

Husteel Co. v. United States,
494 F. Supp. 3d 1287 (Ct. Int'l Trade 2021) ............................................................................3

Hyundai Steel Co. v. United States,
319 F. Supp. 3d 1327 (Ct. Int'l Trade 2018) ..........................................................................24

Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States,
28 F. Supp. 3d 1317 (Ct. Int'l Trade 2014) ..............................................................................9

MacLean-Fogg Co. v. United States,
100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ....................................................................29, 30

Mitsubishi Heavy Indus. Ltd. v. United States,
275 F.3d 1056 (Fed. Cir. 2001)................................................................................................9

Mitsubishi Heavy Indus. v. United States,
54 F. Supp. 2d 1183 (Ct. Int'l Trade 1999) ............................................................................12

Nakornthai Strip Mill Public Co. v. United States,
587 F. Supp. 2d 1303 (Ct. Int'l Trade 2008) ..........................................................................25

Nan Ya Plastics Corp. v. United States,
810 F.3d 1333 (Fed. Cir. 2016)..............................................................................................26

NSK Ltd. v. United States,
481 F.3d 1355 (Fed. Cir. 2007)..............................................................................................31

NTN Bearing Corp. v. United States,
74 F.3d 1204 (Fed. Cir. 1995)................................................................................................31

Qingdao Sea-Line Trading Co. v. United States,
766 F.3d 1378 (Fed. Cir. 2014)..............................................................................................28

POSCO v. United States,
335 F. Supp. 3d 1283 (Ct. Int'l Trade 2018) ..........................................................................28

Rhone Poulenc, Inc. v. United States,
899 F.2d 1185 (Fed. Cir. 1990)..............................................................................................28

Royal Thai Government v. United States,
341 F. Supp. 2d 1315 (Ct. Int'l Trade 2004) ..........................................................................29

Tension Steel Indus. Co. v. United States,
179 F. Supp. 3d 1185 (Ct. Int'l Trade 2016) .....................................................................4, 13

Tianjin Wanhua Co. v. United States,
253 F. Supp. 3d 1318 (Ct. Int'l Trade 2017) ............................................................................9

NONCONFIDENTIAL

TMK IPSCO v. United States,
  179 F. Supp. 3d 1328 (Ct. Int'l Trade 2016) ........................................................29

Uniroyal Marine Exports Ltd. v. United States,
  626 F. Supp. 2d 1312 (Ct. Int'l Trade 2009) ........................................................24

United States v. Eurodif S.A.,
  555 U.S. 305 (2009)...............................................................................................31

**Statutes and Regulations**

19 U.S.C. § 1673d(a)(1)...........................................................................................29

19 U.S.C. § 1677(33) .................................................................................................4

19 U.S.C. § 1677e(a)(1).............................................................................................29

19 C.F.R. § 351.102(b)(3)..........................................................................................18

**Legislative**

Statement of Administrative Action ("SAA"),
  H.R. 5110, H.R. Doc. No. 316, Vol. 1, 103d Cong., 2d Sess., at 838 (1994),
  reprinted in 1994 U.S.C.C.A.N. 4175...........................................................4, 15

**Administrative Determinations**

Decision Memorandum for the Preliminary Determination in the Antidumping
  Duty Investigation of Certain Oil Country Tubular Goods from Taiwan
  (Feb. 14, 2014), ref'd in 79 Fed. Reg. 10,495 (Feb. 25, 2014), aff'd Issues and
  Decision Memorandum for the Final Determination in the Less than Fair
  Value Investigation of Certain Oil Country Tubular Goods from Taiwan
  (July 10, 2014), ref'd in 79 Fed. Reg. 41,979 (July 18, 2014), aff'd, Tension
  Steel Indus. Co. v. United States, 179 Supp. 3d 1185 (Ct. Int'l Trade 2016)........13

Issues and Decision Memorandum for the Final Affirmative Determination in the
  Less-Than-Fair-Value Investigation of Grain-Oriented Electrical Steel from
  the Czech Republic (Sept. 22, 2014), ref'd in 79 Fed. Reg. 58,324
  (Sept. 29, 2014)......................................................................................................12

NONCONFIDENTIAL

Issues and Decision Memorandum for the Final Determination in the
   Antidumping Duty Investigation of Steel Concrete Reinforcing Bars from
   Latvia (June 22, 2001), ref'd in 66 Fed. Reg. 33,530 (June 22, 2001) .............................23, 28

Issues and Decision Memorandum for the Final Determination of the
   Countervailing Duty Investigation of Twist Ties from the People's Republic
   of China (Feb. 16, 2021), ref'd in 86 Fed. Reg. 10,542 (Feb. 22, 2021) .................................29

Issues and Decision Memorandum for the 2001-2003 Administrative Review of
   the Antidumping Duty Order on Certain Polyethylene Terephthalate Film,
   Sheet and Strip from India: Final Results (Feb. 17, 2005), ref'd in
   70 Fed. Reg. 8,072 (Feb. 17, 2005) ..........................................................................................12

Issues and Decision Memorandum for the Final Results in the 2002/2003
   Administrative Review of Honey from the People's Republic of China
   (July 6, 2005), ref'd in 70 Fed. Reg. 38,872 (July 6, 2005)......................................................12

Issues and Decision Memorandum for the Final Results of the Antidumping Duty
   Administrative Review of Large Residential Washers from the Republic of
   Korea (Sept. 5, 2017), ref'd in 82 Fed. Reg. 42,788 (Sept. 12, 2017)....................................20

Issues and Decision Memorandum for the Final Results of Antidumping Duty
   Administrative Review of Corrosion-Resistant Steel Products from the
   Republic of Korea; 2016-2017 (Mar. 18, 2019), ref'd in 84 Fed. Reg. 10,784
   (Mar. 22, 2019) ..................................................................................................................... 21-22

Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel
   Wire Rod From Korea, 63 Fed. Reg. 40,404, 40,410 (Comment 2) (July 29,
   1998) ...........................................................................................................................................11

Stainless Steel Wire Rod from the Republic of Korea:
   Preliminary Results of Antidumping Duty Administrative Review,
   71 Fed. Reg. 59,739 (Oct. 11, 2006), aff'd, Stainless Steel Wire Rod from the
   Republic of Korea: Final Results of Antidumping Duty Administrative
   Review 72 Fed. Reg. 6,528 (Feb. 12, 2007) ..............................................................................11

**Miscellaneous**

Antidumping Duties; Countervailing Duties,
   62 Fed. Reg. 27,296 (May 19, 1997) (final rule) ("Preamble").......................................4, 5, 21

NONCONFIDENTIAL

### DEFENDANT-INTERVENORS' RESPONSE TO PLAINTIFFS' COMMENTS ON COMMERCE'S REMAND REDETERMINATION

Defendant-Intervenors Advanced Extrusion, Inc., Ex-Tech Plastics, Inc., and Multi-Plastics Extrusions, Inc. submit this response to Comments on the Department of Commerce's ("Commerce") Remand Redetermination by Plaintiffs OCTAL Inc. and OCTAL SAOC-FSZ (collectively, "OCTAL") on September 4, 2021 (ECF No. 54) (hereinafter, "OCTAL Comments").

### INTRODUCTION AND SUMMARY OF ARGUMENT

"Barney, you have just asked me six very important questions: who, what, where, when, how and why. That's what every news story should answer." *Teacher's Pet* (Seaton, G. 1958).

The record in this case is complex, but it can be understood clearly when considering the following scenario:  A new car buyer goes to a car dealership and is told by the salesperson that the price of the car is $20,000.  The prospective buyer has a car to trade in with a market value of $5,000.  When the prospective buyer asks for a reduction in price of the new car, the salesperson says, "I can't discount below $20,000, but let me check with the folks who handle trade-ins." After checking, the salesperson offers the prospective buyer $10,000 on the trade in.  Of course, while the nominal price of the new car remains at $20,000, by offering more than the market value on the trade in, the salesperson lowered the effective price of the new car to $15,000.

