# UNITED STATES COURT OF INTERNATIONAL TRADE

*Before*: The Honorable Judge Timothy M. Reif

| | |
|---|---|
| OCTAL Inc. )<br>OCTAL SAOC-FSZ )<br> )<br> Plaintiffs, )<br> )<br> v. )<br> )<br> )<br>United States )<br> Defendant, )<br> )<br>Advanced Extrusion, Inc *et al* )<br> )<br> Defendant-Intervenors. )<br> ) | **Court No. 20-03697**<br><br>**NONCONFIDENTIAL**<br>*Confidential information is contained in brackets on pages 3, 6, 10, 19, and 22.*<br><br>*Such information has been redacted in the Public Version* |

## PLAINTIFF'S REPLY BRIEF
## CONCERNING REMAND REDETERMINATION

Daniel L. Porter
James P. Durling
James C. Beaty
Ana M. Amador

**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, NW
Washington, DC, 20006
*Counsel for Plaintiffs*

Dated: December 22, 2021

## **TABLE OF CONTENTS**

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................... 1

I.      COMMERCE IMPROPERLY FOUND AFFILIATION ....................................... 5

     A.      Nature of the Supply Relationship ................................................. 6

     B.      Purchase of PET Flake/Scape ........................................................ 8

     C.      Alleged Restriction on Production ............................................... 10

     D.      OCTAL's Financing ..................................................................... 10

II.     COMMERCE IMPROPERLY REFUSED TO REOPEN THE RECORD .......... 11

     A.      Commerce Improperly Refused to Consider Additional Facts About the
          Relationship Between OCTAL and Its Customer ....................................... 11

     B.      Commerce Improperly Refused to Gather the Necessary Information on
          Resale Prices to Calculate Accurate Dumping Margins ............................ 14

          1.      Commerce based its margin on incomplete and inaccurate
               information ....................................................................... 15

          2.      Defendant improperly tries to blame OCTAL for alleged gaps in the
               record .............................................................................. 16

          3.      Defendant cannot justify Commerce's failure to collect the necessary
               information ....................................................................... 18

          4.      Defendant cannot justify Commerce's failure through "facts
               available" ......................................................................... 21

          5.      Defendant-Intervenors' argument about exhaustion should be
               rejected ............................................................................ 23

III.    THE COURT SHOULD ORDER ANOTHER REMAND AND REQUIRE
       COMMERCE TO COLLECT THE INFORMATION NECESSARY TO
       DETERMINE THE PROPER BASIS FOR ANY AD ORDER HERE ................ 24

CONCLUSION ......................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.Ş. v. United States*,
    494 F. Supp. 3d 1365 (Ct. Int'l Trade 2021) ....................................................... 22

*Diamond Sawblades Mfrs. Coalition v. United States*,
    986 F.3d 1351 (Fed. Cir. 2021) ........................................................................... 25

*Essar Steel Ltd. v. United States*,
    678 F.3d 1268 (Fed. Cir. 2012) ................................................................... 20, 26

*General Housewares Corp. v. United States*,
    783 F. Supp. 1408  (Ct. Int'l Trade 1992) .......................................................... 26

*Itochu Bldg. Prods. v. United States*,
    733 F.3d 1140 (Fed. Cir. 2013) ........................................................................... 23

*MacLean-Fogg v. United States*,
    100 F. Supp. 3d 1349 (Ct. Int'l Trade 2015) ..................................................... 20

*Nuove Industrie Eletriche di Legnano S.p.A. v. United States*,
    739 F. Supp. 1567 (Ct. Int'l Trade 1990) .......................................................... 26

*Pro-Team Coil Nail Enter. v. United States*,
    419 F. Supp. 3d 1319 (Ct. Int'l Trade 2019) ..................................................... 22

*QVD Food Co. v. United States*,
    658 F.3d. 1318 (Fed. Cir. 2011) .......................................................................... 17

*Rebar Trade Action Coalition v. United States*,
    398 F. Supp. 3d 1359 (Ct. Int'l Trade 2019) ..................................................... 22

*Rhone Poulenc, Inc. v. United States*,
    899 F.2d 1185 (Fed. Cir. 1990) ........................................................................... 26

*Sigma Corp. v. United States*,
    841 F. Supp. 1255 (Ct. Int'l Trade 1993) .......................................................... 16

*Stanley Works (Langfang) Fastening Sys. v. United States*,
    964 F. Supp. 2d 1311 (Ct. Int'l Trade 2013) ..................................................... 22

*Tianjin Mach. Import & Export Corp. v. United States*,
    806 F. Supp. 1008 (Ct. Int'l Trade 1992) .......................................................... 17

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
    716 F.3d 1370 (Fed. Cir. 2013) ........................................................................... 26

**Statutes**

19 U.S.C. §1673b ....................................................................................................... 14

19 U.S.C. §1673d ...................................................................................... 14

19 U.S.C. §1677(33) .................................................................................... 5

19 U.S.C. §1677(35) ............................................................................. 14, 15

19 U.S.C. §1677a(e) ....................................................................... 20, 21, 22

**Regulations**

19 C.F.R. §351.102(b)(3) ............................................................................ 5

**Administrative Decisions**

*Polyethylene Terephthalate (PET) Sheet from Korea and Oman*,
     Inv. No. 731-TA-1455 and 1457, USITC Pub. 5111 (Final) (Sept. 2020) ................... 21

## INTRODUCTION AND SUMMARY OF ARGUMENT

The ultimate issue here is whether there should be any antidumping order at all. Plaintiffs have alleged and the Defendant has not disputed that had the Department of Commerce ("Commerce") simply used the OCTAL sales to its allegedly affiliated customer, the resulting margin would have been *de minimis* and no antidumping order would have been issued.  Commerce has been covering up this factual reality, initially by refusing to consider OCTAL's sales to this customer and now by refusing during the remand to gather the necessary information about the resales by that customer.  This Court has an obligation to ensure this antidumping order actually has a proper factual and legal basis.