This scenario is similar to the fact pattern contained in the record of this case.  And, while OCTAL's failure to be forthcoming to Commerce about the facts caused some delay for the agency in reaching conclusions, like a good investigative journalist, the Commerce investigators were able to discern answers to certain key questions.  For example, **how** was OCTAL able to sell large volumes of PET sheet to Customer A when the prices reported to Commerce [

] than other pricing in the marketplace during the period of investigation (**when**)?  **Why** was this customer willing to accept [                ] prices in a competitive marketplace?  **Who** was essential to make the transaction commercially feasible and **what** mechanism was used to facilitate the scheme, which initially defied detection by Commerce, but was later understood.

Ultimately, Commerce surmised that OCTAL was reporting [        ] prices to the agency because it was not transparent that its affiliate, OCTAL Extrusion, in Cincinnati, Ohio (**where**) was effectively [                    ] Customer A by buying PET flake from that customer at non-market prices.  These non-market PET flake prices were similar to overpaying for the used car in the example above, as both effectively [                ] the customer.  While in the car example, the relationship between the three parties – sales person, trade-in appraiser, and customer – is more obvious, in this case the relationship between the parties – their close supplier relationship – took some digging by the agency to piece together.  But dig it did, and Commerce correctly concluded that the carefully orchestrated scheme reflected in the documents of record had prevented the agency from calculating accurate dumping margins.

## **ARGUMENT**

### I.    **COMMERCE'S REMAND RESULTS WARRANT THE COURT'S APPROVAL**

#### A.    **The Remand Results Comply with the Court's Remand Order**

In its voluntary remand request, Commerce explained that it "properly examined the potential affiliation between the respondent exporter and its customer on the basis of the close supplier arrangement."   Defendant's Motion for Voluntary Remand at 5 (ECF No. 27). Commerce did not, however, "provide an opportunity to comment on its post-preliminary findings related to the issue of affiliation, which prevented it from considering interested parties' arguments," necessitating a remand.  <u>Id.</u>  Accordingly, the Court ordered Commerce to "allow

NONCONFIDENTIAL

interested parties to comment, consider interested parties' arguments on the issue of affiliation, and, if appropriate, to reconsider its finding of affiliation and resulting dumping calculations." See Voluntary Remand Order at 1 (ECF No. 36).

Commerce's remand redetermination fully complies with the Court's instructions. See Final Results of Redetermination, dated August 2, 2021 ("Remand Results") (PRR 13)[1] (ECF No. 42); see also Husteel Co. v. United States, 494 F. Supp. 3d 1287, 1291 (Ct. Int'l Trade 2021) (the court reviews remand redeterminations for compliance with the court's order and under the substantial evidence standard). During the administrative proceeding, parties provided comments and rebuttal. See Remand Results at 2-3. Commerce considered those arguments (see id. at 6-40) and continued to conclude as it did in the final determination that, based on the investigation record and applicable law, OCTAL and its customer are affiliated through a close supplier relationship (id. at 34). Thus, it was not necessary to recalculate a different dumping margin for OCTAL. Id. at 35, 40-41. Commerce's conclusion and use of the methodology from the final determination is consistent with the Court's order and the law, and is supported by the record. See infra sections I.B., III.

**B.     The Remand Results Are Supported by Substantial Evidence and Lawful**

**1.     Commerce Properly Applied the Legal Standard for Affiliation**

While alleging that Commerce "ignored statutory and regulatory limitations on finding affiliation," OCTAL misses critical elements of the legal standard. OCTAL Comments at 6. First, OCTAL misinterprets the statute to "require{}" that Commerce find "either a legal basis or

---

[1]     Documents are cited by their confidential and/or public record number in the investigation administrative record index ("(CR)" and "(PR)") or in the remand administrative record index ("(CRR)" and "(PRR)"), filed with the Court on November 12, 2020 (ECF No. 17) and August 11, 2021 (ECF No. 43), respectively.

some other concrete basis" of control, and to identify "exactly what 'restraint or direction' is occurring." Id. at 6-7. The statute does not impose such a requirement. "Control" exists "if the person is legally or operationally *in a position* to exercise restraint or direction over the other person." 19 U.S.C. § 1677(33) (emphasis added). Neither legal control nor evidence of actual control are required for a finding of affiliation. Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,297-98 (May 19, 1997) (final rule) ("Preamble") (the proper focus is "on the ability to exercise 'control' rather than the actuality of control over specific decisions").

Second, OCTAL ignores that the ability to restrain or direct can manifest in the significance of the relationship to one or both parties. See OCTAL Comments at 7. In examining restraint or direction in a close supplier relationship, Commerce looks to whether "the supplier *or* buyer have become reliant on the other." Statement of Administrative Action ("SAA"), H.R. 5110, H.R. Doc. No. 316, Vol. 1, 103d Cong., 2d Sess., at 838 (1994), reprinted in 1994 U.S.C.C.A.N. 4175 (emphasis added); see also Remand Results at 4. Another way to describe the question in this step is whether "'the relationship is significant and could not be easily replaced.'" Tension Steel Indus. Co. v. United States, 179 F. Supp. 3d 1185, 1198 (Ct. Int'l Trade 2016) ("Tension Steel") (quoting TIJID, Inc. v. United States, 366 F. Supp. 2d 1286, 1299 (Ct. Int'l Trade 2005)). This analysis is heavily fact-specific. See Preamble, 62 Fed. Reg. at 27,298. The facts of the case here, as discussed further below, showed reliance between OCTAL and its customer and exhibited a very significant relationship. Thus, this factor was important to Commerce's decision despite OCTAL's failure to acknowledge it.

Further, while OCTAL is correct that Commerce will decline to find affiliation when the relationship does not have "the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product," OCTAL ignores another important

rule.  See OCTAL Comments at 7 (citing 19 C.F.R. § 351.102(b)(3)); see also Remand Results at 4.  Specifically, where Commerce's two-step analysis results in a finding of potential control, the burden is on the respondent to demonstrate that the relationship cannot affect the subject merchandise (such as its price).  Preamble, 62 Fed. Reg. at 27,298.  OCTAL did not meet that burden during Commerce's investigation, despite multiple opportunities.  Thus, Commerce's Remand Results are properly rooted in a record demonstrating that the close relationship between OCTAL and its customer, in fact, had the significant potential to impact U.S. price.

> ### 2.  Commerce Explained How the Record *as a Whole* Supports Affiliation

OCTAL's chief complaint is that Commerce failed to conduct an "assessment of the record evidence as a whole" in determining whether a close supplier relationship exists.  OCTAL Comments at 8, 11 (extoling the importance of considering "the totality of the circumstances").  According to OCTAL, Commerce's analysis did not show how "any of these facts actually support the key legal conclusion that OCTAL actually 'controls' or has the potential to control the customer," or how "the facts at issue establish that OCTAL's relationship with Customer A has any 'potential to impact' the price that Customer A pays OCTAL for PET sheet."  Id. at 8-9.  A review of Commerce's thorough Remand Results renders these claims meritless.

First, Commerce analyzed the interplay among *all* aspects of the record regarding the nature of the relationship between OCTAL and its customer, explaining, "Certain elements {of the supply agreement} may be sufficient, on their own, to show affiliation between the parties.  However, *when taken together*, these considerations even more strongly demonstrate OCTAL's control of Customer A through this affiliation."  Remand Results at 26 (emphasis added).

Commerce further detailed its comprehensive view of the entire body of evidence in the

accompanying remand memorandum:

> When taken as a whole, these {four contractual} provisions show a
> high degree of control and influence on [          ]. After all, the
> source of [                              ], as is [
>                                        ]. The price of the input is [
>          ], as is  the  price  [
>      ]. [
>                              ]. Moreover, [          ] ability to obtain
> independent external financing for certain activities is restricted. If
> [
>                  ] the right to the financing, which would supplement the
> non-commercial financing agreement already in place. With the
> [                                                    ] fixed by the
> contract, [          ] own business decisions both limited and
> financed by the contract, and [          ] production, prices, and
> costs  all  tied  to  the  contract,  [          ]  had  limited  control
> independent from OCTAL.