Commerce improperly found affiliation.  As Plaintiffs showed in their February 16, 2021 brief on the original determination and their September 2, 2021 comments on the remand redetermination, the record did not support a finding of affiliation.  As shown below, Defendant and Defendant-Intervenors have not rehabilitated that fundamentally flawed determination.  They dance around but cannot avoid the reality that contract prices based on a market index are insulated from possible influence from either party. Commerce has not shown control, and has not shown any control that might affect the subject merchandise at issue here.

But the real problem here is that Commerce appears to have no interest in making a correct determination in accordance with the statute based on a complete factual basis. Commerce improperly refused to reopen the record to accept sworn declarations addressing the core issue of the agreement between OCTAL and its customer.  Those

facts would have supported what the record otherwise shows—that OCTAL and its customer had an arms-length relationship and the pricing reflected market pricing that was insulated from any influence by either party.  There was no proper basis to ignore the sales price from OCTAL to its customer for the subject PET sheet.

This improper finding of affiliation and decision to ignore more than half of the OCTAL U.S. sales created a conundrum for Commerce.  The statute only allows an affirmative determination if there is (1) a dumping margin more than 2 percent that (2) is based on the aggregate of all the U.S. sales and the margins from those U.S. sales.  At the end of the case, the entirety of the export sales by OCTAL showed a margin of less than 2 percent.  If affiliated sales to a U.S. customer had to be ignored, the statute and Commerce practice then required the use of downstream resale prices.  Since the time for submission of factual information had expired, however, Commerce could not collect those resale prices during the original investigation.  But the statute did not permit use of the special rule to simply to ignore these affiliated party export sales, since that only applies when the U.S. value exceeds substantially the export price.  Since the Defendant admits that rule does not apply, the U.S. sales could not be ignored under the special rule.

So Commerce tried to use "facts available" as a work around.  But there was no factual basis to find OCTAL non-cooperative and use adverse facts.  OCTAL had been fully cooperative and answered every question actually posed by Commerce.  Therefore, Commerce was limited to neutral facts available.  But any reasonable neutral facts would lead to the same *de minimis* margin of less than 2 percent.

**NONCONFIDENTIAL**

So Commerce ignored the statute yet again, relabeling the facts available used "neutral" when in fact they were adverse.  By excluding sales with [            ] individual margins and then assuming, without any factual basis, that those sales had the same margin as the remaining U.S. sales with higher margins Commerce made an adverse assumption.  As Commerce did not have the legal predicates for doing so, this approach was unlawful.

Commerce has an obligation to determine an accurate dumping margin.  This obligation is even more critical when the issue is whether the dumping margin is more than *de minimis* and can serve as a proper legal predicate for any antidumping order at all.  Commerce has been doing everything in its power to avoid this critical issue.  Whatever practical constraints may have limited Commerce in the original proceeding simply do not apply during a remand proceeding with no deadlines.  Yet, Commerce continues to defend its original approach rather than using the flexibility of the remand proceeding to obtain data to calculate an accurate margin.

Under the statute, a conclusion that the U.S. customer is affiliated has only one purpose—to identify the need to obtain downstream sales prices necessary to calculate the most accurate antidumping duty possible.  Yet instead of gathering the critically needed information during the remand, Commerce has stuck with its deeply flawed margin that ignored more than half of the U.S. sales and ignored the evidence showing that these excluded sales probably had [          ].  The record already shows that using OCTAL's prices to that customer would have led to a *de minimis* margin.  And Commerce had no factual basis to assume the resale prices from that customer would

have led to any margin higher than *de minimis*.  That Commerce may be afraid of what a proper factual record would show is no excuse.  If the dumping in the original investigation—based on all of the U.S. sales—was legally *de minimis*, the antidumping order should never have been issued. It needs to be terminated.

Accordingly, this statutory framework indicates this Court should remand back to Commerce under one of two scenarios.  Scenario 1 would be the Court's conclusion that Commerce was wrong to conclude that OCTAL and its customer are affiliated and therefore Commerce needs to recalculate the margin based on all of OCTAL's U.S. sales, including those to that customer.  Scenario 2 would be the Court's conclusion that Commerce was correct to conclude that OCTAL and its customer are affiliated and therefore Commerce must obtain that customer's sales and cost data to calculate an accurate dumping margin.

## I.   COMMERCE IMPROPERLY FOUND AFFILIATION

Contrary to Defendant's protestation, Commerce ignored the statutory and regulatory constraints on its action.  The statute requires finding that a person must be "legally or operationally in a position to exercise restraint or direction over the other person" to establish "control."  19 U.S.C. §1677(33).  This statutory language requires Commerce factual findings that are clear about the source of this leverage—either a legal basis or an evidentiary basis.  And the language also requires Commerce to identify exactly what "restraint or direction" is occurring.  The statute requires more than some generalized suspicion about possible influence.  The regulation adds a further limitation, clarifying that "the Secretary will not find that control exists" unless "the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product." 19 C.F.R. §351.102(b)(3).  Thus there must be actual evidence of "restraint or direction" that relates to certain specified elements of the dumping calculation.