Commerce's  Business  Proprietary  Memorandum  Accompanying  the  Final  Results  of

Redetermination Pursuant to Court Order (Aug. 4, 2021) ("Remand Memo") at 18 (Note 21)

(CRR  8,  PRR  14).    Commerce  conducted  precisely  the  type  of  totality-of-the-evidence

examination that the law requires.  OCTAL's criticism is simply not responsive to the Remand

Results.[2]

Second, and contrary to OCTAL's claim, Commerce explained the precise mechanism

that allowed "PET flake potentially to affect the price of PET sheet being sold by OCTAL to its

U.S. customer."  OCTAL Comments at 23.  The contract set both the PET sheet and PET flake

sales terms *and* OCTAL was unable to demonstrate that a non-market [

          ] in the PET flake price, thereby potentially [                    ] the reported PET sheet

---

[2]    Ironically, it is OCTAL that would have the Court view each key fact of record *in isolation*.
See OCTAL Comments at 8-9, 10-31.

sales price.  Remand Results at 30-31 ("OCTAL and Customer A were able to factor the pricing of, and the profit from, Customer A's by-product sales *into the overall arrangement between the parties*, including in the pricing of PET sheet.  This is particularly critical here, because we note that there are lingering questions about the true 'market price' for PET flake used in the contract." (emphasis added)).  OCTAL effectively confirms Commerce's analysis in a stunning admission that "a seller of PET sheet *takes into account its overall relationship* with a customer when setting the price" for both PET sheet and PET flake.  OCTAL Comments at 20-21 (emphasis added).

In the Remand Memo, Commerce provided an even more granular explanation of how the terms of the contract on their face directly impacted costs, production, and price for both OCTAL and its customer.

*For OCTAL:*

- "Because [      ] is such a large customer for OCTAL, this contract has an effect on OCTAL's production and cost of subject merchandise as well as the price OCTAL receives for the merchandise."  Remand Memo at 14 (Note 15) (CRR 8; PRR 14).

- "This multiparty interdependence {with OCTAL and OCTAL Extrusion [                                ]} is also tied to OCTAL's production and costs. . . . OCTAL Extrusion knows how much PET flake it receives from [      ].  As explained above, when providing financing for [
                                                                    ].
  Thus, OCTAL Extrusion's PET flake [
                            ]."  Id. at 15 (Note 16).

- ". . . OCTAL and OCTAL Extrusion control the amount they [
                                              ].  The sum total of this relationship, with OCTAL companies involved at [
                      ] can, therefore, affect OCTAL's subject merchandise production through economies of scale.  ***This tri-company arrangement effectively mimics the vertically integrated structure of competitor companies in this industry*.**"  Id. at 16 (Note 16) (emphasis added).

NONCONFIDENTIAL

*For the customer:*

- "Similarly, [          ] own production is affected by the contract, because the volume of PET sheet received, and the price [          ] pays, is [                ] by the contract; [         ] is restrained from [

                                                                         ] and it is directed to [

                                                ]." Id. at 14-15 (Note 15).

Commerce also detailed how the circular relationship among OCTAL, OCTAL Extrusion, and the customer could have influenced subject merchandise price:

- "As for the effect this provision has on the production, pricing, and cost of the PET sheet, we find that such a relationship is demonstrated by the unique nature of this contract, in which both the price of the PET sheet and the price of the PET flake is established. A single document, which address both sales of subject merchandise and downstream inputs, governs the relationships between OCTAL and [          ] and [          ] and OCTAL Extrusion. Thus, [          ] input price and its by-product price are [                                                               ].
And, since the companies, i.e., OCTAL and OCTAL Extrusion, on [
                                                    ] are affiliated, [          *] in essence has a circular relationship with the OCTAL companies because it is required to obtain its inputs and sell some of its outputs to OCTAL and its affiliate. OCTAL can set a price for the PET sheet while knowing, in advance, what price it will have to pay to get the by-product back, thus informing its pricing decisions for both products*." Id. at 15 (Note 16) (emphasis added).

- "The contract [                                    ] of its PET flake to OCTAL Extrusion at a [                              ], and there are significant questions regarding whether this price is a market-based price for post-industrial, proprietary DPET flake. *Because OCTAL, [          ], and OCTAL Extrusion are tied together through the contract, the [                              ] of PET sheet scrap {sic} PET flake are also fused together*." Id. at 16 (Note 16) (emphasis added).

Thus, Commerce correctly concluded, as OCTAL concedes, that "the relationship as a whole" between OCTAL and its customer is highly relevant. OCTAL Comments at 21. The [          ] circular relationship "fused together" subject merchandise and PET flake [          ] creating the potential for the non-market price of PET flake to [          ] the price of subject merchandise and making the price to the customer *as reported to Commerce* unreliable.

NONCONFIDENTIAL

3.    **OCTAL Has Not Identified Any Factual or Legal Error in the Remand Results**

OCTAL's main argument addresses the key aspects of the record on which Commerce relied in finding affiliation.  See OCTAL Comments at 10-31.  Commerce has evaluated the record as a whole, considered arguments presented by the parties, and exercised its expertise as fact-finder to reasonably reach and explain its conclusions.  Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States, 28 F. Supp. 3d 1317, 1349-50 (Ct. Int'l Trade 2014) (the court need only find that Commerce "reasonably exercised" its fact-finding expertise).  OCTAL offers the Court no new legal or factual basis for the assertion that Commerce's Remand Results are invalid.  Rather, OCTAL's challenge to Commerce's conclusions is nothing more than "an alternative view of the evidence."  Chemours Co. FC, LLC v. United States, 443 F. Supp. 3d 1315, 1327 (Ct. Int'l Trade 2020); see also Tianjin Wanhua Co. v. United States, 253 F. Supp. 3d 1318, 1328 (Ct. Int'l Trade 2017) (reiterating that the party challenging Commerce's decision must demonstrate that its preferred outcome is the "one and only reasonable" result based on the record) (citation omitted).  That OCTAL disagrees with the Remand Results does not prevent them from being supported by substantial evidence.  Mitsubishi Heavy Indus. Ltd. v. United States, 275 F.3d 1056, 1062 (Fed. Cir. 2001).

a.    **Exclusive Supply Agreement**

OCTAL claims that Commerce erred in focusing on the exclusive supply relationship between OCTAL and its customer, which "is not enough" for affiliation.  OCTAL Comments at 10-11.  OCTAL also asserts that Commerce ignored the relevance of "alternative sources of supply."  Id. at 11-13.  Both arguments lack support.

NONCONFIDENTIAL

As to the sufficiency of an exclusive supply relationship to the analysis, OCTAL continues to rely on the same prior agency decisions that Commerce already distinguished as lacking evidence of exclusivity:

> In support of its position that exclusive supply agreements do not demonstrate affiliation, OCTAL cited a number of prior Commerce decisions. These decisions, however, are inapposite, because the relationships among the parties in those cases either did not involve exclusive supply agreements or there was evidence that exclusivity agreements were not honored. In contrast, here, there is an existing agreement in place and there is no evidence that the parties to the agreement did not honor it.

Remand Results at 26-27 (internal citations omitted); see also Remand Memo at 13-14 (Note 14) (CRR 8; PRR 14). OCTAL offers no retort and continues to assert a "basic principle" that is inapplicable to this case.

Effectively acknowledging that Commerce looked at "other factors" here, consistent with agency practice, OCTAL next claims that Commerce's analysis was flawed because it failed to consider "alternative sources of supply" – which, allegedly, make control impossible. OCTAL Comments at 11-14. Commerce did not ignore this factor. Commerce fully considered and rejected OCTAL's argument regarding alternative sources of supply because the record showed the customer did not have any meaningful sources of supply besides OCTAL. See Remand Results at 27. As Commerce explained,

> Here, there was an agreement in place, and the only exemption [                    ] was narrow (i.e., providing for exemptions where there are natural disasters), and no evidence that [        ] utilized the exemption. While OCTAL argues that there are numerous other PET sheet producers that [        ] could have purchased from, the [                                        ] outside of a [                    ].

Remand Memo at 14 (Note 14) (CRR 8; PRR 14).

OCTAL avers that if Commerce "had considered its record as a whole, Commerce would have realized there were numerous other suppliers of PET sheet, both domestic and foreign." OCTAL Comments at 12.  First, Commerce *did* acknowledge the existence of other PET sheet suppliers.  See Remand Memo at 13 (Note 13) (CRR 8; PRR 14).  Second, OCTAL is mistaken that the mere existence of other PET sheet suppliers is dispositive given other record evidence that OCTAL ignores, including the extremely limited circumstances under which the customer *may* have sourced from other suppliers during the period and the contract's [

               ] Id.