Commerce did not even try to articulate any "legal" basis for control.  Instead, Commerce largely recycled the insufficient rationale from it's original determination about "operational" control in the remand determination, which Defendant now seeks to defend.  Commerce has failed to link it's conjectures about control to some evidence of impact on production, prices, or costs of the subject merchandise.  Commerce instead focuses on non-subject merchandise and factors that are irrelevant to the core issue—any possible influence on the price of subject merchandise from OCTAL to the allegedly affiliated customer.  Instead of using the remand process to gather or develop any new

NONCONFIDENTIAL

facts, Commerce stuck to the existing record that simply does not provide an adequate factual basis to find "control" within the meaning of the statute.

### A.      Nature of the Supply Relationship

Defendant's defense of Commerce's rationale based on the nature of the supply relationships fails.  First, defendants comments about the contract defining the supply relationship and setting the price merely restate the contents of any supply agreement. Def. Cmts. 7-8 (ECF No. 59).  Under Defendant's theory, any supply contract would establish the predicate of "control" that Commerce labors to establish in this case. Contracts define the mutual obligations of the parties for the period of the contract.  They do not establish control.

Second, Defendant misunderstands and mischaracterizes the pricing mechanism. Defendant, and Defendant-Intervenors, argue the pricing mechanism does not reflect market prices.  Def. Cmts. 7-8, Def.-Int. Cmts. 15 (ECF No. 61).  Yet the prices reflected the market when signed and those prices have changed only in response to changes in the price index.  Defendant further argues that PET resin is a "small input", Def. Cmts. 9, but this argument makes no factual sense.  PET melt is simply the liquid PET that has not yet been turned into either PET resin (small pellets) or extruded into PET sheet.  It is not a different product, but simply an earlier stage in the production process.  PET melt—a mixture of the key raw materials used for PET sheet—is the overwhelming majority of the total production cost.  The record shows that raw materials that go into PET melt are about [     ] percent of total manufacturing costs of PET sheet.  Section D, at 7. (C.R.

113).  Defendant admits as much, Def. Cmts. 9, but does seem to appreciate the

significance of this fact.  Under Defendant's silly theory, the changing price of ice cream

would not be a good proxy for setting the price of a milkshake simply because the milk

shake is a different product.  PET resin is an excellent proxy for determining when

changing raw materials prices warrant a change in the finished product price.  Moreover,

this is the best available index, since it is the only publicly available index that is closest

to the finished PET sheet.  In any event, it is the index the two parties to the contract

chose, and thus reflects what the two parties believed was the best available proxy for

price changes.

Third, Defendant cites various other features of the supply contract, Def. Cmts. 10,

but this argument tries to bootstrap from the other elements discussed in the sections

below.  Supply agreements often have other features.  As shown in the sections below,

these features do not establish control and do not strengthen Commerce's basis for

finding affiliation.  Indeed, Defendant itself notes there is no disagreement with

Plaintiff's statement that Commerce routinely finds exclusive supply contracts as a

normal business practice that does not in itself establish control.  Def. Cmts. 9-10.

Fourth, Defendant improperly dismisses the role of alternative supply.  Defendant

focuses narrowly on the fact that the use of alternative supply was limited during this

period.  Def. Cmts. 11-13.  But this argument misses the key points about the role of

alternative supply when setting the original price and the role of the price index going

forward.  Pl. Cmts. 12-14 (ECF No. 54).  Commerce looks at the exclusivity and price

index separately, when they were both important interrelated features of the contract.

Exclusivity did not constrain the customer's pricing because that pricing was being set independently by market trends through the price index.  Alternative supply and options mattered a great deal when the contract was signed.  Either party could have relied on a different source arrangement prior to signing.  After the agreement, however, alternative supply was not an issue because the pricing index in the contract automatically reflects the market changes.

Finally, we note that Defendant actually says little about the failure to link the contract to an effect on price or production.  Plaintiffs developed this point at length.  Pl. Cmts. 14-17.  The price level and production amounts change in reaction to changing market conditions.  The customer does not face any mandatory quantities and buys what it needs.  The customer pays the market price—as originally set when the contract was signed, and as changed to reflect changes in the key raw materials use to produce PET sheet.  By using a market index, the contract actually insulates both parties to the control from any undue "restraint or direction" as to pricing.

### B.     Purchase of PET Flake/Scape

Rather than focus on the issue under the statute and regulation—affiliation impacting subject merchandise—Commerce relies on the contract provisions addressing non-subject merchandise.  Defendant alleges that subject merchandise pricing will necessarily include a customer's belief about byproduct value and thus restraints on byproduct sales will impact the selling price, Def. Cmts. 14, but this argument fails.  Such indirect effects would occur whenever a customer transacts more than one product.  Such

an approach would essentially write out of the regulation the explicit focus on subject merchandise. That is what the regulation requires and what Defendant concedes. Def. Cmts. 4.