OCTAL is incorrect that "alternative supply is relevant even when not used."  OCTAL Comments at 13.  Commerce has previously found that an exclusive or predominant supply relationship that creates a significant level of dependence – and, conversely, control – supports a close supplier relationship, *particularly where other sources of supply are not available* whether due to the market or, as here, a contract.[3]  That other PET sheet suppliers exist in the market, or that PET sheet is "a highly substitutable product" that any party can buy or sell,[4] are irrelevant to whether the customer could actually access those other sources.  See id. at 13-14.  The contract imposed a [                                        ] acquiring PET sheet from [

---

[3]   See Petitioners' Administrative Comments on Affiliation Issue (May 14, 2021), at 18-19 (CRR 4; PRR 6) (citing Notice of Final Determination of Sales at Less Than Fair Value: Stainless Steel Wire Rod From Korea, 63 Fed. Reg. 40,404, 40,410 (Comment 2) (July 29, 1998); Stainless Steel Wire Rod from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review, 71 Fed. Reg. 59,739, 59,739-40 (Oct. 11, 2006), aff'd, Stainless Steel Wire Rod from the Republic of Korea: Final Results of Antidumping Duty Administrative Review, 72 Fed. Reg. 6,528 & n.1 (Feb. 12, 2007)).

[4]   OCTAL's characterization of PET sheet as "highly substitutable" contradicts its contention during the investigation that the price for PET flake sold by [      ] to OCTAL Extrusion was [               ] price due to its alleged superior quality.  See Petitioners' Administrative Comments at 27-28 (CRR 4; PRR 6).

] "except under the most extraordinary circumstances" that

manifested for only six weeks since [                                    ] Remand Memo at 1

(Note 1), 12, 13 (Note 13), 14 (Note 14) (CRR 8; PRR 14).

OCTAL's reliance on <u>Polyethylene Film, Sheet and Strip from India</u> as giving weight to

the "mere possibility" of alternative supply is misplaced. OCTAL Comments at 12. In that case,

there was "no record evidence indicating that Valencia could not purchase PET film from other

suppliers."[5] The record here involves different facts, including a [

] exception. None of the other cases

OCTAL cites (OCTAL Comments at 12) stand for the proposition that the mere existence of

other suppliers defeats affiliation. <u>See</u> <u>Grain-Oriented Electrical Steel from the Czech Republic</u>

(declining to find a close supplier relationship due to the lack of selling or supply agreement

between the two companies);[6] <u>Honey from China</u> (declining to find a close supplier relationship

where the "exclusive dealing agreement" was not strictly honored or enforced and the U.S.

distributor purchased subject merchandise from many suppliers);[7] <u>Certain Oil Country Tubular</u>

---

[5]    <u>Issues and Decision Memorandum for the 2001-2003 Administrative Review of the</u>
<u>Antidumping Duty Order on Certain Polyethylene Terephthalate Film, Sheet and Strip from</u>
<u>India: Final Results</u> (Feb. 17, 2005), at 10 (Comment 1), <u>ref'd in</u> 70 Fed. Reg. 8,072 (Feb. 17,
2005).

[6]    <u>Issues and Decision Memorandum for the Final Affirmative Determination in the Less-</u>
<u>Than-Fair-Value Investigation of Grain-Oriented Electrical Steel from the Czech Republic</u> (Sept.
22, 2014), at 8 (Comment 1), <u>ref'd in</u> 79 Fed. Reg. 58,324 (Sept. 29, 2014).

[7]    <u>Issues and Decision Memorandum for the Final Results in the 2002/2003 Administrative</u>
<u>Review of Honey from the People's Republic of China</u> (July 6, 2005) ("<u>Honey 2002-2003 Final</u>
<u>Results IDM</u>"), at 59, 66 (Comment 11), <u>ref'd in</u> 70 Fed. Reg. 38,872 (July 6, 2005). Another
critical distinction between <u>Honey from China</u> and this case is that the supplier did *not* rely on
the U.S. distributor for at least 50 percent of its sales – a factor upheld as potentially
demonstrative of a close supplier relationship in <u>Mitsubishi Heavy Indus. v. United States</u>, 54 F.
Supp. 2d 1183, 1190-91 (Ct. Int'l Trade 1999). <u>See</u> <u>Honey 2002-2003 Final Results IDM</u> at 67
(Comment 1). Here, as Commerce observed, [         ] had been obtaining [     ] percent of its
(cont'd on next page)

NONCONFIDENTIAL

Goods from Taiwan (finding no affiliation because "Tension Steel could, and did, look to other unaffiliated suppliers of the input").[8]

OCTAL makes a number of other arguments in claiming that Commerce failed to "link" the exclusivity of the contract "to any possible distortions in the price paid to OCTAL for PET sheet." OCTAL Comments at 14. The premise of the overall claim is incorrect. Commerce never relied solely on the exclusive sales terms to find affiliation between OCTAL and its customer. On the contrary, Commerce *agreed* with OCTAL that an exclusive supply agreement alone is not necessarily sufficient to find affiliation, but that *many facts* of record here supported the finding:

> OCTAL also cited LDWP from Canada in support of its argument that a large percentage of, or even all, sales to one customer does not "by itself, constitute sufficient evidence to determine affiliation by virtue of a close relationship." ***We do not disagree with this characterization of Commerce's practice; however, in addition to considering the percentage of sales itself, we found several factors indicative of affiliation through a close supplier relationship in the current case***, which makes LDWP from Canada inapposite. Beyond the significant percentage (i.e., [    ] percent) of OCTAL's U.S. sales being made to [       ], the contract also requires [
>
>
> ].

---

PET sheet purchases from OCTAL, and [       ] accounted for [    ] percent of OCTAL's U.S. PET sheet sales during the POI. Remand Memo at 12, 13 (Note 13) (CRR 8; PRR 14).

[8]   Decision Memorandum for the Preliminary Determination in the Antidumping Duty Investigation of Certain Oil Country Tubular Goods from Taiwan (Feb. 14, 2014), at 11, ref'd in 79 Fed. Reg. 10,495 (Feb. 25, 2014), aff'd Issues and Decision Memorandum for the Final Determination in the Less than Fair Value Investigation of Certain Oil Country Tubular Goods from Taiwan (July 10, 2014), at Comment 1, ref'd in 79 Fed. Reg. 41,979 (July 18, 2014), aff'd, Tension Steel, 179 F. Supp. 3d at 1198.

Remand Memo at 14 (Note 14) (emphasis added) (CRR 8; PRR 14);[9] see also Remand Results at

25 (finding multiple aspects of the buyer-supplier relationship, "taken together, indicate a degree

of entanglement and control that warrants a finding of affiliation"), 26, 28, 34.

Similarly, OCTAL's assertion that the "market index" price established for PET sheet in

the supply agreement alone precludes affiliation is also incorrect because it fails to take into

account the rest of the record.  See OCTAL Comments at 14-16.  OCTAL ignores that the

customer was required to sell [      ] its PET flake to OCTAL's U.S. sister company, OCTAL

Extrusion, that the contract set sales terms for both PET sheet and PET flake, and that the record

lacked evidence that the PET flake price was a market price.  In contrast, Commerce did *not*

ignore such evidence:

> Importantly, the single sales contract sets the terms of sale for
> Customer A's sales of this by-product as well as for OCTAL's
> sales of PET sheet to Customer A; thus, OCTAL and Customer A
> were able to factor the pricing of, and the profit from, Customer
> A's by-product sales into the overall arrangement between the
> parties, including in the pricing of PET sheet. This is particularly
> critical here, because we note that there are lingering questions
> about the true "market price" for PET flake used in the contract.

Remand Results at 30; see also Remand Memo at 15 (Note 16) ("[      ] in essence has a

circular relationship with the OCTAL companies because it is required to obtain its inputs and

sell some of its outputs to OCTAL and its affiliate. OCTAL can set a price for the PET sheet

while knowing, in advance, what price it will have to pay to get the by-product back, thus

informing its pricing decisions for both products.") (CRR 8; PRR 14).

---

[9]     In its comments to the Court, OCTAL stubbornly relies on Large Diameter Welded Pipe from Canada for the same proposition, despite Commerce having thoroughly addressed the point. OCTAL Comments at 17-18 (citing Large Diameter Welded Pipe from Canada: Preliminary Determination, 83 Fed. Reg. 43,649 and accompanying Decision Memorandum at Comment 1).