Defendant ignores that PET flake/scrap—non-subject merchandise—is from another company and another country. Pl. Cmts. 19. Instead of focusing on the possible effects on price of subject merchandise from Oman, Commerce has wandered to a price for non-subject merchandise being sold to a U.S. company in Ohio. It is not surprising that Defendant wants to ignore rather than address this flaw in its logic.

Defendant also stresses that both the subject merchandise and the non-subject merchandise were tied to the same market index for PET resin, Def. Cmts. 15, but continues to ignore the effect of indexing on the ability of the parties to affect the price. That changing raw material prices affect the price index, and thus the price for the subject PET sheet and the non-subject PET flake/scape, does not establish that the relationship between the parties affects the price. The price of both PET sheet and PET flake/scrap are outside the control of the parties—that is the whole point of the price index. The mechanism that Commerce and now Defendant argues establishes the linkage actually ensures the independence of the pricing from influence by either party to the contract. That is the point of this provision.

NONCONFIDENTIAL

### C.    Alleged Restriction on Production

Defendant's effort to rehabilitate Commerce's finding about restrictions on

production fails. First, Defendant disputes that such contract terms are normal

commercial terms, Def. Cmts. 17, but focuses on these terms in isolation rather than as

part of the overall contract.  That OCTAL and this customer had a different business

relationship than other smaller thermoformers does not mean the terms deviated from

standard business practice.

Second, Defendant repeats Commerce's argument about changing production

affecting price, Def. Cmts. 18, but does not address the key point that such an effect on

price would only affect the prices to <u>other customers</u>.  Pl. Cmts. 24.  Defendant has not

and cannot explain any effect on the price the alleged affiliated customer, since that price

is being set based on the market index and is thus insulated from any possible affects

from the alleged affiliation.

### D.    OCTAL's Financing

Finally, Defendant repeats in various forms arguments about [

                              ].  Def. Cmts. 18-20.  The financing in itself is not, however,

part of the dumping calculation, and need not be an arms-length loan.  Rather, the

financing must show control that affects the subject merchandise.  Plaintiffs specifically

rebutted Commerce's theory of control, Pl. Cmts. 28-30, and Defendant has nothing to

say about these specific points about the lack of any control that might affect subject

merchandise.

## II.     COMMERCE IMPROPERLY REFUSED TO REOPEN THE RECORD

Even though the Court's remand instruction made clear Commerce might need to reconsider its dumping calculations, Commerce refused to consider either (1) supplemental evidence about the alleged affiliation, or (2) any information about the resale prices by that customer.  Commerce thus decided it had to ignore more than half of the U.S. sales transaction, but then also decided not to bother collecting the necessary resale prices for those excluded U.S. sales.  Instead, Commerce made adverse assumptions to create an affirmative dumping determination without a proper legal or factual basis.

### A.     Commerce Improperly Refused to Consider Additional Facts About the Relationship Between OCTAL and Its Customer

Refusing to reopen the record in this case was wrong.  Whatever general discretion Commerce may have and whatever general need for finality might exist, Def. Cmts. 22-23, the refusal to consider the additional facts must be tested against the specific factual circumstances here.

First, the new factual information relates to an issue that developed very late in the original investigation.  The issue of a possible affiliation between OCTAL and its customer did not arise until the 11th hour after all the original deadlines passed.  Commerce has created a Catch-22 situation, where it does not raise an issue until it is too late for parties to address it. And then when challenged in court, Commerce uses its original deadlines as an excuse to continue ignoring important factual information during remand.  That is not the purpose of finality and that is an abuse of discretion.

Second, Defendant's efforts to justify Commerce's failure to investigate this issue, Def. Cmts. 22, mischaracterize the record.  OCTAL was not hiding this issue.  Defendant stresses the exhibit in which the contract was provided, but says nothing about the accompanying narrative OCTAL had provided that specifically discussed contract sales and identified this possible concern for Commerce.  Pl. Cmts. 34 (citing P.R. 108).  Moreover, Defendant ignores the rest of the record evidence.  Petitioners raised OCTAL's relationship with its customer as early as Petitioners pre-preliminary comments on February 5, 2020, more than a month before the preliminary determination and five months before the final determination.  Commerce gathered other information about this issue after the March 3, 2020 preliminary, but did not request any information on the customer's resale prices.  Pl. Br. 1, 48-49.  OCTAL was not hiding anything.

The issue of OCTAL's relationship with its customer was on the table early on.  That neither Commerce nor Petitioners raised possible affiliation until the last minute was not OCTAL's fault.  OCTAL provided the contract early in the investigation and the relationship was raised by Petitioners a month before the preliminary determination.  Commerce did nothing to address affiliation until it was too late to base its determination on facts from the record.  If Commerce had concerns about possible affiliation, Commerce should have raised the point earlier.  But Commerce did not.

Third, Defendant cites cases for the general need for finality, Def. Cmts. 23, but these cases all involve situations where the facts made clear that the parties had an opportunity to provide the necessary information.  They do not involve issues not raised until the last minute when the record was otherwise closed.  Commerce cannot ask a

question, receive an answer, and then decide it disagrees with that answer only after it too late for the part to respond with follow up and clarification.