NONCONFIDENTIAL

OCTAL reprises an earlier argument that "possible influence over the price is undermined by {Commerce's} recognition of mutual dependence," to no avail. OCTAL Comments at 16. OCTAL points to Commerce's recognition of the customer's large volume of purchases from OCTAL, theorizing that shared "leverage" had an "offsetting influence." <u>Id.</u> There is no legal support for OCTAL's position, nor does it cite any. The law does not require that parties in a close supplier relationship be interdependent for reliance to indicate control, nor does it *prohibit* a finding of control if reliance between the supplier and buyer goes both ways. <u>See</u> SAA at 838 (contemplating control in a close supplier relationship where "the supplier *or* buyer becomes reliant upon the other" (emphasis added)).

In sum, the record of entanglement here highlights the special relationship between OCTAL and its customer – the kind of relationship to which the close supplier affiliation provision of the statute was designed to apply. Indeed, for all the "bargaining leverage" OCTAL claims its customer had, the record shows that the customer ceded control over [

] in exchange for paying what OCTAL reported as [      ] prices than OCTAL's other U.S. customers who enjoyed no restrictions. <u>See</u> Remand Memo at 6 (Note 5), 18 (Note 21) (CRR 8; PRR 14); OCTAL Comments at Att. B at 52-53 (stating OCTAL's sales to [      ] were [            ] than sales to other customers). In fact, those concessions only make sense considering the actual [      ] prices the customer paid for PET sheet after accounting for OCTAL Extrusion's [            ] for PET flake.

### b.   The Customer's Sale of PET Flake to OCTAL Extrusion

OCTAL lodges two challenges to the way Commerce addressed the customer's required sale of [      ] its PET flake byproduct to OCTAL Extrusion according to the supply agreement.

NONCONFIDENTIAL

First, OCTAL argues that this element of the supply agreement is irrelevant to Commerce's affiliation analysis. OCTAL Comments at 18-21. Second, OCTAL suggests that the sale of PET flake cannot support affiliation because both the PET sheet and PET flake prices were benchmarked to the market index price for PET resin, a primary sheet input. Id. at 21-23. Neither argument has merit.

Regarding relevance, OCTAL's attempt to distance PET flake from the equation by painting OCTAL Extrusion as "a different company" defies the evidence. Id. at 20.   OCTAL Extrusion is [                                                        ] is a [                              ] and was [                        ] PET flake from [        ] to be able to conduct its operations during the period of investigation.[10]   See Petitioners' Administrative Comments at 5 n.3, 6, 16-17 (CRR 4; PRR 6).

OCTAL also willfully ignores that Commerce explained why PET flake is relevant. According to Commerce, the issue was whether the [        ] price for PET flake paid by one OCTAL company to the customer could potentially [              ] subject merchandise price charged to the customer by another:

> Importantly, the single sales contract sets the terms of sale for Customer A's sales of this by-product as well as for OCTAL's sales of PET sheet to Customer A; thus, OCTAL and Customer A were able to factor the pricing of, and the profit from, Customer A's by-product sales into the overall arrangement between the parties, including in the pricing of PET sheet. This is particularly critical here, because we note that there are lingering questions about the true "market price" for PET flake used in the contract.

Remand Results at 30.

---

[10]   OCTAL later argues that it provided [                    ] financing to its customer to promote the customer's sale of more PET flake to OCTAL Extrusion – further demonstrating the [              ] relationship between the two OCTAL companies.  See OCTAL Comments at 27.

Indeed, while OCTAL pretends that the supply agreement "say{s} nothing" about the relationship between PET sheet and PET flake (OCTAL Comments at 19), it ignores the overwhelming evidence of how closely – and circularly – they are related. This evidence includes that OCTAL, OCTAL Extrusion, and [       ] were [       ]; that the PET flake price was [

]; and that the exclusivity term of the supply agreement [

] See Petitioners' Administrative Rebuttal (May 21, 2021), at 12-13 (CRR 7; PRR 12). Thus, OCTAL's reference to prior decisions in which Commerce has declined to find affiliation "even where the finished product is then sold to an affiliate" misses not just the point, but the entire theme. OCTAL Comments at 19-20. Commerce did not rely on *just* the sale of PET flake in finding affiliation, but rather found this factor to be one among many pieces of evidence deeply tying OCTAL and its customer together. Indeed, this factor explains another factor, which otherwise might be puzzling: why the customer would accept PET sheet prices that were reportedly [       ] than those to OCTAL's other customers.

As to the second point of how the sale of PET flake to OCTAL Extrusion could have affected the price of PET sheet, OCTAL again mischaracterizes Commerce's findings. OCTAL Comments at 21-23. Commerce did not "question{} the use of a PET resin benchmark to set the price for PET sheet and PET flake." Id. at 22. Instead, Commerce *rejected* OCTAL's explanation that the PET flake price was benchmarked to a PET resin index because it lacked

record support.  Remand Results at 30-31; Remand Memo at 16 (Note 16) (CRR 8; PRR 14).[11]

Without record evidence that the PET flake price was an arm's-length market price, and given

record evidence that it was, in fact, [          ] the market, that [      ] price the customer

received for PET flake *had the potential* to affect [                    ] price the customer paid

for PET sheet.  See id.  The law on affiliation requires nothing more.  19 C.F.R. § 351.102(b)(3).

### c.   Restrictions on the Customer's Business Activities

OCTAL again repeats earlier submissions in insisting that the contract's restrictions on

the customer's business activities did not support affiliation because they "are completely normal

commercial terms" and [                    ] of other aspects of the supply agreement.  OCTAL

Comments at 23.  OCTAL also asserts that Commerce's "brief discussion" of the issue fails to

address how this factor influenced price.  Id. at 24.  OCTAL is wrong on both counts.

First, Commerce explained how the business restrictions at issue are [                    ]

other contractual terms:

> . . . this {[
>                                          ]} is a specific control of
> [        ] business activities.  It is one thing to [
>                                          ], but *restricting the
> company from becoming [*
>            *] is a step further*.  In practice, OCTAL has removed all
> options, both [              ], for [      ] to [
>        ] or [                  ] freely.  This is a very clear
> example of OCTAL's restraint and direction of [      ], as it
> explicitly cuts off [      ] own options for its business.

---

[11]   In its comments to the Court, OCTAL misconstrues the record in suggesting that it *always* asserted the PET flake price was based on the PET resin index.  OCTAL Comments at 22.  That is simply untrue.  In the course of the investigation, OCTAL asserted no fewer than four competing explanations for how the PET flake price was set.  See Petitioners' Administrative Comments at 24-28 (CRR 4; PRR 6).

NONCONFIDENTIAL

Remand Memo at 16 (Note 17) (emphasis added) (CRR 8; PRR 14).

Second, Commerce explained why such restrictions are unusual for this industry and, therefore, significant to its analysis:

> We note that the restriction in question is significant when considered in light of how the relevant industry operates. Both the petitioners and OCTAL agree that the vast majority of companies in the thermoforming industry are vertically integrated, yet Customer A is subject to restrictions as a result of its contract with OCTAL. Therefore, through this provision of the contract, OCTAL has restricted, directed, and controlled the internal business decisions of Customer A.

Remand Results at 32.  As Commerce observed, the restrictions contributed to [                    ] reliance on OCTAL and put the customer at a [

                                                    ] See Petitioners'

Administrative Comments at 15-16, 20-21 (CRR 4; PRR 6).[12]

Finally, contrary to OCTAL's claim, Commerce explained how this aspect of the relationship had the potential to influence the price, production, or cost of subject merchandise. See Remand Results at 32-22 ("These restrictions on Customer A's business activities have a significant impact on Customer A itself, and they also impact OCTAL's price, production, and cost of subject merchandise as Customer A represents a significant percentage of OCTAL's U.S. sales."); Remand Memo at 16 (Note 17) (CRR 8; PRR 14) (finding this factor "affects the overall price OCTAL charges for the subject merchandise in the United States and also affects OCTAL's production levels and production costs through the aforementioned economies of

---

[12] This again raises the question of why the customer agreed to these restrictions, atypical in the industry, in return for a reportedly [          ] price from OCTAL than OCTAL's price to other U.S. customers.  OCTAL glosses over this issue because the explanation is one OCTAL has been trying to obfuscate this entire time: the customer's actual PET sheet price was, in fact, [          ] given the [                    ] OCTAL Extrusion paid the customer for PET flake.