Fourth, Defendant errs with respect to new information jurisprudence.  Defendant again says that OCTAL waited too long, Def. Cmts. 26, even though OCTAL submitted the information at the first opportunity.  OCTAL responded to Commerce's question about affiliation. Commerce never posed any additional questions.  Commerce accepted the customer as unaffiliated in the preliminary determination, Pl. Br. 16, 48 (citing P.R. 183),  even after Petitioner raised the relationship between OCTAL and its customer a month earlier.  Pl. Br. 15 (citing C.R. 216, P.R. 175).  Commerce altered course after briefing when it was too late for additional submissions.  The point of the cases cited by Plaintiff is that the courts recognize the need to police unreasonable decisions by Commerce to refuse to consider information that should have been considered.

Fifth, contrary to Defendant Intervenor's claims, Def.-Int. Cmts. 25-27, the record here was not high quality and did not reflect other opportunities to submit the information.  As noted above, Commerce changed its mind at the last minute.  No one had an opportunity to submit information.  Commerce decided to rely solely on the contract, and refused to consider sworn affidavits by the two signatories of that contract about its background and meaning.  Commerce had the authority to accept the affidavits.  Further, the parties addressed the content of new factual information during the remand, so Commerce's fear of delay is misplaced.  Commerce instead stubbornly decided that less is more and ignored the affidavits.

Finally, we urge the Court to step back and consider the implication of Defendant's theory.  Under Defendant's approach, a respondent would have to assume that every customer might be related and every supply contract could result in control.  A respondent would have to assume the worst, and prove the absence of affiliation for every customer.  Such an approach is absurd, and improperly shifts the burden regarding affiliation issues.

**B.   Commerce Improperly Refused to Gather the Necessary Information on Resale Prices to Calculate Accurate Dumping Margins**

Aside from the issue of affiliation, this case needs to resolve whether there is any factual or legal basis for this antidumping order to exist.  If the dumping margin is less that 2 percent, then it is legally *de minimis* and there is no legal basis for an affirmative determination by Commerce.  19 U.S.C. §1673b(b)(3); §1673d(a)(4).  That margin must also reflect the "aggregate" of the U.S. sales and those margins. 19 U.S.C.  §1677(35)(B).

Plaintiffs have alleged that had Commerce simply used the OCTAL U.S. sales to its customer, the resulting margin would have been *de minimis* and no antidumping order would have issued.  Complaint, count 2, para. 31; see also Pl. Br. 2. Defendant has never disputed this factual claim, which proceeds inexorably from Commerce's margin calculations.  Instead, Commerce has been covering up this factual reality, initially with its last minute decision to refuse to consider the OCTAL sales to this customer and now by refusing during the remand to gather the necessary information about the resales by that customer.

The current record supports the conclusion that resale prices would confirm a *de minimis* margin.  This Court must ensure this antidumping order actually has a proper factual and legal basis, and there is actually more than *de minimis* dumping to justify the existence of the order.

### 1.    Commerce based its margin on incomplete and inaccurate information

Plaintiffs have shown that Commerce's margin effectively ignored more than half of the U.S. sales transactions and made assumptions about those transaction that were inconsistent with the record evidence.  Pl. Br. 49-54 (citing C.R. 268; P.R. 240); Pl. Cmts. 37-38.  Defendant has not disputed the factual core of these arguments.  In response to Plaintiffs' argument about the importance of accurate dumping margins, Defendant asserts that Commerce calculated an accurate dumping margin, Def. Cmts. 29, but nothing could be further from reality.

Defendant argues that Commerce used OCTAL's prices and costs, Def. Cmts. 30, but this argument continues to ignore what Commerce was ignoring—appropriate data on more than half of the U.S. sales during the period of investigation.  A margin that ignores more than half of the relevant sales is not accurate, it is a fiction.

Notably, Defendant says nothing about Plaintiffs' argument, Pl. Cmts. 32-33, the statute requires the margin to be based on the "aggregate export prices" and "aggregate dumping margins."  19 U.S.C. §1677(35)(B).  The statute does not allow Commerce to exclude more than half of the U.S. sales, and base the dumping margin on something less than the "aggregate" prices and margins associated with those U.S. prices.  Commerce

should have used OCTAL's price to its customer.  But even if Commerce doubted those prices, the answer was to gather the necessary downstream resale prices by that customer. To the best of our knowledge, Commerce has never before purported to base a dumping margin on fewer than half of the U.S. sales in that period of time.  The scope of uncollected data in this case is enormous.

> **2.      Defendant improperly tries to blame OCTAL for alleged gaps in the record**

Recognizing that its argument about an accurate dumping margin strains credulity, Defendant tries to shift the blame to OCTAL for the inaccurate margin.  Defendant's argument that OCTAL should have anticipated Commerce's future affiliation finding and submitted downstream sales information, Def. Cmts. 30, fundamentally mischaracterizes the record here.  The burden is on Commerce to ask questions, and not on respondents to read Commerce's mind about what it needs.  *Sigma Corp. v. United States*, 841 F. Supp. 1255, 1267 (Ct. Int'l Trade 1993) ("Commerce cannot expect a respondent to be a mind-reader.").  It is not OCTAL's fault that Commerce simply ignored this issue until the eleventh hour when it was too late to ask for additional information.

It is true that respondents need to create an adequate record, Def. Cmts. 30, but that burden applies only with respect to the questions that Commerce has actually posed. Here, Commerce asked about affiliated parties, and OCTAL replied.  Commerce never challenged this response or followed up about any possible affiliation between OCTAL and it customer even though the issue was squarely before Commerce.  Defendant cites cases, but ignores this key point that the information needed to have been requested.