NONCONFIDENTIAL

scale"). Contrary to OCTAL's attempt to attribute these "dynamics" to "any new contract with a customer" (OCTAL Comments at 25), the atypical restrictions on the customer's business activities contributed to the unique nature of the buyer-supplier relationship that allowed for potential price manipulation.

**d.    Financing from OCTAL**

OCTAL raises several challenges to Commerce's reliance on the financing from OCTAL to the customer as a factor in its affiliation finding.   Commerce completely and properly addressed each of these claims in the Remand Results.

First, OCTAL again argues that the existence of collateral in a transaction defeats control, but the cases on which OCTAL relies provide no support.  See OCTAL Comments at 26-27. Large Residential Washers from Korea is distinguishable from the record here.  In that case, Commerce placed little weight on financing between the parties because (1) the lender "did not assume risk in extending credit," (2) there was no sales exclusivity between the buyer and suppliers, and (3) the supply agreements were short-term.[13]   In contrast, [

] supply agreement exists here.  See Remand Memo at 12 (Note 13) (CRR 8; PRR 14). Moreover, OCTAL [

]

See Remand Memo at 17 (Note 18) (CRR 8; PRR 14); Supplemental Sections A-C Questionnaire Response (Jan. 16, 2020) ("OCTAL SABCQR"), at 52-53 (CR 169; PR 159).

---

[13]    Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review of Large Residential Washers from the Republic of Korea (Sept. 5, 2017) ("Large Residential Washers"), at 14 (Comment 2), ref'd in 82 Fed. Reg. 42,788 (Sept. 12, 2017).

**NONCONFIDENTIAL**

Collateral is only useful in the case of default; it does not provide any [

]

Second, there is no basis for OCTAL's assertion that the financing here constituted a "normal commercial transaction." OCTAL Comments at 26. As Commerce explained:

> {W}hile the existence of collateral may indicate that the loan may have been properly collateralized, *other aspects of the financing, such as interest rate charged, must be also evaluated*. Even when a loan is secured with collateral, its other terms could differ from terms that a borrower such as [          ] could obtain in the market from a commercial bank.

Remand Memo at 17 (Note 19) (CRR 8; PRR 14) (emphasis added). Here, [

] is not a normal commercial transaction that could have been obtained from a commercial bank or any other PET sheet supplier. See id. at 17 (Note 18); OCTAL SABCQR at 52-53, Exh. SABC-2, para. 7 (CR 169; PR 159). In any event, Commerce has rejected the notion that lending "provided on terms consistent with commercial considerations is necessarily dispositive with respect to the issue of control." Preamble, 62 Fed. Reg. at 27,298. Nor did the fact that OCTAL financed [          ] make this transaction any more "normal." See OCTAL Comments at 26. There is no evidence on this record – nor does OCTAL cite to any – that a supplier's financing [                                    ] is common in the PET sheet industry, even if outsourcing arrangements are coming in other industries. See OCTAL Comments at 26 (citing CORE from Korea 2016/2017).[14]

---

[14] Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review of Corrosion-Resistant Steel Products from the Republic of Korea; 2016-

(cont'd on next page)

Third, OCTAL claims that the financing "fit into the overall structure of the business relationship" by supporting expansion of the parties' businesses  Id. at 27-28.  Yet, OCTAL ignores that the deal was structured to [          ] OCTAL.  OCTAL's financing [

          ]  Remand Memo at 17 (Notes 18, 20), 18 (Note 21) (CRR 8; PRR 14).[15]  Despite OCTAL's insistence that the customer "made its own decision about what to produce and how much to produc{e}" and that the loan "influence{ed} nothing" (OCTAL Comments at 29-30), the record demonstrates otherwise.  The non-commercial financing terms, the requirements placed on the customer, and the benefits of the transaction [                    ] substantiate OCTAL's ability to exercise restraint and direction over [      ]  See Remand Results at 33; Remand Memo at 17-18 (Notes 18-20) (CRR 8; PRR 14).

Fourth, OCTAL alleges that Commerce failed to tie the financing element to some impact on the price of PET sheet, but Commerce did exactly that.  See OCTAL Comments at 30; Remand Results at 34.  Commerce first observed that the exclusivity aspect of the contract affected the customer's price for PET sheet and its purchasing decisions and OCTAL's production and costs.  Remand Memo at 17 (Note 20) (CRR 8; PRR 14).  Commerce next explained that "OCTAL controlled [      ] by directing it to accept the [          ] arrangement" in order to obtain the non-commercial financing, a link that OCTAL admits.  Id. at

2017 (Mar. 18, 2019) ("CORE from Korea 2016/2017"), at 57 (Comment 11), ref'd in 84 Fed. Reg. 10,784 (Mar. 22, 2019).
[15]   Contrary to OCTAL's assertion, the [
          ] See OCTAL Comments at 29.

17-18 (Note 20); OCTAL Comments at 28.  The financing terms, in turn, magnified the control

over the customer and the same price- and production-related effects by [



] Remand Memo at 18 (Notes 20-21) (CRR 8; PRR 14).

Finally, as a general matter, OCTAL fails to recognize that no single aspect of the record

was dispositive in supporting Commerce's affiliation finding.  Remand Results at 33 (explaining

"there are other factors at play in this relationship beyond the mere existence of the loans

themselves," and "this case involves multiple indicia of control").  Thus, Commerce's discussion

of Rebar from Latvia,[16] which involved both an exclusive distribution agreement and a large line

of credit for production financing, was pertinent.  Id. at 33-34; Remand Memo at 17 (Note 19)

(finding the facts in Rebar from Latvia make it "[                                                    ]")

(CRR 8; PRR 14).  OCTAL's attempt to distinguish Rebar from Latvia by pointing to the lack of

"index pricing" in that case (OCTAL Comments at 27) misses the mark given what the record *as

a whole* here shows: that the circular relationship among the customer and the OCTAL

companies allowed OCTAL to tie together its pricing decisions for both PET sheet and PET

flake (*not* an indexed price) and potentially influence the *actual* subject merchandise price

experienced by the customer.  See Remand Memo at 15-16 (Note 16), 19 (Note 21) (CRR 8;

PRR 14).

---

[16]   Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Steel Concrete Reinforcing Bars from Latvia (June 22, 2001), ref'd in 66 Fed. Reg. 33,530 (June 22, 2001) ("Rebar from Latvia").

NONCONFIDENTIAL

## II.   COMMERCE'S CONDUCT OF THE REMAND PROCEEDING WAS LAWFUL

### A.   Commerce Did Not Abuse Its Discretion in Rejecting Unsolicited Information

Commerce did not abuse its discretion in rejecting the untimely declarations OCTAL proffered during the administrative remand proceeding. See OCTAL Comments at 2-5. At the outset, Commerce maintains discretion whether to reopen the record on remand. Essar Steel Ltd. v. United States, 678 F.3d 1268, 1278 (Fed. Cir. 2012). Commerce declined to reopen the record in this case, making OCTAL's new factual information unsolicited and untimely. See Remand Results at 40; Rejection of OCTAL Submissions (May 18, 2021) (PRR 7). Commerce must base its decision on the record before it. See, e.g., Hyundai Steel Co. v. United States, 319 F. Supp. 3d 1327, 1342 n.13 (Ct. Int'l Trade 2018) (citation omitted). Moreover, the Court's review of remand results "only extends to the same world of materials that Commerce reviewed." Canadian Solar Int'l v. United States, 399 F. Supp. 3d 1379, 1383 (Ct. Int'l Trade 2019) (citing 19 U.S.C. §§ 1516a(b)(1)(B)(i), (b)(2)(A)). Here, Commerce's finding of affiliation based on a close supplier relationship between OCTAL and its customer was supported by substantial evidence in the existing investigation record, and the Remand Results should be sustained on that basis. See supra section I.

While it is correct to say that the Court reviews Commerce's decision to reject unsolicited factual information for abuse of discretion,[17] OCTAL's discussion of the factors the Court should consider does not take into account – let alone mention – the paramount importance of finality after the record has closed. See OCTAL Comments at 4 (citing Grobest & I-Mei Indus.