*QVD Food* involved a situation where Commerce had expressly "invited {the parties} to submit relevant factual information about valuing the factors of production." *QVD Food Co. v. United States*, 658 F.3d. 1318, 1324 (Fed. Cir. 2011).  The same was true in *Tianjin Mach. Import & Export Corp. v. United States*, 806 F. Supp. 1008, 1014 (Ct. Int'l Trade 1992) (discussing Commerce's request for information that was not met). Respondents only have a burden with respect to information that was actually requested.

Contrary to Defendant's argument, Def. Cmts. 30-31, OCTAL was not hiding this issue.  As discussed in Section II.A, Defendant stresses the exhibit in which the contract was provided, but says nothing about the accompanying narrative OCTAL had provided specifically discussing contract sales and flagging this possible concern for Commerce. Pl. Cmts. 34 (citing P.R. 108).  Moreover, Defendant ignores the rest of the record evidence showing that Commerce either was or should have been aware of this issue early on, more than a month before the preliminary determination.  Commerce gathered other information after the preliminary determination, but continue to proceed as if OCTAL's customer was unaffiliated. OCTAL responded to the questions posed by Commerce and did not hide anything.  That Commerce did not see possible affiliation until the last minute is not OCTAL's fault or a basis to apply the methodology Commerce did.

Indeed, the timing of how Commerce handled this issue is highly suspicious. Prior to the briefing stage, neither Commerce nor Petitioners alleged affiliation. Although Commerce asked OCTAL for many other types of burdensome information— including third country sales to a new market—Commerce asked for nothing about

customer resale prices.  It was only after the briefing—when OCTAL raised a clerical error that lowered the preliminary margin below 2 percent and made margin legally *de minimis*—that Commerce began to re-evaluate the OCTAL sales to the customer and ultimately decided to reject them.

### 3.   Defendant cannot justify Commerce's failure to collect the necessary information

After incorrectly trying to blame OCTAL, Defendant tries to blame circumstances beyond its control, asserting a lack of time to collect the necessary information. Def. Cmts. 32.  But this argument fails for two reasons.  First, Commerce created its own dilemma, by raising affiliation late.  The record supported finding the customer to be unaffiliated and OCTAL's prices to that customer could have been used.  Commerce routinely makes decisions in original investigations based on the record at that time and then says it will reconsider the issue in any administrative reviews.  Commerce chose instead to make a determination with a huge factual gap in the record.

Second, whatever timing issues might have existed during the original investigation no longer exist during this remand proceeding.  There are no deadlines in the remand process.  Indeed, Plaintiffs believed that Commerce sought a generous voluntary remand period precisely to gather the necessary information.  Instead, Commerce used its time to defend its use of an incomplete record and an inaccurate dumping margin.  The remand process is not so limited and grants Commerce the flexibility to calculate an accurate margin.

NONCONFIDENTIAL

Whatever its general practice, Commerce had a duty here to collect information and render a correct determination. The facts in this case are unique and compelling. The available information on the record—the Commerce preliminary margin, corrected for an undisputed clerical error—supported a finding of legally *de minimis* dumping. Commerce only avoided that conclusion by ignoring more than half of the U.S. sales. Commerce effectively excluded [                              ] and Commerce applied the average margin from the higher margin transactions to those transactions. Such an approach ignores the statutory mandate to determine the margins based on the aggregate of all the U.S. sales transactions. Essentially, Commerce considered only a subset of U.S. sales that gave the desired outcome of a positive dumping margin even though the record strongly supported a dumping margin below *de minimis*.

Moreover, the record as it currently stands supports the conclusion that resale prices from the allegedly affiliated customer would confirm the *de minimis* margin. Commerce assigned the average margin for sales to other customers to sales to [        ], even though: (1) the record showed that almost half of the transactions to these unaffiliated customers were not dumped at all; Pl. Br. 50; and (2) in general, [


        ]; Pl Br. 52-53. These facts strongly suggest that the margins on those sales to the allegedly affiliated customer—either the prices directly to that customers, or the resale prices through that customer—would reflect [                    ] margins than the group of sales upon which Commerce actually relied. The overall margin Commerce found was so close to *de minimis* that the available evidence suggests the downstream

sales would also have shown a *de minimis* margin and no order would have been imposed.

Defendant cites *Essar* for the general proposition of the need for finality, Def. Cmts. 33, but *Essar* involves a situation where the parties had a clear opportunity to provide the necessary facts. *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1275 (Fed. Cir. 2012) (discussing failure to address repeated explicit questions). *Essar* does not involve issues not raised by Commerce until the last minute when the record was otherwise closed. *McClean Fogg*, however, is instructive on this point and states that where Commerce causes a gap in the record it must be fixed. *MacLean-Fogg v. United States*, 100 F. Supp. 3d 1349, 1363 (Ct. Int'l Trade 2015).

Contrary to Defendant's argument, Def. Cmts. 34-35, 19 U.S.C. §1677a(e) does not properly apply here by analogy. Indeed, Defendant admits "that the special rule does not apply in this case," Def. Cmts. 35, because the factual predicate for invoking the rule did not exist on this factual record. It is highly doubtful that the U.S. value added in turning PET sheet into a clear plastic package will meet the "exceed substantially" standard of 19 U.S.C. §1677a(e).