---

[17]   "Abuse of discretion review, which generally parallels arbitrariness review, . . . is less demanding than substantial evidence review." Uniroyal Marine Exports Ltd. v. United States, 626 F. Supp. 2d 1312, 1316 (Ct. Int'l Trade 2009) (internal citations omitted).

(Vietnam) Co. v. United States, 815 F. Supp. 2d 1342, 1367 (Ct. Int'l Trade 2012) (involving untimely factual information submitted *before the preliminary results* in an administrative review – a very different stage than here)).[18]   In reviewing Commerce's rejection of unsolicited information in the unique *remand* context, the Court considers the interests in finality and the extent of any inaccuracies in the earlier proceedings.   CS Wind Vietnam Co., Ltd. v. United States, 219 F. Supp. 3d 1273, 1285 (Ct. Int'l Trade 2017) (noting also the court may consider any issues of fraud, which were relevant to that case).

The interests in finality strongly support Commerce's decision to reject OCTAL's unsolicited information, particularly given the "high quality" of the investigatory record. Remand Results at 40.   First, the documentation at issue was not necessary to correct any inaccuracies or material misstatements in the investigation record.   CS Wind Vietnam, 219 F. Supp. 3d at 1286 (holding Commerce did not abuse its discretion in rejecting unsolicited information given the "lack of evidence of 'material misstatements' . . . or significant inaccuracies, and recognizing the need for finality in administrative proceedings").   To the contrary, OCTAL states that the declarations provided "additional details and context" about OCTAL's relationship with its customer.   OCTAL Comments at 4-5.   Statements by interested parties providing their interpretation of the supply agreement at issue – when Commerce relied on the plain, uncontested terms of the contract – do not constitute vital corrective information.[19]

---

[18]   Although ignored by OCTAL, the Court in Grobest explained its review for abuse of discretion balances "whether the interests of accuracy and fairness outweigh the burden placed on the Department *and the interest in finality*."  815 F. Supp. 2d at 1365 (emphasis added).

[19]   Similarly, there is no claim that the information submitted was required to fix a clerical mistake.  See Nakornthai Strip Mill Public Co. v. United States, 587 F. Supp. 2d 1303, 1312 n.7 (Ct. Int'l Trade 2008) ("While the court has occasionally required Commerce to examine newly-submitted information on remand . . . those cases involved the correction of a clerical mistake

(cont'd on next page)

See Guizhou Tyre Co. v. United States, 523 F. Supp. 3d 1312, 1345-45 (Ct. Int'l Trade 2021) (observing the Court has previously found Commerce abused its discretion in rejecting corrective information, but not untimely new information to fill perceived gaps in the record).

Second, there was no lack of opportunity to submit the information during the investigation. See Cultivos Miramonte SA v. United States, 7 F. Supp. 2d 989, 994 (Ct. Int'l Trade 1998) (holding Commerce acted within its discretion in rejecting new information given adequate opportunity to submit such information in the underlying review). OCTAL's focus on the time available *during the remand proceeding* is a red herring. OCTAL Comments at 5. In fact, OCTAL missed multiple opportunities to submit the information *during the investigation*. The issue of the special relationship between OCTAL and its customer was detailed by Petitioners in filings before (CR 216; PR 175) and after the preliminary determination (CR 244; PR 197), by Commerce in a post-preliminary supplemental questionnaire (PR 200), and in Petitioners' comments on OCTAL's questionnaire response (CR 251; PR 206). OCTAL, for its part, failed to present any of the "details and context" about the supply agreement during the investigation, despite the contract being central to Petitioners' submissions and Commerce's questions, and despite having had the opportunity to do so in its pre-preliminary rebuttal comments (CR 234; PR 180), a supplemental questionnaire response (CR 246; PR 204), and a subsequent "rebuttal" submission (containing 73 pages of untimely new factual information, including a declaration from Mr. Barenberg of OCTAL, which Commerce ultimately accepted) (CR 253; PR 213). The burden rested with OCTAL to create an adequate record during the investigation. Nan Ya Plastics Corp. v. United States, 810 F.3d 1333, 1337 (Fed. Cir. 2016). It

such that the court would otherwise be knowingly affirming a determination with errors.") (citations omitted).

failed to meet that burden.  Commerce's rejection of the new information, therefore, was not an abuse of discretion.

OCTAL may regret not having submitted the declarations at issue earlier in the investigation, but nothing compels Commerce to consider that information after the record has closed.  The court has previously affirmed Commerce's decision to decline new information on remand where, like here, its decision was supported by substantial evidence based on the existing record.  Elkay Mfg. Co. v. United States, 180 F. Supp. 3d 1245, 1260 (Ct. Int'l Trade 2016).  The Court should sustain Commerce's decision here as well.

### B.  Commerce Properly Deferred Investigation into Customer A

OCTAL asserts that Commerce's Remand Results are unlawful because, upon finding OCTAL and its customer to be affiliated, it failed to continue the investigation by collecting "sales and expense data" from the customer and calculate a margin.  OCTAL Comments at 31-32. OCTAL's argument fails on several grounds.

As a threshold matter, OCTAL failed to exhaust its administrative remedies because it did not request that Commerce take such action during the agency's remand proceeding.  As Commerce observed, "OCTAL does not argue in its comments that Commerce should have requested Customer A's downstream sales and cost data as part of this remand redetermination . . . ."  Remand Results at 35 (going on to explain the methodology applied in the absence of the customer's sales and cost data); see also generally OCTAL's Administrative Comments on Affiliation Issue (May 14, 2021) (CRR 9; PRR 5).[20]  It is well-settled that to exhaust remedies,

---

[20]    In its administrative remand rebuttal, OCTAL generally stated in its *conclusion* that Commerce "should recalculate OCTAL'S AD margin so as to include OCTAL'S U.S. sales to [        ]," which was consistent with its position that Commerce should not have found
(cont'd on next page)

NONCONFIDENTIAL

parties must raise all issues and arguments in briefing before the agency.  Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1388 (Fed. Cir. 2014); Dorbest Ltd. v. United States, 604 F.3d 1363, 1375 (Fed. Cir. 2010); Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990) (failure to raise a specific argument before Commerce precluded judicial review even if the argument was "simply another angle to an issue which it did raise before {Commerce}").  The exhaustion requirement applies equally to remand proceedings, as the court in POSCO v. United States ruled that "failure to raise an issue on remand precludes parties from raising that issue before the court." 335 F. Supp. 3d 1283, 1287-88 (Ct. Int'l Trade 2018) (citing Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375, 1383 (Fed. Cir. 2008)); see also ArcelorMittal USA LLC v. United States, 399 F. Supp. 3d 1271, 1282 (Ct. Int'l Trade 2019) (citing cases).[21]   OCTAL is wrong that Commerce provided "justifications for refusing to obtain" data from the customer on remand *because OCTAL never asked the agency to do that*.  OCTAL Comments at 33-37.  Because OCTAL's argument regarding reopening the record to collect the customer's data in the remand proceeding is raised for the first time before the Court, it does not satisfy the exhaustion requirement and is not entitled to judicial review.

Even if the Court were to consider OCTAL's argument, it is meritless.  Again, Commerce maintains discretion to reopen the record on remand.   Essar Steel, 678 F.3d at 1278.

---

affiliation.  OCTAL's Administrative Rebuttal (May 21, 2021), at 34 (CRR 6; PRR 11).  OCTAL also made a passing reference to the agency's decision to collect downstream sales information of an affiliated entity (during the investigation, *not* remand) in Rebar from Latvia, but did not assert any related argument.  See Remand Results at 35; OCTAL's Administrative Rebuttal at 20; Rebar from Latvia at Comment 1.

[21]   None of the several exceptions to the exhaustion requirement apply here.  See Corus Staal BV v. United States, 502 F.3d 1370, 1378 n.4, 1379 (Fed. Cir. 2007) (finding the "futility" exception inapplicable and the "pure legal question" exception waived when raised for the first time in appellant's reply brief).