Commerce did not bother even to collect this limited information during the remand. Commerce probably strongly suspects what Plaintiffs believe—that this standard cannot be met here and the special rule does not apply. The available evidence suggests it cannot apply. The public ITC reports at the preliminary and final both showed that PET sheet is typically more than half the value of plastic packaging, which means the U.S. value cannot possibly "exceed substantially." *Polyethylene Terephthalate (PET)*

*Sheet from Korea and Oman*, Inv. No. 731-TA-1455 and 1457, USITC Pub. 5111 (Final) at II-8  (Sept. 2020) ("PET sheet accounts for a large share of the main end-use"); USITC Pub. 4970 (Preliminary) at II-5 (Sept. 20219)(same).

Moreover, this special rule was designed for situations where the sales being excluded were a small part of the total universe of U.S. sales.  To the best of Plaintiffs' knowledge, the special rule has never been applied to ignore more than half of the U.S. sales transactions at issue.

In sum, it is shocking just how much Commerce has done to limit the record. Rather than collect information to obtain an accurate margin, Commerce instead has focused on finding excuses to avoid gathering the necessary information.

### 4.      Defendant cannot justify Commerce's failure through "facts available"

After conceding that 19 U.S.C. §1677a(e) does not apply, Defendant turns to "facts available" under  19 U.S.C. §1677e(a), Def. Cmts. 35-36, but this shift does not save the argument.  Defendant argues that because Commerce said the "facts available" were neutral then they must be neutral.  But the presence of more adverse "facts available" does not render the choice actually made "neutral."

Plaintiffs has argued based on specific record evidence that the "facts available" were adverse.  Pl Br. 49-54 (citing C.R. 262; P.R. 234); Pl. Cmts. 37-38.  Defendant has not responded to these arguments at all.  Def. Cmts. 35-36.  Defendant Intervenor also has little to say about these fact specific arguments.  Def.-Int. Cmts. 32.  Indeed,

Defendant-Intervenors stress [

          ], but that implied [                              ] that Commerce simply ignored.

The bottom line is that Commerce faced a preliminary margin calculation that when corrected for an undisputed clerical error would have been a legally *de minimis* margin below 2 percent.  So Commerce excluded those sales with [                    ], and recalculated the margin based on the fewer than half of U.S. sales that had higher margins.  This is not neutral.  It is adverse to find a dumping margin out of incomplete information and then impose an antidumping order that has no proper factual basis.

Proper application of 19 U.S.C. §1677a(e) does not allow such egregious behavior.  Commerce did not invoke its authority to make adverse inferences, and Defendant also make no such claims.  Absent some basis to apply adverse facts, the "facts otherwise available" under the statute must be neutral gap filling.  *See Borusan Mannesmann Boru Sanayi Ve Ticaret A.Ş. v. United States*, 494 F. Supp. 3d 1365, 1377 (Ct. Int'l Trade 2021) (finding that Commerce's method can result in "neutral facts" being adverse); *see also Pro-Team Coil Nail Enter. v. United States*, 419 F. Supp. 3d 1319, 1333 (Ct. Int'l Trade 2019) ("Commerce must do more than simply restate its findings ostensibly supporting the use of neutral facts available to support the use of adverse facts available."); *Rebar Trade Action Coalition v. United States*, 398 F. Supp. 3d 1359,  1371 n. 18 (Ct. Int'l Trade 2019) ("Commerce must identify how a respondent failed to cooperate to the best of its ability in providing the missing information."); *Stanley Works (Langfang) Fastening Sys. v. United States*, 964 F. Supp. 2d 1311, 1328 (Ct. Int'l Trade 2013) ("Commerce is authorized to fill in the information gaps using

facts otherwise available { } Commerce may rely on neutral (i.e., non-adverse) facts

otherwise available to fill these gaps").  It is not neutral gap filing to cherry pick positive

dumping margins, find some excuse to ignore contrary evidence, and then impose an

antidumping order without the necessary legal and factual predicates.

### 5. Defendant-Intervenors' argument about exhaustion should be rejected

Defendant-Intervenors argument about exhaustion must be rejected. Def. Int.

Cmts. 27-28.  Exhaustion does not apply here.  First, OCTAL raised the issue.  The need

to collect the downstream sales has been a prominent issue in this litigation.  Plaintiffs

raised this issue prominently in their opening brief, Pl Br. 4-5, 44-49.  Plaintiffs also

stressed this issue in their April 21, 2021 comments on the request for voluntary remand.

It is disingenuous for Commerce to assert and Defendant-Intervenors to argue that

Plaintiffs never made this argument in their comments on the remand.  Plaintiff has

squarely made this argument.  Second, not raising the issue in the remand comments—

when Commerce had already decided not to reopen the record and gather new

information, is not failing to exhaust.  Comments on the remand had to focus on what

Commerce had done.  Third, given Commerce's position in this litigation, it is quite clear

that Commerce has had no intention to reopen the record and gather the information.

Thus to the extent this Court considers exhaustion, the futility exception would apply.

*See, e.g.*, *Itochu Bldg. Prods. v. United States*, 733 F.3d 1140, 1146 (Fed. Cir. 2013)

(declining to find a failure to exhaust where Commerce was aware of and had already

rejected the litigants position).  As a result, Defendant Intervenors' exhaustion argument should be rejected.