Commerce was not obligated to initiate a new investigation into the customer after the record closed because Commerce had a complete investigation record on which to conduct its analysis, including to make its affiliation finding.  See section I.  That Commerce had to apply an alternative methodology in order to calculate OCTAL's margin is of no moment.  In fact, such a scenario is precisely why the statute expressly permits Commerce to use "facts otherwise available" to reach a final determination when "necessary information is not available on the record."  19 U.S.C. § 1677e(a)(1).  If Commerce was not permitted to make a final determination based on the record at the time of the statutory investigation deadline, investigations would continue indefinitely, in contravention of the law.  See 19 U.S.C. § 1673d(a)(1) (requiring antidumping investigations to be completed within 75 days of the preliminary determination).[22]

The court's decision in MacLean-Fogg provides no support for OCTAL's position.  See OCTAL Comments at 35-36.  In that case, Commerce was ordered to use the voluntary respondents' calculated subsidy rates to develop an "all others" rate given the non-participation of the mandatory respondents.  MacLean-Fogg Co. v. United States, 100 F. Supp. 3d 1349, 1354 (Ct. Int'l Trade 2015).  The petitioner took issue with Commerce's methodology, commenting on remand that Commerce should reopen the record to collect publicly ranged versions of the voluntary respondents' data in order to calculate the all others rate consistent with agency practice; Commerce had not enforced its own regulation to require public ranging from the

---

[22]  This is also why Commerce has adopted a practice of deferring aspects of a final determination until a later proceeding when it lacks sufficient time to investigate, which the court has affirmed.  See TMK IPSCO v. United States, 179 F. Supp. 3d 1328, 1336-38 (Ct. Int'l Trade 2016); Royal Thai Government v. United States, 341 F. Supp. 2d 1315, 1323 (Ct. Int'l Trade 2004); see also Issues and Decision Memorandum for the Final Determination of the Countervailing Duty Investigation of Twist Ties from the People's Republic of China (Feb. 16, 2021), at Comment 1 (deferring decision on currency undervaluation subsidy allegation to a later proceeding given "significant time constraints"), ref'd in 86 Fed. Reg. 10,542 (Feb. 22, 2021).

voluntary respondents during the original investigation.  Id. at 1354-55.  Although the court remanded the case again to Commerce on this point, there are two critical distinctions.  First, the court remanded the issue to Commerce "due to Commerce's own decision not to enforce its regulatory requirement" and because Commerce would have to "expend {} minimal effort . . . to correct the error."  Id. at 1362, 1363.  The opposite facts are present here.  Second, the court did not *require* Commerce to reopen the record, but remanded for further consideration of that as an option.  Id. at 1363.  In sum, OCTAL presents no support for its assertion that Commerce is required to conduct a new, extensive investigation long after the record has closed.

### III.  COMMERCE'S NEUTRAL FACTS AVAILABLE METHODOLOGY IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND THERE IS NO BASIS TO REOPEN THE RECORD

OCTAL incorporates by reference two arguments made in its initial Rule 56.2 brief related to Commerce's action – or lack thereof – taken as a result of its affirmative affiliation finding.  See OCTAL Comments at Att. B.  Neither argument provides a basis for the Court to reject Commerce's Remand Results.

OCTAL first argues "in the alternative" that the Court should order Commerce to reopen the record and continue its investigation even if the Court concludes that Commerce's determination – at this stage, the Remand Results – is supported by substantial evidence and in accordance with law.  See OCTAL Comments at 39 and Att. B. at 49, 54.  Importantly, this is a separate and distinct claim from OCTAL's allegation that Commerce erred in not investigating the customer on remand – which, as demonstrated above, the law did not require Commerce to do.  See supra section II.B.  With this argument, OCTAL is instead seeking the absurd and unlawful result that the Court again remand Commerce's Remand Results even if OCTAL loses this appeal.

NONCONFIDENTIAL

The alternative remedy OCTAL seeks is contrary to the statutory standard of review. The Court sustains any determination, finding or conclusion made by Commerce unless it is "'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" NSK Ltd. v. United States, 481 F.3d 1355, 1359 (Fed. Cir. 2007) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)); see also United States v. Eurodif S.A., 555 U.S. 305, 316 n.6 (2009). Further, the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even when the record contains evidence that detracts from the agency's conclusions. Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984). Commerce's Remand Results here are supported by substantial evidence and in accordance with the law on how the agency determines and treats affiliation, and must, therefore, be sustained by the Court pursuant to this standard. See supra section I.B. There is no legal authority for the Court to order Commerce to take further action if its decision is found to be lawful.

Moreover, because the Remand Results are lawful, there is no tension between the interests of finality and accuracy, which must often be balanced by the Court. NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208 (Fed. Cir. 1995) ("'Whenever a question concerning administrative, or judicial, reconsideration arises, two opposing policies immediately demand recognition: the desirability of finality, on the one hand, and the public interest in reaching what, ultimately, appears to be the right result on the other.'") (quoting Civil Aeronautics Bd. v. Delta Air Lines, Inc., 367 U.S. 316, 321 (1961)). Just as in Commerce's decision not to accept untimely new factual information proffered by OCTAL during the remand proceeding, the strong interests of finality in this case preclude reopening the record for further investigation where, as here, the agency's decision is sound. See supra section II.A.

-31-

OCTAL's second argument challenges Commerce's methodology of applying neutral facts available.  See OCTAL Comments at 37-38 and Att. B at 50-54.  Contrary to OCTAL's claim, Commerce's margin methodology was supported by substantial evidence.  See Remand Results at 37-40.  Commerce has broad discretion in selecting a methodology that supports the calculation of accurate dumping margins.  See Fujian Mach. & Equip. Imp. & Exp. Corp. v. United States, 178 F. Supp. 2d 1305, 1327 (Ct. Int'l Trade 2001).  Moreover, nearly [     ] of OCTAL's sales to the customer were reportedly [                    ] than sales to other customers.  OCTAL Comments at Att. B at 52-53.  Thus, it would have been unreasonable for Commerce to apply a dumping margin to just a portion of [         ] sales, when [            ] of those prices were claimed to be [                    ] the rest of the market and did not include the effective PET flake [         ] OCTAL's suggestion would not have resulted in the most accurate dumping margin.  Commerce also properly explained how its methodology reflects an element of the further manufactured merchandise analysis that Commerce would have conducted in the investigation had it had time.  Remand Results at 38-40.  Indeed, Commerce would have been justified in making an adverse facts available finding due to OCTAL's failure to be completely forthcoming.  Rather than consider itself lucky, OCTAL continues to press its unjustified claims.  They should be rejected; chutzpah is not substantial evidence.

NONCONFIDENTIAL

IV.     **CONCLUSION**

For the foregoing reasons, Defendant-Intervenors respectfully request that the Court sustain Commerce's Remand Results.

Respectfully submitted,

/s/ Brooke M. Ringel
PAUL C. ROSENTHAL
BROOKE M. RINGEL
DAVID C. SMITH, JR.
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, D.C.  20007
(202) 342-8400

Counsel to Defendant-Intervenors Advanced
Extrusion, Inc., Ex-Tech Plastics, Inc., and
Multi-Plastics Extrusions, Inc.

Dated:  November 22, 2021

**CERTIFICATE OF COMPLIANCE**
**WITH COURT OF INTERNATIONAL TRADE**
**STANDARD CHAMBERS PROCEDURES**

Pursuant to this Court's October 29, 2021 Order (ECF No. 58) expanding the word limit for any response comments on the U.S. Department of Commerce's August 2, 2021 <u>Results of Redetermination Pursuant to Court Remand</u> (ECF No. 42) to not exceed 12,000 words, counsel to Defendant-Intervenors Advanced Extrusion, Inc., Ex-Tech Plastics, Inc., and Multi-Plastics Extrusions, Inc. certifies that these response comments on remand contain 10,584 words, including headings, footnotes, and quotations. The word count certification is made in reliance on the word-count feature contained in Microsoft Word Office 2013.

Respectfully submitted,

<u>/s/ Brooke M. Ringel</u>
PAUL C. ROSENTHAL
BROOKE M. RINGEL
DAVID C. SMITH, JR.
KELLEY DRYE & WARREN LLP
3050 K Street, NW, Suite 400
Washington, DC 20007
(202)342-8400

Counsel to Defendant-Intervenors Advanced Extrusion, Inc., Ex-Tech Plastics, Inc., and Multi-Plastics Extrusions, Inc.

Dated: November 22, 2021