## III.   THE COURT SHOULD ORDER ANOTHER REMAND AND REQUIRE COMMERCE TO COLLECT THE INFORMATION NECESSARY TO DETERMINE THE PROPER BASIS FOR ANY AD ORDER HERE

To the extent Commerce's affiliation finding is sustained, the proper course of action in this case is clear.  Commerce must collect sales information to calculate an accurate dumping margin.  Commerce has been avoiding this course of action because it wants to preserve the current antidumping order.

Defendant tries to justify inaction, claiming Commerce has calculated accurate margins,  Def. Cmts. 29, and that OCTAL did not report the necessary information, Def. Cmts. 30, but neither of these statements is correct.  The aggregate margin on the U.S. sales cannot be accurate when it ignores the actual prices for more half of those transactions.  And the necessary information was missing because Commerce never requested it.  Respondents do not routinely submit downstream resale information for customers, unless Commerce requests such information.  Commerce asked for the OCTAL sales to its customer, and that is what OCTAL supplied.  Defendant argues that OCTAL should have reported its customer as affiliated, Def. Cmts. 30, but OCTAL strongly disagrees with this characterization as it has been arguing in this appeal.  That Commerce took this view—at the last moment, when the record was closed to new information, does not establish that OCTAL could have read Commerce's mind months earlier and submitted information for which there was no request.  This is particularly

true given that Commerce rendered its preliminary determination without any conclusion of affiliation, even though Commerce had the exclusive supply agreement (which is the foundation of Commerce's affiliation decision) for months before the preliminary determination.

Defendant-Intervenors argue collecting the downstream sales now would be contrary to the standard of review, Def.-Int. Cmts. 31, but the Court taking this action is not contrary to the standard of review.  Defendant-Intervenors acknowledge, but then ignore, the important policy interest in reaching the "right result."  The goal is accurate margins, and accurate margins requires the information that Commerce now says it needs, but never bothered to request.

Defendant now reads the Court's remand instructions too narrowly. Defendant argues the remand was about only commenting on affiliation. Def. Cmts. 33.  But this is only part of the remand order.  The possible need for the downstream sales has been apparent from early in this litigation.  Accordingly, the Court included language specifically contemplating, if appropriate, Commerce reconsidering "its finding of affiliation and resulting dumping calculations."  Remand Order at para. 2 (ECF No. 36). Nothing in the Court's order narrowed the scope regarding how Commerce could proceed in the remand.

Whatever interest in finality might exist, the Federal Circuit has recognized the importance of accurate dumping  margins.  That overarching goal applies in every case as the Federal Circuit has repeatedly stressed. *Diamond Sawblades Mfrs. Coalition v. United States*, 986 F.3d 1351, 1365 (Fed. Cir. 2021) ("{a}n overriding purpose of

Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible.")(citing *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013) (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990))).  And that is why the Federal Circuit has expressly acknowledged an exception to finality when the agency decision is based on inaccurate data.  *Essar Steel Ltd.*, 678 F.3d. at 1277; *see also* Def. Cmts. 25.  That is the case here. The agency decision about the alleged dumping on a large volume of transactions with the allegedly affiliate party—without any real data on those transactions—is patently inaccurate.

The courts have also recognized that a legal challenge lowering a dumping margin below *de minimis* is an exception to the mootness doctrine that might otherwise require dismissing a court challenge.  "{W}here the validity of the order underlying that review, rather than the duty for dumping, is at issue, a party continues to be possessed of 'a legally cognizable interest in the outcome.'"  *General Housewares Corp. v. United States*, 783 F. Supp. 1408, 1410 (Ct. Int'l Trade 1992) (quoting *Nuove Industrie Eletriche di Legnano S.p.A. v. United States*, 739 F. Supp. 1567, 1569 (Ct. Int'l Trade 1990)).  The need to ensure an accurate margin that justifies the existence of an antidumping order is critical.

These basic principles of an accurate margin apply here with even more force, where the real issue is the proper existence of any antidumping order at all.  This dispute is not about the size of a margin or the amount of any antidumping liability—it is about

the proper existence of the antidumping order itself.  There is no situation in which the

principle of an accurate dumping is more important.

## CONCLUSION

Commerce has an obligation to make an accurate determination of dumping, particularly when that finding determines whether there should be any antidumping at all. But in this case, Commerce has manipulated the factual record to hide the accurate answer to this question.  During the original investigation, Commerce ignored the issue of affiliation until it was too late for OCTAL to provide the necessary information.  And now, Defendant argues Commerce has no duty during the remand proceedings to collect the information necessary for an accurate margin.  This cannot be correct.  It cannot be the law that Commerce can ignore actual sales data for more than half of the U.S. sales, and then use the margin for the remaining minority of U.S. sales to impose a dumping order that may have no proper factual or legal basis.  We urge the Court to remand to Commerce with instructions using actual data for the sales to this customer to determine an accurate dumping margin.

Respectfully submitted

/s/ Daniel L. Porter

Daniel L. Porter
James P. Durling
James C. Beaty
Ana M. Amador

**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, NW
Washington, DC, 20006
*Counsel for Plaintiffs*

## <u>Word Count Certificate of Compliance</u>

This brief has been prepared utilizing Microsoft Word 2010 using a proportionally spaced typeface 13-point Times New Roman font.

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in the Chambers Procedures. Specifically, excluding those exempted portions of the brief as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains 6,952 words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

<u>/s/ Daniel L. Porter</u>

Daniel L. Porter
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, NW
Washington, D.C., 20006
Counsel for *Plaintiffs*

Dated: December 22, 2021